1   MARIA K. PUM (State Bar No. 120987)
    KRISTEN E. CAVERLY (State Bar No. 175070)
2   HENDERSON & CAVERLY LLP
    P.O. Box 9144 (all U.S. Mail)
3   16236 San Dieguito Road, Suite 4-13
    Rancho Santa Fe, CA 92067-9144
4   Telephone:     (858) 756-6342
    Facsimile:     (858) 756-4732
5   Email:  mpum@hcesq.com

6   Attorneys for Plaintiff
    McKESSON CORPORATION
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  McKESSON CORPORATION, a Delaware          Case No. 4:07-cv-05715 WDB
    corporation,

12                           Plaintiff,        **NOTICE OF MOTION;**
            v.
13                                             **MOTION FOR SUMMARY JUDGMENT
                                               OR, IN THE ALTERNATIVE,**
14  FAMILYMEDS GROUP, INC.,                    **SUMMARY ADJUDICATION BY
    f/k/a Drugmax, Inc., a Connecticut corporation,   McKESSON CORPORATION; AND**
15                           Defendant.
                                               **MEMORANDUM OF POINTS AND
16  _____   AUTHORITIES**

17  FAMILYMEDS GROUP, INC.,
    f/k/a Drugmax, Inc., a Connecticut corporation,

18                      Counter-Claimant,       Complaint filed: November 9, 2007

19          v.                                  Counterclaim & Cross-Complaint Filed:
                                                December 17, 2007
20  McKESSON CORPORATION, a Delaware
    corporation,                                Date:   August 6, 2008
21                                              Time:   1:30 p.m.
                        Counterdefendant.       Place:  Ctrm 4
22  _____            1301 Clay St., 3d Floor
                                                        Oakland, CA
23  FAMILYMEDS, INC.,
    a Connecticut corporation,

24
                        Cross-Complainant,
25          v.

26  McKESSON CORPORATION, a Delaware
    corporation,
27
                        Cross-Defendant.
28

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................ 1

TABLE OF AUTHORITIES ........................................................................................ 2

I.    NOTICE OF MOTION. ...................................................................................... 4

II.   MOTION. ............................................................................................................ 4

III.  MEMORANDUM OF POINTS AND AUTHORITIES. ................................... 5

      A.    INTRODUCTION. .................................................................................... 5

      B.    STATEMENT OF ISSUES TO BE DECIDED ........................................ 6

      C.    STATEMENT OF FACTS ........................................................................ 6

            1.    Contract between McKesson and FM Group. ................................ 6

            2.    Course of Performance of Contract. ............................................. 8

            3.    Relationship of McKesson to D&K. ............................................ 11

            4.    Litigation History. ...................................................................... 12

      D.    ARGUMENT. .......................................................................................... 13

            1.    Applicable Standards. .................................................................. 13

            2.    McKesson is Entitled to Judgment on its Breach of Contract
                  Claim. ......................................................................................... 14

                  a.    Contract. ............................................................................ 15

                  b.    Performance by McKesson. ............................................... 15

                  c.    Breach by FM Group. ........................................................ 15

                  d.    Damages Suffered by McKesson. ....................................... 16

            3.    McKesson Is Entitled To Judgment on FM Group's Claims for
                  "Specific Performance" and an "Accounting". ........................... 16

                  a.    The Implied Covenant. ....................................................... 17

                  b.    The Equitable Obligation to Provide an Accounting ........... 18

            4.    McKesson is Entitled To Judgment on FM Inc.'s Accounting
                  Claim .......................................................................................... 20

IV.   CONCLUSION ................................................................................................ 21

1

1

## TABLE OF AUTHORITIES

2

Cases

3

*A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc.*,
852 F.2d 493 (9th Cir.1988) ...................................................................16

4

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...............................................................................13

5

*Banco Do Brasil S.A. v. Latian, Inc.*,
234 Cal. App. 3d 973 (1991), *cert. denied*, 504 U.S. 986 (1992) ........16

6

7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...............................................................................12

8

*Civic W. Corp. v. Zila Indus., Inc.*,
66 Cal. App. 3d 1 (1977)........................................................................18

9

10

*Commodity Futures Trading Comm'n v. Savage*,
611 F.2d 270 (9th Cir. 1979)..................................................................13

11

*County of Santa Clara v. Astra USA, Inc.*,
WL 2193343 (N.D. Cal. 2006) ...............................................................18

12

13

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938). ................................................................................12

14

*Faivre v. Daley*,
93 Cal. 664 (1892)..................................................................................18

15

16

*Golden West Baseball Co. v. City of Anaheim*,
25 Cal. App. 4th 11 (1994) .....................................................................15

17

*In re Bubble Up Delaware, Inc.*,
684 F.2d 1259 (9th Cir. 1982) ...............................................................17

18

19

*Janis v. California State Lottery Com.*,
68 Cal. App. 4th 824 (1998)..............................................................17, 18

20

*Mora v. Chem-Tronics, Inc.*,
16 F. Supp. 2d 1192 (S.D.Cal. 1998) ....................................................12

21

22

*Ratcliff Architects v. Vanir Construction Management, Inc.*,
88 Cal. App. 4th 595 (2001)....................................................................16

23

*Reichert v. General Ins. Co. of Am.*,
68 Cal. 2d 822 (1968).............................................................................13

24

25

*Republic Pictures Corp. v. Rogers*,
213 F.2d 662 (9th Cir. 1954) .............................................................13, 17

26

*Taylor v. Johnston*,
15 Cal.3d 130 (1975)..............................................................................15

27

28

2

*Third Story Music, Inc. v. Waits,*
    41 Cal. App. 4th 798 (1995) ................................................................................17

*United California Bank v. Maltzman,*
    44 Cal. App. 3d 41 (1974) ..................................................................................20

*Vicko Ins. Serv.  v. Ohio Indemnity Co.,*
    70 Cal. App. 4th 55 (1999) ................................................................................16

*Yerkovich v. MCA Inc.,*
    11 F. Supp. 2d 1167 (N.D. Cal. 1997) ..............................................................17

*Zuill v. Shanahan,*
    80 F.3d 1366 (9th Cir. 1996) .............................................................................18

