MARIA K. PUM (State Bar No. 120987)
KRISTEN E. CAVERLY (State Bar No. 175070)
HENDERSON & CAVERLY LLP
P.O. Box 9144 (all U.S. Mail)
16236 San Dieguito Road, Suite 4-13
Rancho Santa Fe, CA 92067-9144
Telephone:    (858) 756-6342
Facsimile:    (858) 756-4732
Email:  mpum@hcesq.com

Attorneys for Plaintiff
McKESSON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| McKESSON CORPORATION, a Delaware corporation,<br><br>　　　　　Plaintiff,<br>　　v.<br>FAMILYMEDS GROUP, INC.,<br>　f/k/a Drugmax, Inc., a Connecticut corporation,<br><br>　　　　　Defendant. | Case No.4:07-cv-05715 WDB<br><br>**DECLARATION OF ANA SCHRANK IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION BY McKESSON CORPORATION** |
| FAMILYMEDS GROUP, INC.,<br>　f/k/a Drugmax, Inc., a Connecticut corporation,<br><br>　　　　　Counterclaimant,<br>　　v.<br>McKESSON CORPORATION, a Delaware corporation,<br><br>　　　　　Counterdefendant. | Complaint Filed:  November 9, 2007<br>Cross-Complaint Filed: December 17, 2007<br><br>Motion Date:  August 6, 2008<br>Time:  1:30 p.m.<br>Place:  Ctrm 4<br>　　　1301 Clay St., 3d Floor<br>　　　Oakland, CA |
| FAMILYMEDS, INC.,<br>a Connecticut corporation,<br><br>　　　　　Cross-Complainant,<br>　　v.<br>McKESSON CORPORATION, a Delaware corporation,<br><br>　　　　　Cross-Defendant. | |

1     I, ANA SCHRANK, declare that I have personal knowledge of the following facts and, if
2 called upon to do so, I could competently testify thereto:
3     1.    I am employed by McKESSON CORPORATION ("McKesson").  At all times
4 relevant to the events described below, my title was Vice President, Financial Services.  In January
5 2008, I became the Vice President of Investor Relations for McKesson.

## FM Group Debt

7     2.    In the ordinary course of its business, McKesson keeps books and records, almost
8 exclusively in electronic form, into which persons with personal knowledge of the data being
9 recorded make entries.  Among McKesson's books and records are those relating to the contractual
10 relationship between McKesson and Familymeds Group, Inc., f/k/a Drugmax, Inc. ("FM Group").
11 Hereinafter, I will refer to these books and records as the "Books and Records re FM Group."
12     3.    The Books and Records re FM Group are in my custody and control as much as they
13 are in any other person's custody and control for employees of McKesson that have the required
14 passwords and clearance.  I have reviewed the Books and Records re FM Group and, based on my
15 review, I know of my own personal knowledge that:
16         a.    On February 2, 2007, for fair and valuable consideration, McKesson and FM
17 Group entered into a written contract entitled "Supply Agreement" (the "Supply Agreement").  The
18 Supply Agreement is a confidential agreement.  However, a true and correct copy of the Supply
19 Agreement redacted so that only non-confidential provisions material to the Motion remain is
20 attached to that certain "Compendium of Exhibits" filed and served herewith (the "Exhibit
21 Compendium") as **Exhibit A**.
22         b.    The Supply Agreement provides a term of three years commencing on
23 December 28, 2006.
24         c.    The Supply Agreement was signed and executed by duly authorized
25 representatives of both FM Group and McKesson.
26         d.    Under the Supply Agreement, McKesson agreed to sell to FM Group, and FM
27 Group agreed to buy, certain "Merchandise" described therein, including prescription drugs and

1  other health and beauty care products.

2      e.  The Supply Agreement is a fully integrated agreement.  It provides in Paragraph 17(A):

> This Agreement embodies the entire agreement between the parties with regard to the subject matter hereof and supersedes all prior agreements, understandings and representations with the exception of any promissory note, security agreement or other credit or financial related document(s) executed by [FM Group] or between [FM Group] and McKesson.  This Agreement may not be modified, supplemented or extended except by a writing signed by both parties.

    f.  The Supply Agreement provides that invoices must be paid within seven days of the invoice date. Paragraph 4(A) of the Supply Agreement provides:

> Payment for Merchandise delivered to [FM Group's] retail pharmacies shall be paid by [FM Group] as follows:  Invoices are due and payable within seven days from the invoice date via EFT or ACH.