<u>Rules</u>

Civil Local Rule 56 ....................................................................................................3

Civil Local Rule 7-2 ...............................................................................................3, 4

Civil Local Rule 7-3 ..................................................................................................3

Civil Local Rule 7-4 ..................................................................................................4

Civil Local Rule 7-4(a) ..............................................................................................5

Federal Rules of Civil Procedure Rule 56 ...........................................................3, 12

Federal Rules of Evidence Rule 201 .........................................................................3

3

# I. <u>NOTICE OF MOTION.</u>

PLEASE TAKE NOTICE that **on August 6, 2008** at **1:30 p.m.**, or as soon thereafter as the matter may be heard, in Courtroom 4 of the United States District Court for the Northern District of California, located at 1301 Clay St., 3rd Floor, Oakland, California, Plaintiff, Counterdefendant, and Cross-Defendant McKESSON CORPORATION ("McKesson") will move the Court for an order granting McKesson summary judgment or, in the alternative, summary adjudication, in its favor upon its "Complaint for Breach of Contract" ("the Complaint"), and against Defendant and Counterclaimant FAMILYMEDS GROUP, INC. f/k/a Drugmax, Inc ("FM Group") and Cross-Complainant FAMILYMEDS, INC. ("FM Inc.," and together with FM Group, called "Familymeds") on their "Counterclaim for Specific Performance of Contract and Accounting; Cross-Complaint for Accounting" (the "Counterclaim & Cross-Complaint") pursuant Federal Rules of Civil Procedure ("Rule") 56, Civil L.R. 7-2, 7-3 and 56, and the Standing Order of U.S. Magistrate Judge Wayne D. Brazil issued on November 10, 2003.

# II. <u>MOTION.</u>

McKesson hereby moves this Court for an order granting summary judgment in favor of McKesson on all issues and claims set forth in the complaint commencing this action (the "Complaint") and awarding to McKesson not less than $814,419.44,[1] plus additional service charges as continue to accrue from and after May 31, 2007, plus pre-judgment interest from and after November 9, 2007 when the Complaint was filed, plus attorneys' fees and costs and determining that the claims alleged by Familymeds in their "Counterclaim for Specific Performance of Contract and Accounting; Cross-Complaint for Accounting" (the "Counterclaim & Cross-Complaint") have no merit. In the alternative, McKesson moves for summary adjudication granting McKesson judgment on its claim for breach of contract against FM Group in the amounts stated above, without ruling on the claims made in the Counterclaim & Cross-Complaint.

---

[1] In the Complaint, McKesson also asserts a claim to recover amounts representing discounts taken by FM Group that it did not earn because its sale volume was not adequate (the "Unearned Volume Discounts"). For purposes of this motion, McKesson is waiving its claim for Unearned Volume Discounts as the amount may create a disputed fact. If summary judgment is not granted, however, McKesson reserves the right to pursue all amounts sought in the Complaint.

1    This Motion is based on the foregoing Notice of Motion, on this Motion, on the

2    Memorandum of Points and Authorities set forth below in accordance with Civil Local Rule 7-2 and

3    7-4, on the declarations of Ms. Leslie Morgan, Ms. Ana Schrank and Kristen E. Caverly, Esq. filed

4    concurrently herewith, on the concurrently filed Separate Statement of Undisputed Material Facts

5    containing undisputed facts as to which FM Group did not stipulate prior to the filing of this Motion

6    (cited as "UF Statement"), on the Compendium of Exhibits filed and served herewith, upon all

7    pleadings and papers on file in this case, and upon such other evidence  and argument as may be

8    presented to the Court at or before the time of the hearing on the Motion.

9    **III.   MEMORANDUM OF POINTS AND AUTHORITIES.**

10   **A.       INTRODUCTION.**

11   As of October 31, 2007, FM Group owed McKesson over $724,574.80 for merchandise sold

12   to FM Group pursuant to a duly-executed "Supply Agreement" dated as of February 2, 2007 (the

13   "Supply Agreement"). FM Group does not dispute that the Supply Agreement is valid, binding, and

14   enforceable against FM Group.  Nor does FM Group dispute that it received the goods that are

15   reflected as having been ordered by and delivered to FM Group and on account of which FM Group

16   was billed the amounts currently sought by McKesson (exclusive of service charges and late charges

17   and the like).  Nor does FM Group dispute that the Supply Agreement contains a provision that

18   requires FM Group to make payment to McKesson in the amount of any invoice that is sent to FM

19   Group without set-off for any reason.  Furthermore, under the express language of the Supply

20   Agreement, FM Group was required to pay each invoice sent to FM Group in full within 7 days of

21   the invoice date.  FM Group did not do so and continues to refuse to do so.  McKesson has been

22   obliged to bring the instant action to recover sums due for product actually delivered to FM Group.

23   FM Group has no *bona fide* defense to payment in full of the sums owing to McKesson which as of

24   May 30, 2008 totaled $814,419.44 excluding unearned volume discounts.  Summary judgment in

25   favor of McKesson should be granted immediately in favor of McKesson on its Complaint and

26   against each of FM Group and FM Inc. on their Counterclaim & Cross-Complaint.

27

28

**B.      STATEMENT OF ISSUES TO BE DECIDED**

Pursuant to Civil L.R. 7-4(a), McKesson states that the issues to be decided in this Motion for Summary Judgment are:

1.    Whether pursuant to a valid, binding and enforceable agreement, FM Group must pay to McKesson all amounts stated as owing on invoices sent to FM Group which remain unpaid, plus applicable service charges and lost discounts, which as of May 30, 2008 aggregated $814,419.44 (the "Unpaid Invoice Claim").

2.    Whether FM Group has a viable defense to payment of the Unpaid Invoice Claim based on an alleged implied covenant that gives FM Group the right to require McKesson to provide it with an accounting prior to payment.

3.    Whether FM Group has a viable defense to payment of the Unpaid Invoice Claim based on an equitable right to require McKesson to provide it with an accounting prior to payment.

4.    Whether FM Group's wholly owned subsidiary, FM Inc. may assert rights to an accounting against McKesson where McKesson and FM Inc. are not in privity of contract with each other.