The term EFT means "Electronic Funds Transfer."  The reference to ACH payments refers to wire transfers using the "Automated Clearing House" system.

    g.  If payments are made late, FM Group is in default and certain consequences result, including an increase in the price payable for the products delivered to FM Group, and the imposition of service charges. Paragraph 4(E) of the Supply Agreement provides:

> Any payments made after the due date indicated shall result in a two percent (2%) (or the maximum amount permissible under applicable law, if lower) increase in the purchase price of the Merchandise.  A one percent (1%) service charge (or the maximum amount permissible under applicable law, if lower) will be imposed semi-monthly on all balances delinquent more than fifteen (15) days.

    h.  The Supply Agreement provides that invoices must be paid by the applicable due date without set off or excuse.  The Supply Agreement provides in Paragraph 4(F):

> [FM Group] agrees to render payment in full to McKesson on the applicable due date as specified in this Agreement without (i) making any deductions, short payments, or other accounts payable adjustments to such obligation; or (ii) seeking to condition such remittance on any demand for or receipt of proofs of delivery.  Any accounts payable adjustments claimed by [FM Group] shall require prior written authorization of McKesson and must be supported by accompanying detail documenting the basis for any such requested adjustments.

    i.  Paragraph 12(A) of the Supply Agreement provides, in part, that "Failure by [FM Group] to make any payment when due in accordance with the terms of its Agreement with

1  McKesson constitutes a default."

2      j.  The Supply Agreement embodies a choice of law provision. Specifically, Paragraph 12(E) of the Agreement provides that:

> This Agreement shall be construed in accordance with the laws of the State of California without regard to the provisions of Section 1654 of the California Civil Code or the rules regarding conflict of laws.

    k.  The Agreement also contains a section detailing the "Cost of Goods" for Merchandise that are delivered to FM Group. As relevant here, Paragraph 5(C) of the Agreement sets forth a pricing provision, which details that in addition to the 2% Price Increase and the 1% Service Charge, the price that FM Group must pay to McKesson for merchandise increases as the volume of purchases decreases, and vice versa, across several levels of purchase volumes.

    l.  I have read the entire contract that is the Supply Agreement. The Supply Agreement contains no provision imposing any obligation up on McKesson to perform an accounting for FM Group with regard to the amounts ordered by FM Group, paid to McKesson or owing to McKesson.

4.  Based on my review of the Books and Records re FM Group, I can testify that the Merchandise listed in each invoice issued to FM Group or one if its constituent pharmacies was actually delivered to FM Group or one of its constituent pharmacies. Moreover, at no time during the period that I sought to collect the sums owing to McKesson from FM Group in my role as Vice President, Financial Services did any representative of FM Group allege that FM Group had been billed for Merchandise that was not delivered to FM Group or one of its constituent pharmacies. The Books and Records re FM Group demonstrate that McKesson performed all of its material obligations under the Supply Agreement.

5.  Based on my review of the Books and Records re FM Group, I can testify that although FM Group generally paid invoices seven days after their invoice date as required by the Supply Agreement, FM Group did not always do so. When FM Group did not make a payment, FM Group would miss an entire days' payment, meaning that all the invoices dated seven days earlier went unpaid. This began to occur almost immediately after the Supply Agreement was

4

1 signed.

2       6.      After missing payment for a particular day's invoices, FM Group would skip paying those invoices, choosing to pay subsequent invoices with invoice dates seven days earlier to avoid charges that accrue when an invoice is paid late. In this way, FM Group could avoid incurring service charges and could qualify for timely payment discounts on other invoices, though FM Group had missed the payments due for a particular date's purchase. For example, if FM Group failed to make a payment for invoices due on March 7, 2007 (meaning the particular invoices were dated as of March 1, 2007), instead of curing the default that had occurred with regard to the invoices dated March 1, 2007, FM Group would make the payment due on March 8, 2007 for invoices dated March 2, 2007 and leave the invoices due on March 7, 2007 unpaid.