**C.      STATEMENT OF FACTS**

1.    <u>Contract between McKesson and FM Group.</u>

On February 2, 2007, for fair and valuable consideration, McKesson and FM Group entered into a written contract entitled "Supply Agreement" (the "Supply Agreement"). UF Statement at ¶1. Pursuant to the Supply Agreement, McKesson agreed to sell to FM Group, and FM Group agreed to buy, certain "Merchandise" described therein, including prescription drugs and other health and beauty care products. UF Statement at ¶2. The stated term of the Supply Agreement was three years, commencing on December 28, 2006. UF Statement at ¶3. The parties agree that the Supply Agreement was valid, binding and enforceable against the parties. UF Statement at ¶¶1 & 4; *see also* Counterclaim & Cross-Complaint at ¶¶24 & 25. The Supply Agreement embodies the entire agreement between McKesson and FM Group and "supersedes all

1  prior agreements, understandings and representations with the exception of any promissory note,

2  security agreement or other credit or financial related document(s)" executed by FM Group or

3  between FM Group and McKesson.  UF Statement at ¶11.

4         The Supply Agreement provides that "Invoices are due and payable within seven days from

5  the  invoice date via EFT or ACH."  UF Statement at ¶5; *see also* the "Declaration of Ana Schrank

6  in Support of McKesson's Motion for Summary Judgment" filed and served herewith (the "Schrank

7  Decl.") at ¶3(f).  If payments are made late, FM Group is in default and certain consequences result,

8  including an increase in the price payable for the products delivered to FM Group, and the

9  imposition of service charges.  UF Statement at ¶¶6&7.  The Supply Agreement provides:

10         Any payments made after the due date indicated shall result in a two percent (2%) (or the
11         maximum amount permissible under applicable law, if lower) increase in the purchase price
           of the Merchandise.  A one percent (1%) service charge (or the maximum amount
12         permissible under applicable law, if lower) will be imposed semi-monthly on all balances
           delinquent more than fifteen (15) days.

13

14  UF Statement at ¶¶6&7; *see also* Schrank Decl. at. ¶3(g).

15         The Supply Agreement provides that invoices must be paid by the applicable due date

16  without set-off or excuse. UF Statement at ¶8; *see also* Schrank Decl. at ¶3(h)   The Supply

17  Agreement provides in Paragraph 4(F):

18         [FM Group] agrees to render payment in full to McKesson on the applicable due date as
           specified in this Agreement without (i) making any deductions, short payments, or other
19         accounts payable adjustments to such obligation; or (ii) seeking to condition such remittance
20         on any demand for or receipt of proofs of delivery.  Any accounts payable adjustments
           claimed by [FM Group] shall require prior written authorization of McKesson and must be
21         supported by accompanying detail documenting the basis for any such requested
           adjustments.

22

23  UF Statement at ¶8; *see also* Schrank Decl. at ¶3(h).

24         The Supply Agreement provides that the terms of the Supply Agreement are to remain

25  confidential.  Schrank Decl. at ¶3(a).  However, a copy of the Supply Agreement redacted to

26  eliminate all but material non-confidential provisions is attached to the "Compendium of Exhibits"

27  (the "Exhibit Compendium") filed and served herewith as **<u>Exhibit A.</u>**  Schrank Decl. at ¶3(a).

28  Furthermore, relevant provisions are cited to by the UF Statement.

7

1    The Supply Agreement permitted FM Group to purchase Merchandise from McKesson for a

2    price defined in the Supply Agreement as the "Cost of Goods." *See* the "Declaration of Leslie

3    Morgan in Support of McKesson's Motion for Summary Judgment" filed and served herewith (the

4    "Morgan Decl.") at ¶13.  FM Group's "Cost of Goods" for any particular piece of Merchandise was

5    determined by a formula set forth in the Supply Agreement that related to a base-line price for the

6    particular product purchased defined in the Supply Agreement as "Cost." Morgan Decl. at ¶14.  All

7    such reference prices whether based on WAC or another reference price are entered into

8    McKesson's data base in the ordinary course of McKesson's business at or about the time there is

9    any change in such reference prices.  Morgan Decl. at ¶14.  To verify the accuracy of the invoices

10   sent to FM Group, McKesson randomly selected three representative invoices to "audit" for pricing

11   errors.  These invoices contained more than 90 line items of products.  Morgan Decl. at ¶21.  After

12   completing that "audit," McKesson found not a single error in the computation of FM Group's Cost

13   of Goods, including with respect to the entry of the appropriate base-line prices for such goods.

14   Morgan Decl. at ¶22.

15           2.   Course of Performance of Contract.

16   Since the effective date of the Supply Agreement, FM Group has ordered and received

17   delivery of goods from McKesson aggregating nearly $60,000,000.  Morgan Decl. at ¶19.  FM

18   Group and its constituent pharmacies submitted orders to McKesson on almost a daily basis using

19   an on-line account management system referred to as the "Supply Management Online" system or

20   "SMO System."   Morgan Decl. at ¶20.  Once an order was placed through the SMO System, the

21   SMO System would communicate that order to a second system, which is an internal billing and

22   inventory control system referred to as the "SAP System."   Morgan Decl. at ¶¶ 5 & 7.  If the SAP

23   System showed that the product that was ordered was available, an invoice would be generated

24   relating to that order.  Morgan Decl. at ¶¶5.  That invoice would then be electronically transmitted

25   to and stored on the SMO System to which FM Group had 24/7 access. Morgan Decl. at ¶8.