      7.      To induce McKesson to continue to ship goods to FM Group under the Supply Agreement in the wake of several of these missed payment days, FM Group promised McKesson that it would add some additional money to future daily remittances so that the delinquency relating to missed days would be paid down while at the same time FM Group could continue to remain current on other invoices. In practice, this resulted in FM Group adding $5,000 or $10,000 "extra" to its daily remittances. These payments, referred to as "adders," did little to address the shortfall because one day's invoices could aggregate hundreds of thousands of dollars. Indeed, on April 7, 2007 FM Group failed to make the payment for the invoices dated March 31, 2007 which resulted in unpaid (or "open") invoices aggregating $531,138.64 that remain unpaid to this day.

      8.      In addition to making "adder" payments of $5,000 or $10,000 to pay down invoices outstanding on missed due dates, FM Group induced McKesson to continue to ship product by advising McKesson that FM Group was selling off its stores and that the sales proceeds would be used to bring FM Group current. In fact, FM Group advised us that it had entered into an agreement executed in February, 2007 to sell the majority of its stores to Walgreen's and that those proceeds would be used to pay McKesson in full.

///

///

5

1    9.    After the sale to Walgreen's apparently closed, there was no substantial pay down of the amounts owing to McKesson for past-due invoices. Instead, FM Group continued to rely on adder payments. It then assured us that it planned to sell the stores that had not been sold to Walgreens in smaller sales that would generate sales proceeds and that those sales proceeds would be made available to pay McKesson for goods shipped to FM Group and to cure defaults relating to open invoices. Based on these assurances, McKesson continued to allow FM Group to order product even as the number of pharmacies operated under the FM Group umbrella began to dwindle and no substantial payments were made to McKesson using sale proceeds from store sales.

10.   On September 17, 2007, I advised FM Group that unless it made a substantial payment on account of the outstanding amounts owing as of that date, no further shipments would be made. By this time, FM Group was down to only a handful of stores meaning that the prospect of new store sales actually paying off the open invoices was looking doubtful.

11.   At no time during the entire period that we were trying to collect the outstanding invoices from FM Group through the time I advised FM group that McKesson could no longer ship to them did FM Group assert that there were any pricing errors or issues with regard to the amounts stated as owing on any of their invoices.

12.   Once I told FM Group that McKesson was going to stop shipping due to the failure of FM Group to cure its default, FM Group stopped making any payments to McKesson. Because of FM Group's payment methodology, this meant that two very old, unpaid invoices went unpaid. In addition, no payments were made for any of the invoices falling due after September 17, 2007, although approximately $10,000 in "adder" payments received before September 17, 2007 were credited against certain of these invoices as well as $38,649.88 in returns that were processed on September 14, 2007.

///
///
///
///

13. The invoices affected by FM Group's refusal to make further payments to McKesson is as follows:

| Invoice Date | Due Date | Gross Payment Owed | Amount initially billed because invoices presume FM Group will qualify for "timely payment" discount |
|---|---|---|---|
| 2/26/07 | 3/5/07 | 110,873.35 | 108,655.87 |
| 3/31/07 | 4/7/07 | 531,138.64 | 520,338.35 |
| 9/11/07 | 9/18/07 | 34,745.61 | 34,037.15 |
| 9/12/07 | 9/19/07 | 23,208.17 | 22,740.64 |
| 9/13/07 | 9/20/07 | 21,666.97 | 21,233.63 |
| 9/14/07 | 9/21/07 | 26,575.03 | 26,044.56 |
| 9/17/07 | 9/24/07 | 14,610.90 | 14,423.89 |

The "Gross Payment Owed" column refers to what FM Group owes on account of goods delivered to FM Group after FM Group lost its discount for timely payment.

### D&K Healthcare Resources, Inc.

14. D&K Healthcare Resources, Inc. ("D&K") is a distributor of pharmaceutical and other products similar to those supplied by McKesson. In August 2005, McKesson acquired all of the stock of D&K. D&K and McKesson are separate corporate entities.