26

27

28

8

1    Because under the Supply Agreement invoices were due and payable to McKesson within

2    seven days of the invoice date, it was FM Group's practice to determine what invoices were due and

3    payable—namely the invoices that were dated 7 days previously and to pay those invoices.  Schrank

4    Decl. at ¶5.

5    Although FM Group generally paid invoices seven days after their invoice date as required

6    by the Supply Agreement, FM Group did not always do so.   Schrank Decl. at ¶5.  When FM Group

7    did not make a payment, FM Group would miss an entire days' payment meaning that all the

8    invoices dated seven days earlier went unpaid.   Schrank Decl. at ¶5.  This began to occur almost

9    immediately after the Supply Agreement was signed.   Schrank Decl. at ¶5.  After missing payment

10   for a particular day's invoices, FM Group would skip paying those invoices, choosing to pay

11   subsequent invoices with invoice dates seven days earlier to avoid charges that accrue when an

12   invoice is paid late.  In this way, FM Group could avoid incurring service charges and could qualify

13   for timely payment discounts on other invoices, though FM Group had missed the payments due for

14   a particular date's purchase.  Schrank Decl. at ¶6.  For example, if FM Group failed to make a

15   payment for invoices due on March 7, 2007 (meaning the particular invoices were dated as of

16   March 1, 2007), instead of curing the default that had occurred with regard to the invoices dated

17   March 1, 2007, FM Group would make the payment due on March 8, 2007 for invoices dated March

18   2, 2007 and leave the invoices due on March 7, 2007 unpaid.  Schrank Decl. at ¶6.

19   To induce McKesson to continue to ship goods to FM Group under the Supply Agreement in

20   the wake of several of these missed payment days, FM Group promised McKesson that it would add

21   some additional money to future daily remittances so that the delinquency relating to missed days

22   would be paid down while at the same time FM Group could continue to remain current on other

23   invoices.  Schrank Decl. at ¶7.  In practice, this resulted in FM Group adding $5,000 or $10,000

24   "extra" to its daily remittances.   Schrank Decl. at ¶7.  These payments, referred to as "adders," did

25   little to address the shortfall because one day's invoices could aggregate hundreds of thousands of

26   dollars.   Schrank Decl. at ¶7.  Indeed, on April 7, 2007, FM Group failed to make the payment for

27   the invoices dated March 31, 2007 and this resulted in unpaid (or "open") invoices aggregating

28   $531,138.64 which remain unpaid to this day.  Schrank Decl. at ¶7.

9

1    In addition to making "adder" payments, FM Group induced McKesson to continue to ship

2    product by advising McKesson that FM Group was selling off its stores and that the sales proceeds

3    would be used to bring FM Group current.  Schrank Decl. at ¶8.  In fact, FM Group had entered into

4    an agreement executed in February 2007 to sell the majority of its stores to Walgreens and that

5    those proceeds would be used to pay McKesson in full.   Schrank Decl. at ¶8.  After the sale to

6    Walgreens apparently closed, there was no substantial pay down of the amounts owing to

7    McKesson for past-due invoices. Schrank Decl. at ¶9.  Instead, FM Group continued to rely on

8    adder payments.  Schrank Decl. at ¶9.  It then assured McKesson that it planned to sell its remaining

9    stores in smaller sales that would also generate proceeds that would be available to pay McKesson

10    for goods shipped to FM Group and to cure defaults relating to open invoices.  Schrank Decl. at ¶9.

11    Based on these assurances, McKesson continued to allow FM Group to order product even as the

12    number of pharmacies operated under the FM Group umbrella began to dwindle and no substantial

13    payments were made to McKesson using sale proceeds from store sales.  Schrank Decl. at ¶9.

14    On September 17, 2007, McKesson advised FM Group that unless it made a substantial

15    payment on account of the outstanding amounts owing as of that date, no further shipments would

16    be made.  Schrank Decl. at ¶10.  By this time, FM Group was down to only a handful of stores

17    meaning that the prospect of new store sales actually paying off the open invoices was looking

18    doubtful.  Schrank Decl. at ¶10.  At no time during the entire period that McKesson was trying to

19    collect the outstanding invoices from FM Group up to the time McKesson advised FM Group that

20    McKesson could no longer ship to them did FM Group assert that there were any pricing errors or

21    issues with regard to the amounts stated being owed to McKesson on any of their invoices. Schrank

22    Decl. at ¶11.

23    Once McKesson told FM Group that McKesson was going to stop shipping due to the failure

24    of FM Group to cure its default, FM Group stopped making any payments to McKesson.  Schrank

25    Decl. at ¶12.  Because of FM Group's payment methodology, this meant that two very old, unpaid

26    invoices went unpaid.  In addition, no payments were made for any of the invoices falling due after

27    September 17, 2007, although approximately $10,000 in "adder" payments received before

28    September 17, 2007 were credited against certain of these invoices as well as $38,649.88 in returns

1  that were processed on September 14, 2007.   Schrank Decl. at ¶12.  A summary of the affected

2  invoices is set forth below:

| Invoice Date | Due Date | Gross Payment Owed | Amount initially billed because invoices presume FM Group will qualify for "timely payment" discount |
|---|---|---|---|
| 2/26/07 | 3/5/07 | 110,873.35 | 108,655.87 |
| 3/31/07 | 4/7/07 | 531,138.64 | 520,338.35 |
| 9/11/07[2] | 9/18/07 | 34,745.61 | 34,037.15 |
| 9/12/07[2] | 9/19/07 | 23,208.17 | 22,740.64 |
| 9/13/07[2] | 9/20/07 | 21,666.97 | 21,233.63 |
| 9/14/07[2] | 9/21/07 | 26,575.03 | 26,044.56 |
| 9/17/07[2] | 9/24/07 | 14,610.90 | 14,423.89 |

12  Schrank Decl. at ¶13.

13            3.   Relationship of McKesson to D&K.

14       FM Group contends that D&K Healthcare Resources, Inc. ("D&K)  is relevant to this

15  action.  In August of 2005, McKesson acquired all the stock of D&K which was a distributor of

16  pharmaceutical and other products similar to those supplied by McKesson.  Schrank Decl. at ¶14.

17  At the time McKesson acquired all of the stock of  D&K, one of D&K's customers was FM, Inc.

18  FM Inc. and D&K were parties to a "Prime Warehouse Supplier Agreement" dated as of December

19  28, 2004 (the "D&K Contract") to which Valley Drug Company South was also a party.  UF

20  Statement at ¶17; Schrank Decl. at ¶15; Exhibit Compendium, **Exhibit B.**  The D&K Contract was

21  later amended by a "First Amendment to Prime Warehouse Supplier Agreement" dated December

22  27, 2005 and executed by Drugmax, Inc. (later known as FM Group), FM Inc. and D&K (the "D&K

23  Amendment").  Schrank Decl. at ¶15; Exhibit Compendium, **Exhibit C.**

24       The D&K Contract was a contract between D&K and FM Inc.  FM Inc. is a subsidiary of

25  FM Group.  Schrank Decl. at ¶15. McKesson was never a party to the D&K Contract nor did it

26  assume D&K's obligations under the D&K Contract.  Schrank Decl. at ¶16.  Indeed, even after

27  ――――――――――――――――――

28  [2] Invoices outstanding but not due and payable until after September 17 when McKesson notified
FM Group that it would no longer ship unless FM Group cured its default.