15. At the time McKesson acquired D&K's stock, one of D&K's customers was FM, Inc. FM Inc. and D&K were parties to a "Prime Warehouse Supplier Agreement" dated December 28, 2004 (the "D&K Contract") to which Valley Drug Company South also was a party. The D&K Contract was later amended by a "First Amendment to Prime Warehouse Supplier Agreement" dated December 27, 2005 and executed by Drugmax, Inc. (later known as FM Group), FM Inc. and D&K (the "D&K Amendment"). True and correct copies of the relevant pages (the front and signature pages) of the D&K Contract and D&K Amendment are attached to the Exhibit Compendium as **Exhibit B** and **Exhibit C**, respectively. I am informed that FM Inc. is a subsidiary of FM Group. McKesson was never a party to the D&K Contract, nor did it sign the D&K Amendment which occurred after McKesson acquired the stock of D&K.

16. McKesson did not assume the liabilities of D&K, nor is it the successor in interest to D&K.

17. I am familiar with the Form 10-Q that McKesson filed with the Securities and Exchange Commission for the quarter ending September 30, 2005. The first paragraph from the 10-Q cited by FM Group reads:

> In August 2005, we acquired substantially all of the issued and outstanding stock of D&K Healthcare Resources, Inc. ("D&K") of St. Louis, Missouri, for an aggregate cash purchase price of $478 million, including the assumption of D&K's debt. D&K is primarily a wholesale distributor of branded and generic pharmaceuticals and over-the-counter health and beauty products to independent and regional pharmacies, primarily in the Midwest. The results of D&K's operations have been included in the condensed consolidated financial statements within our Pharmaceutical Solutions segment since the August acquisition date.

The foregoing provision confirms that the acquisition of D&K was a stock acquisition, not a merger. The reference to an "assumption of D&K's debt" does not mean that the operational liabilities of D&K became the liabilities of McKesson. Instead, it referred to the calculation of the $478 million purchase price. In other words, McKesson bought D&K with all of its liabilities for $478 million, not for $478 million less the amount needed to pay off D&K's debt. A true and correct copy of the cover page and the relevant page from the 10-Q containing the cited language is attached to the Exhibit Compendium as **Exhibit D**.

18. The second paragraph from the 10-Q cited by FM Group also appears on page 7 of the 10-Q and it reads:

> In connection with the D&K acquisition, we have recorded $27 million of liabilities relating to facility exit costs as part of the purchase price allocation. Additional restructuring costs are anticipated to be incurred as the business integration plans are finalized. These restructuring costs are anticipated to be paid by mid-2007.

The foregoing excerpt does not mean that D&K's liabilities are now McKesson's liabilities. The statement merely explains how McKesson was accounting for $27 million in facility exit costs: as part of the purchase for D&K. The reference to business integration had to do with having the computer systems used by D&K and those used by McKesson communicate with one another. It

8

did not mean that D&K was subsumed into McKesson. D&K continues to exist as a separate legal entity and remains liable for its debts, if any.

19.    As part of my collection efforts, I asked FM Group on several occasions for even one example of an incorrect price or for even one item of evidence that FM Group had overpaid McKesson. To date, FM Group has provided no such example or evidence. FM Group also has not provided McKesson with a specific amount it asserts McKesson owes FM Group, nor with any list of products for which it alleges it was overcharged.

20.    By reference to the Books and Records re FM Group, I determined at the time that we filed the Complaint that as of October 31, 2007, FM Group owed McKesson at least $724,574.80. That amount included the 2% Price Increase and the 1% Service Charge authorized under the Supply Agreement after failure to make payment on time, but it did not include the price increase that applies because FM Group took advantage of certain discounts attributable to the volume of product it purchased that it did not qualify for. .

21.    I have recently checked the Books and Records re FM Group. As of May 30, 2008 FM Group owed McKesson at least $814,419.44, excluding the price increase that applies due FM Group's failure to qualify for volume price discounts that it took. Service Charges under the Supply Agreement continued to accrue at the rates set forth in the Supply Agreement.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 4th day of June, 2008 at San Francisco California.

_____
ANA SCHRANK