11

1  McKesson acquired D&K, it was D&K that signed the D&K Amendment, not McKesson. Schrank

2  Decl. at ¶15.  Neither D&K nor FM Inc. is relevant to this action to enforce the Supply Agreement.

3          4.  <u>Litigation History.</u>

4       On November 9, 2007, McKesson filed the Complaint.  Before doing so, McKesson

5  determined from the SAP System that as of October 31, 2007 FM Group owed McKesson at least

6  $724,574.80, including the 2% Price Increase and the 1% Service Charges to which McKesson was

7  entitled under the Supply Agreement, but excluding any price increase that would result because

8  FM Group did not qualify for all the volume discounts it took.  Schrank Decl. at ¶20. The Complaint

9  alleges a single cause of action for breach of contract against FM Group, and seeks to recover all

10  amounts due to McKesson under the Supply Agreement.  *See* the "Declaration of Kristen E.

11  Caverly" filed and served herewith (the "Caverly Decl.") at ¶2; Exhibit Compendium, **Exhibit G**.

12       On or about December 17, 2007, FM Group served its Answer to the Complaint.  Caverly

13  Decl. at ¶2; Exhibit Compendium, **Exhibit H**.  McKesson was also served with a "Counterclaim for

14  Specific Performance of Contract and Accounting; Cross-Complaint for Accounting" (the

15  "Counterclaim & Cross-Complaint"). Caverly Decl. at ¶2; Exhibit Compendium, **Exhibit I.**  The

16  Counterclaim & Cross-Complaint named FM, Inc. as a Cross-Complainant against McKesson and

17  did not name D&K as a party.  *Id.*

18       In the Counterclaim & Cross-Complaint, FM Group alleges that the Supply Agreement

19  contains an implied covenant giving FM Group a right to an accounting.  *Id.* It then asks for specific

20  performance of that implied covenant and also demands an accounting from McKesson.  *Id.*  In

21  addition, the Counterclaim & Cross-Complaint asserts a claim by FM Inc. demanding an accounting

22  from McKesson, apparently under the D&K Contract since FM Inc. was not a party to the Supply

23  Agreement.  *Id.*; UF Statement at ¶1.

24       On January 14, 2008, McKesson moved to dismiss the Counterclaim & Cross-Complaint.

25  Caverly Decl. at ¶2; Exhibit Compendium, **Exhibit J**. On March 12, 2008, a hearing was held on

26  McKesson's motion to dismiss the Counterclaim & Cross-Complaint. On May 5, 2008, the Court

27  denied McKesson's dismissal motion "without prejudice" and issued an order dated as of May 5,

28  2008 (the "May 5 Order"), a true and correct copy of which is attached to the Exhibit Compendium

12

1  as **Exhibit K.**  In the May 5 Order, the Court appears to have concluded that FM Inc. is not

2  currently a proper party to the litigation commenced by the Complaint and expressly ruled that FM

3  Group "may, <u>using an appropriate procedural device</u>, seek to add Familymeds, Inc., and/or D&K as

4  a party in this or a separate lawsuit." Exhibit Compendium, **Exhibit K**,  p. 2; lls. 5-6. (Underscoring

5  in original.)  FM Inc. and D&K have not (yet) been added to this action.   McKesson filed its answer

6  to the Counterclaim and Cross-Complaint on May 19, 2008.  Caverly Decl. at ¶2; Exhibit

7  Compendium, **Exhibit L.**

8        **D.    ARGUMENT.**

9            1.  <u>Applicable Standards.</u>

10       Federal courts sitting in diversity apply federal procedural law.  *See Erie R. Co. v. Tompkins*,

11  304 U.S. 64, 78 (1938).  Federal Rules of Civil Procedure ("Rule") 56 sets forth the requirements

12  for summary judgment motions.  The same standard applies to summary adjudication motions.  *See*

13  Fed. R. Civ. P. 56(a), (c); *Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1200 (S.D.Cal. 1998).

14  Under Rule 56(a), "[a] party claiming relief may move, with or without supporting affidavits, for

15  summary judgment on all or part of the claim." Judgment "should be rendered" when the evidence

16  shows that "there is no genuine issue as to any material fact and that the movant is entitled to

17  judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Further, it is improper to consider summary

18  judgment a disfavored approach to resolving litigation.  As was recognized by the Supreme Court in

19  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986):  "Summary judgment procedure is properly regarded

20  not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a

21  whole, which are designed 'to secure the just, speedy and inexpensive determination of every

22  action.'" *Id.* at 327 (citation omitted).  As was also explained by the *Celotex* court: "One of the

23  principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported

24  claims or defenses . . . ." *Id.* at 323-325.

25       As will be discussed more fully below, in the instant case the parties do not dispute (i) the

26  existence of a binding contract, (ii) McKesson's delivery of goods to FM Group under the contract,

27  (iii) FM Group's failure to pay for all goods invoiced to FM Group,  and (iv) the existence of

28  express contractual language requiring FM Group to pay invoices sent to FM Group without

1    "making any deductions, short payments, or other accounts payable adjustments to such obligation"

2    within 7 days of the invoice date.  Nor can FM Group genuinely dispute that McKesson has been

3    damaged by FM Group's nonpayment.  In short, there are no genuine issues as to any material fact

4    and McKesson is entitled to judgment as a matter of law.

5         FM Group's accounting claim is not a defense to payment. A defense without some evidence

6    to support that defense is not sufficient means to withstand summary judgment.  As is set forth in

7    Rule 56(e)(2), a party opposing a Motion for Summary Judgment "may not rely merely on

8    allegations or denials in its own pleadings; rather its response . . . must set out specific facts

9    showing a genuine issue for trial."  Furthermore, as has been recognized by the Ninth Circuit, a

10   party such as FM Group "may not defeat summary judgment . . . in the absence of 'any significant

11   probative evidence tending to support ([its] legal theory.'"  *Commodity Futures Trading Comm'n v.*

12   *Savage*, 611 F.2d 270, 282 (9th Cir. 1979) (*quoting First National Bank v. Cities Service Co.*, 391

13   U.S. 253, 290 (1968)).  FM Group must come forward with meaningful evidence to support its

14   defense and the evidence offered must be more than a mere "scintilla of evidence."  *Anderson v.*

15   *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  FM Group has no evidence of any pricing

16   irregularities or that FM Group owes McKesson anything less than what is reflected in McKesson's

17   books and records maintained in the ordinary course of McKesson's business.

18             2.   <u>McKesson is Entitled to Judgment on its Breach of Contract Claim.</u>

19        The enforcement of McKesson's claims under the Supply Agreement are governed by

20   California law.  UF Statement at ¶12; *see also Republic Pictures Corp. v. Rogers*, 213 F.2d 662,

21   664 (9th Cir. 1954), *cert. denied,* 348 U.S. 858 (1954) ("Being a diversity of citizenship case, the

22   contracts will be interpreted so as to reach the same results as would be reached in a California

23   court.").   In California, the elements for a breach of contract claim are: "(1) the contract, (2)

24   plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting

25   damages to plaintiff."  *Reichert v. General Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (1968).

26

27

28

14

### a. Contract.

FM Group does not dispute that the Supply Agreement was a valid and binding contract between FM Group and McKesson. In its Answer, it admits the allegations in Paragraph 7 of the Complaint that allege that "[o]n February 2, 2007, Familymeds and Plaintiff entered into a contract entitled 'Supply Agreement' . . . for fair and valuable consideration, pursuant to which Plaintiff agreed to sell to Familymeds and Familymeds agreed to buy from Plaintiff certain 'Merchandise' described therein." Exhibit Compendium, **Exhibits G&H**, at ¶7. Furthermore, in its Counterclaim & Cross-Complaint, FM Group alleges and admits that the terms of the Supply Agreement "can be enforced by and against either [FM Group] or McKesson.", Exhibit Compendium, **Exhibit I** at ¶ 26. Nor its there any question of ambiguity in the Supply Agreement. In Paragraph 24 of the Counterclaim & Cross-Complaint, FM Group alleges and admits that the terms of the Supply Agreement "are sufficiently precise, certain, and definite for enforcement by this Court." Exhibit Compendium, **Exhibit I** at ¶ 24. FM Group also alleges and admits that the terms of the Supply Agreement "are fair, just, and reasonable under all of the circumstances, and adequate consideration was provided by and to all parties." Exhibit Compendium, **Exhibit I** at ¶ 25. Thus, the first element of McKesson's claim for relief for breach of contract is established.

### b. Performance by McKesson.

The second element of McKesson's claim for relief is also established. Each time a representative of FM Group made an order for "Merchandise" under the Supply Agreement, that Merchandise was shipped to FM Group. There has never been any suggestion that FM Group was billed for product that it did not receive. Indeed, shipments continued to FM Group for months after material breaches by FM Group resulting from non-payment of outstanding invoices.

### c. Breach by FM Group.

Under the express written terms of the Supply Agreement, FM Group was required to pay each invoice it received in full "without (i) making any deductions, short payments, or other accounts payable adjustments to such payment obligation; or (ii) seeking to condition such remittance on any demand for or receipt of proofs of delivery." UF Statement at ¶8; Schrank Decl. at ¶3(h). The Supply Agreement also provided that payment on account of invoices was due within

15

1  seven days of the invoice date.  UF Statement at ¶5; Schrank Decl. at ¶3(f).   It cannot be disputed

2  that FM Group failed to perform either of these obligations.  A party breaches a contract when it

3  fails to perform its contractual duties at the time such performance is due.  *See Taylor v. Johnston*,

4  15 Cal.3d 130, 137 (1975).

### d.  Damages Suffered by McKesson.

6  There can be no dispute that the fourth element of McKesson's breach of contract claim also

7  is satisfied.  McKesson is clearly damaged by FM Group's refusal to pay the sums that it owes

8  McKesson under the Supply Agreement.  As of May 30, 2008, those amounts totaled not less than

9  $814,419.44 as is substantiated by the Statement issued by McKesson's SAP System on May 30,

10  2008.  Morgan Decl. at ¶10; Exhibit Compendium, **Exhibit E.**

11            3.   McKesson Is Entitled To Judgment on FM Group's Claims for "Specific

12                 Performance" and an "Accounting".

13  The Counterclaim & Cross-Complaint asserts three claims for relief against McKesson:  two

14  by FM Group against McKesson, and one by FM Inc.  Exhibit Compendium, **Exhibit I**.  The claims

15  asserted by FM Group are for specific performance of contract and for an accounting. Exhibit

16  Compendium, **Exhibit I** at ¶¶ 21-35.  In truth, "specific performance" is not a distinct claim for

17  relief.  *Golden West Baseball Co. v. City of Anaheim*, 25 Cal. App. 4th 11, 49 (1994) ("specific

18  performance is a remedy for breach of contract, a cause of action which requires proof the contract

19  was breached.")  Thus, this Memorandum of Points and Authorities this Motion addresses the

20  "specific performance" claim as a claim that McKesson has breached an implied covenant, to

21  provide FM Group with an accounting.  Ultimately, both claims for relief by FM Group make a

22  demand for an accounting, though the first is a contract claim premised on an implied covenant and

23  the second is said to be based on an equitable right to an accounting.  Neither claim for relief is

24  supported by any probative evidence or colorable legal theory.

25

26

27

28

1         ***a. The Implied Covenant.***

2    The Supply Agreement is a fully integrated agreement. It expressly provides:

3      This Agreement embodies the entire agreement between the parties with regard to the
      subject matter hereof and supersedes all prior agreements, understandings and
4      representations with the exception of any promissory note, security agreement or
      other credit or financial related document(s) executed by [FM Group] or between
5      [FM Group] and McKesson. This Agreement may not be modified, supplemented or
      extended except by a writing signed by both parties.
6

7 UF Statement at ¶11; Schrank Decl. at ¶3(e). As a fully integrated agreement, FM Group is not

8 free to graft new obligations onto the terms of the Supply Agreement by declaring the new

9 obligation to be an "implied covenant." *See A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc.*, 852

10 F.2d 493, 495 (9th Cir.1988) (an agreement is "integrated" if the "parties intended their writing to

11 serve as the exclusive embodiment of their agreement.") (citations omitted).

12    McKesson and FM Group agreed that the Supply Agreement—except as later amended in

13 writing—would serve as the complete embodiment of their agreement. Consequently, FM Group

14 cannot import a new obligation into the Supply Agreement without the written consent of

15 McKesson. In *Banco Do Brasil S.A. v. Latian, Inc.*, 234 Cal. App. 3d 973, 1003 (1991), *cert.*

16 *denied*, 504 U.S. 986 (1992), the court considered an agreement which recited as does the Supply

17 Agreement that it "embodies the *entire agreement* and understanding among the parties hereto and

18 supersedes all *prior agreements and understandings* relating to the subject matter hereof."

19 (emphasis by *Banco* court). On those facts the *Banco* court observed: "It is difficult to imagine

20 how the parties could have more clearly expressed their intent to make the written instrument a full

21 and complete expression of their agreement." *Id.; see also Ratcliff Architects v. Vanir Construction*

22 *Management, Inc.*, 88 Cal. App. 4th 595, 602 (2001) ("In construing a contract which purports on its

23 face to be a complete expression of the entire agreement, courts will not add thereto another term,

24 about which the agreement is silent.") In other words, it is not permissible for FM Group to modify

25 a fully integrated agreement such as the Supply Agreement by the expedient of labeling the

26 modification an "implied covenant." *See Vicko Ins. Serv. v. Ohio Indemnity Co.*, 70 Cal. App. 4th

27 55, 70 (1999) ("The Courts will not imply a better agreement for parties than they themselves have

28

1    been satisfied to enter into, or rewrite contracts whenever they operate harshly.  There can be no

2    implied covenant where the subject matter is completely covered by the existing contract.")

3    Nor can FM Group import an implied accounting covenant and then point to that implied

4    covenant to run roughshod over explicit terms of the parties' agreement.  As was stated by the court

5    in *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808 (1995):  "No obligation can be

6    implied ... which would result in the obliteration of a right expressly given under a written

7    contract...."(*quoting Gerdlund v. Electronic Dispensers Int'l*, 190 Cal. App. 3d 263, 266, 277

8    (1987)).  Attempts to create new conditions precedent are especially disfavored. *In re Bubble Up*

9    *Delaware, Inc.*, 684 F.2d 1259, 1264 (9th Cir. 1982) ("Conditions precedent are not favored and the

10   courts will not construe stipulations as conditions unless required to do so by plain, unambiguous

11   language.") (citations omitted); *Republic Pictures Corp. v. Rogers*, 213 F.2d 662, 665 (9th Cir.1954)

12   ("[C]ourts are loath to impose limitations or restrictions upon the parties which are not expressly

13   contained in their agreement....")(citations omitted).

14   FM Group cannot successfully maintain that the Supply Agreement should be read to

15   include an implied covenant for an accounting and then use that implied covenant to justify its

16   refusal to pay amounts that the Supply Agreement expressly states must be paid without

17   "deductions, short payments, or other accounts payable adjustments."  Judgment on the first claim

18   for relief asserted in the Counterclaim and Cross-Complaint should be rendered in favor of

19   McKesson.

20   ### b.   The Equitable Obligation to Provide an Accounting

21   In addition to attempting to assert a right to an accounting based on an implied covenant, FM

22   Group seeks to force McKesson to provide it with an accounting as a stand-alone equitable claim.

23   This it cannot do.  An equitable right to an accounting is a remedy; it is not a stand alone claim for

24   relief.  Thus, a demand for an accounting is "only viable if requested in connection with an

25   appropriate claim." *Yerkovich v. MCA Inc.,* 11 F. Supp. 2d 1167, 1178 (N.D. Cal. 1997); *see also*

26   *Janis v. California State Lottery Com.*, 68 Cal. App. 4th 824, 833-834 (1998) ("A right to an

27   accounting is derivative; it must be based on other claims.")

28

1    Court's have sometimes struggled with the circumstances in which a plaintiff—or here, a

2    counterclaimant in the form of FM Group—may demand and receive an accounting from an

3    opposing party.  A relatively recent decision by the District Court for the Northern District of

4    California has culled through the earlier decisions and has concluded that an accounting claim that

5    is not related to an independent claim fails as a matter of law.  In *County of Santa Clara v. Astra*

6    *USA, Inc.*, WL 2193343, 5-7 (N.D. Cal. 2006) (Slip Op.), the City of Santa Clara sought leave to

7    file a third amended complaint alleging causes of action against various pharmaceutical companies

8    (including, incidentally, McKesson) including for violations of the False Claims Act, unfair

9    competition, breach of contract, negligence, unjust enrichment, and for an accounting.  The Court

10   dismissed each of the other causes of action and then turned to the accounting claim.  It ruled,

11   quoting from the earlier decision that dismissed the plaintiff's second amended complaint, *County of*

12   *Santa Clara v. Astra USA, Inc.*, 428 F. Supp. 2d 1029, 1037 (N.D. Cal. 2006):

13           Plaintiff's accounting claim cannot stand independently. It is merely derivative of
             other claims. *See Janis v. Cal. State Lottery Comm'n*, 68 Cal. App. 4th 824, 833, 80
14           Cal. Rptr. 2d 549 (Cal. Ct. App. 1998); see also *Zuill v. Shanahan*, 80 F.3d 1366,
             1369 (9th Cir. 1996).... There are no viable independent claims. The accounting
15           claim therefore fails. Even if there were viable claims, the accounting claim would
             not survive because no action for accounting may be maintained if there is an
16           adequate remedy at law. *Faivre v. Daley*, 93 Cal. 664, 673, 29 P. 256 (1892); *Civic*
             *W. Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 14, 135 Cal. Rptr. 915 (Cal. Ct. App.
17           1977). If the other claims here were viable, they would provide plaintiff with an
             adequate remedy at law
18

19

20   WL 2193343 at *5.  Similarly, FM Group cannot assert an equitable right to an accounting as a

21   stand-alone claim.  If FM Group has any claim, it would be a breach of contract claim.  However, it

22   appears that FM Group recognizes that it cannot substantiate a breach of contract claim against

23   McKesson and also withstand sanctions under Rule 11 of the Federal Rules of Civil Procedure—

24   otherwise it would have done so and would not have resorted to an equitable claim for an

25   accounting.  But, as has been shown above, an equitable claim to an accounting cannot stand on its

26   own; there must be an independent, viable claim.  Here, all of FM Group's claims have failed; it has

27   no viable independent claims.  Thus, the Second Claim for Relief in the Counterclaim & Cross-

28   Complaint seeking an equitable right to an accounting fails as a matter of law.

1          4.   <u>McKesson is Entitled To Judgment on FM Inc.'s Accounting Claim</u>

2          The third claim for relief alleged in the Counterclaim & Cross-Complaint is asserted

3    by FM Inc., apparently against McKesson since no other party is named as a defendant or cross-

4    defendant.  Exhibit Compendium, **<u>Exhibit I</u>** , ¶¶ 37-40.  Although the Court appears to have ruled

5    that FM Inc. is no longer a party to this action, it is unclear whether FM Inc. has in fact been

6    dismissed from this case. Exhibit Compendium, **<u>Exhibit K</u>**.  If FM Inc. has been dismissed, then

7    such dismissal would render the Third Claim for Relief a nullity and would not prevent summary

8    judgment in favor of McKesson.  In the event that FM Inc. is still considered a party in this action,

9    then it would appear that this Third Claim for Relief is based on an equitable claim for an

10   accounting and this equitable accounting claim asserted by FM Group against McKesson would fail

11   as a matter of law because a claim for an accounting in equity is not a viable stand-alone claim.

12         There is yet an additional reason that FM Inc.'s claim for an accounting would fail as a

13   matter of law.  If FM Inc. is to assert any claims against McKesson, FM Inc. must be able to show

14   with some probative evidence that McKesson owes some duty or obligation to FM Inc.  It cannot do

15   so based on any direct contractual relationship, since FM Inc. and McKesson are not parties to any

16   agreement and are therefore not in privity of contract.  Instead, FM Inc. argues that McKesson is the

17   successor in interest to D&K and owes duties under the D&K Contract as amended. FM Inc's sole

18   "support" for this assertion is McKesson's 10-Q Report for the quarter ending September 30, 2005.

19   That 10-Q Report contains the following statement:

20                In August 2005, we acquired substantially all of the issued and outstanding stock of
             D&K Healthcare Resources, Inc. ("D&K") of St. Louis, Missouri, for an aggregate
21           cash purchase price of $478 million, including the assumption of D&K's debt. D&K
             is primarily a wholesale distributor of branded and generic pharmaceuticals and over-
22           the-counter health and beauty products to independent and regional pharmacies,
             primarily in the Midwest. The results of D&K's operations have been included in the
23           condensed consolidated financial statements within our Pharmaceutical Solutions
             segment since the August acquisition date.
24

25   Schrank Decl. at ¶ 17; Exhibit Compendium at **<u>Exhibit D</u>**.  The foregoing language specifically

26   states that the acquisition of D&K was a stock acquisition, not a merger.  Schrank Decl. at ¶ 17.

27   The reference to an "assumption of D&K's debt" does not mean that the operational liabilities of

28   D&K became the liabilities of McKesson.  Instead, it refers to the calculation of the $478 million

                                            20

1    purchase price. In other words, the language explains that McKesson bought D&K with all of its

2    liabilities intact for $478 million, not for $478 million less the amount needed to pay off D&K's

3    debt. Schrank Decl. at ¶17.

4         The 10-Q also states:

5              In connection with the D&K acquisition, we have recorded $27 million of liabilities
               relating to facility exit costs as part of the purchase price allocation. Additional
6              restructuring costs are anticipated to be incurred as the business integration plans are
               finalized. These restructuring costs are anticipated to be paid by mid-2007.
7

8    Schrank Decl. at ¶18. The foregoing excerpt does not mean that D&K's liabilities are now

9    McKesson's liabilities. The statement explains how McKesson was accounting for $27 million in

10   facility exit costs: as part of the purchase for D&K. The reference to "business integration" relates

11   to the computer systems used by D&K and those used by McKesson to communicate with one

12   another. It does not mean that D&K was subsumed into McKesson. D&K continues to exist as a

13   separate legal entity and remains liable for its debts, if any. Schrank Decl. at ¶18.

14        There is no evidence that D&K and McKesson are anything other than separate entities.

15   Thus, there is no basis to put aside the presumption that two corporate entities remain separate. *See*

16   *United California Bank v. Maltzman*, 44 Cal. App. 3d 41, 53 (1974) (separate entities presumed to

17   exist). As a matter of law, FM Inc. cannot sustain a claim of any kind against McKesson.

18                                    IV.    **CONCLUSION**

19        For the reasons set forth above, McKesson respectfully requests that the Court grant its

20   Motion and enter an order:

21        (1) granting judgment in favor of McKesson, and against FM Group, in the amount of

22   $814,419.44, plus such additional service charges as accrue under the terms of the Supply

23   Agreement from and after May 31, 2008 until the date of entry of judgment, plus prejudgment

24   interest on the amounts owing as of November 9, 2007 when the Complaint was filed until the date

25   of entry of judgment, plus attorneys' fees and costs, all according to proof,

26

27

28

---

                                            21

1    (2) granting judgment in favor of McKesson and against each of FM Group and FM Inc. on

2  each claim for relief set forth in the Counterclaim and Cross-Complaint.

3

4  DATED:  June 4, 2008.                        HENDERSON & CAVERLY, LLP

5

6                                               By: _____

7                                                   Maria K. Pum
                                                   Attorneys for McKesson Corporation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28