1  MARIA K. PUM (State Bar No. 120987)
   KRISTEN E. CAVERLY (State Bar No. 175070)
2  HENDERSON & CAVERLY LLP
   P.O. Box 9144 (all U.S. Mail)
3  16236 San Dieguito Road, Suite 4-13
   Rancho Santa Fe, CA 92067-9144
4  Telephone:    (858) 756-6342
   Facsimile:    (858) 756-4732
5  Email:  mpum@hcesq.com

6  Attorneys for Plaintiff
   McKESSON CORPORATION
7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  McKESSON CORPORATION, a Delaware corporation,<br>12<br>                  Plaintiff,<br>13     v.<br>14  FAMILYMEDS GROUP, INC.,<br>    f/k/a Drugmax, Inc., a Connecticut corporation,<br>15<br>16                  Defendant. | Case No.4:07-cv-05715 WDB<br><br>**DECLARATION OF LESLIE MORGAN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION BY McKESSON CORPORATION** |
| 17  FAMILYMEDS GROUP, INC.,<br>    f/k/a Drugmax, Inc., a Connecticut corporation,<br>18<br>19                  Counterclaimant,<br>20     v.<br>21  McKESSON CORPORATION, a Delaware corporation,<br>22                  Counterdefendant. | Complaint Filed:  November 9, 2007<br>Cross-Complaint Filed: December 17, 2007<br><br>Motion Date:  August 6, 2008<br>Time: 1:30 p.m.<br>Place: Ctrm 4<br>       1301 Clay St., 3d Floor<br>       Oakland, CA |
| 23<br>24  FAMILYMEDS, INC.,<br>    a Connecticut corporation,<br>25<br>                  Cross-Complainant,<br>26     v.<br>27  McKESSON CORPORATION, a Delaware corporation,<br>28                  Cross-Defendant. | |

I, LESLIE MORGAN, declare that I have personal knowledge of the following facts and, if called upon to do so, I could and would testify competently thereto:

1. I am employed by McKESSON CORPORATION ("McKesson"). At all times relevant to the events described below, my title was Senior Manager, Contract Compliance.

2. In my capacity as Senior Manager, Contract Compliance, I am intimately familiar with the books and records of McKesson (the "Books and Records"), essentially all of which are electronic, into which data is recorded in the ordinary course of McKesson's business by persons with personal knowledge of the data being recorded. All entries of data into the data bases and other systems included in the Books and Records of McKesson are made at or about the time that events occur that affect the contractual relationships between McKesson and its customers. Among such Books and Records that are kept in the ordinary course of McKesson's business are books and records relating to the contractual relationship between McKesson on the one hand and FAMILYMEDS GROUP, INC., f/k/a Drugmax, Inc., a Connecticut corporation ("FM Group") on the other (the "Familymeds Books and Records").

3. Also in the course of my employment with McKesson, I have become intimately familiar with the electronic ordering systems and billing systems that are put into place to enhance our ability to give prompt and effective service to our customers. McKesson is one of the largest distributors in the world of pharmaceutical products and sundry items often sold in pharmacies and drug stores. On a daily basis, McKesson distributes one-third of the medicines used in North America. This necessarily requires McKesson to rely on computer systems and automated systems to facilitate ordering and paying for the products we distribute. These computer systems and automated systems are part of the Books and Records of McKesson.

### **The "SMO System"**.

4. One of the systems that McKesson uses and that is part of the Books and Records of McKesson is the front-end ordering and account management system known as the "Supply Management Online" system or "SMO System." This system is designed as a convenience for customers and is a powerful tool that allows customers to manage their orders and their payment obligations on a 24/7 basis, all through the Internet.

1

1    5.    When a customer makes an order using the SMO System, the order is transmitted to a separate system maintained by McKesson, the "SAP System" which is described below, and that system verifies that the product is in stock. This happens within 24 hours. If the product ordered is in stock, the invoice is immediately generated by the SAP System by reference to prices on the SAP System and the invoice is reported to the SMO System the following day. At this point, the customer has access to the invoice on the SMO System and that invoice remains on the SMO System even after it is paid. In other words, all invoices for a particular customer, whether the invoices are paid (a "Closed Invoice") or unpaid (an "Open Invoice"), can be accessed by the applicable customer using the SMO System on a 24/7 basis. If a product that is ordered is not in stock to the degree necessary to completely fill the order, the invoice that is generated only reflects so much of the product as is in stock; McKesson does not backorder product. It has what the industry refers to as a "fill or kill" system: if the product is in stock, the order is filled and an invoice is generated, if not, the unfillable portion of the order is rejected and does not appear on the invoice though if no product is in stock, the invoice will list "0" for the item.

6.    The SMO System also allows customers to check on a daily basis how much it owes McKesson by tallying all the Open Invoices.

**The SAP System**

7.    The SAP System is McKesson's internal inventory control and billing system to which the public does not have access. Data is entered into the system with regard to the terms of the contract with each customer including the algorithm of how each customer is charged for a particular product ordered, for example "Cost" (a defined term) less 2%, or something like that. Also entered into the SAP System's data base in the ordinary course of McKesson's business is pricing information for each product in McKesson's inventory all in the ordinary course of business by person's with personal knowledge of the relevant base prices. The initial data entry of pricing information is then immediately double-checked by another employee of McKesson and thereafter such entries are audited on a regular basis.

8.    For each order filled for FM Group, the SAP System automatically calculates the amount due.

2

**Billing Statements**

9. In its contract with McKesson, FM Group agreed that it would pay the amount shown on each invoice within seven days after the invoice date. At the conclusion of every calendar month, a "Statement" is generated by the SAP System and was typically sent electronically to FM Group as a courtesy, and a copy is posted on the SMO System. Each such Statement lists as of the date the Statement is generated the amounts outstanding on an invoice-by invoice basis, it identifies any past due amounts, it lists applicable service charges, it indicates the late charge that will be owed if the statement is not timely paid, it lists each "add-bill" item, and it lists all applicable credits, including for returned items. Each of the adjustments reflected on the Statement is explained below:

a. <u>Service Charges, Late Charges and Loss of Timely Payment Discount</u>: Under McKesson's contract with FM Group, the parties agreed that if invoices were not paid timely, FM Group would lose the discount given to FM Group for timely payment and would also incur a "Service Charge" as follows:

> Any payments made after the due date indicated herein shall result in a two percent (2%) (or the maximum amount permissible under applicable law, if lower) increase in the purchase price of the Merchandise. A one percent (1%) service charge (or the maximum amount permissible under applicable law, if lower) will be imposed semi-monthly on all balances delinquent more than fifteen (15) days.

b. <u>Add-Bills</u>: Items classified as "add-bills" are charges that McKesson adds to a customer's account due to chargeback discrepancies. Such discrepancies arise when a customer pays a contract price for an item and it turns out the customer was not eligible for that contract price or in circumstances where the price loaded into McKesson's data base was too low. Contract prices paid by a customer are negotiated between the customer and the manufacturer or other supplier of the particular pharmaceutical. McKesson is not responsible for negotiating that contract price between the customer and the manufacturer/supplier. An add-bill requires McKesson's customer to pay the difference between the contract price it negotiated with the manufacturer/supplier and the lower price that was erroneously charged on the relevant invoice.

3

       c. <u>Credits</u>.  These items consist of reductions to the amounts owed by FM Group to McKesson usually based on returns.

10. A Statement for FM Group as of May 30, 2008 is attached to the "Compendium of Exhibits" filed and served herewith (the "Exhibit Compendium") as **Exhibit E**.  FM Group also has a copy of that Statement.  The aggregate amount owing to McKesson as reflected on the May 30 Statement is $814,419.44.  That figure does not include additional amounts owing by FM group to McKesson on account of various discounts taken by FM Group for which FM Group did not qualify.

11. As part of my audit role for McKesson, I caused several invoices sent to FM Group containing more than 90 different products to be audited, meaning that I investigated what base-line price was used by the SAP System and how the price that appeared on the invoice was calculated.  Of the audited invoices, there was not a single error made in the computation of FM Group's Cost of Goods.

**Course of Dealing with FM Group**

12. The business relationship between McKesson and FM Group is governed by that certain "Supply Agreement" (the "Supply Agreement") signed by McKesson and FM Group, which was dated as of February 2, 2007 and effective as of December 28, 2007.  I have read that agreement and am very familiar with its contents.

13. The Supply Agreement permitted FM Group to purchase Merchandise from McKesson for a price defined in the Supply Agreement as the "Cost of Goods."

14. FM Group's "Cost of Goods" for any particular piece of Merchandise was determined by a formula set forth in the Supply Agreement.  That formula relied in each case on a base-line price for the particular product, which was either the "Wholesale Acquisition Cost" ("WAC"), contract pricing, or one of two special pricing models.  All such reference prices are entered into McKesson's data base and on the SAP System in the ordinary course of McKesson's business at or about the time there is any change in such reference prices.

4

1    15.    The vast majority of the pricing relevant to FM Group was based on either contract pricing or WAC. "Contract pricing" is the price FM Group has itself negotiated the price with the vendor or the manufacturer of a particular item.

16.    For goods based on "WAC prices", McKesson refers to the published wholesale acquisition cost posted by the applicable vendor.

17.    Certain products purchased by FM Group were based on special pricing called "National Specialty Pricing" and "Net-Billed" pricing. The National Specialty Priced products included caps and vials—that is, the containers into which pharmaceutical products are dispensed. The National Specialty price for these caps and vials was WAC.

18.    "Net-billed" pricing items include slow moving items might have special prices as either an incentive to customers to buy the product, or in some cases, as a disincentive to customers to ask McKesson to stock the particular product.

19.    Since the effective date of the Supply Agreement, FM Group has ordered and received delivery of goods from McKesson aggregating nearly $60,000,000.

20.    FM Group and its constituent pharmacies submitted orders to McKesson on almost a daily basis utilizing the SMO System. Once invoices were generated by the SAP System as described above, they would be transmitted to the SMO System where they could be readily accessed by FM Group 24 hours a day, seven days a week.

### Audit of Outstanding Invoices

21.    To verify the accuracy of McKesson's outstanding invoices, I randomly selected three representative invoices to "audit" for pricing errors. Those three invoices reflected orders made on January 29, 2007, March 23, 2007, and July 13, 2007. Those invoices covered 91 line items of products. True and correct copies of those invoices (the "Sample Invoices") are attached to the Exhibit Compendium as composite **Exhibit F**. The pricing on the sample Invoices has been redacted as it is available to FM Group but is otherwise confidential.

1  22.   I reviewed each of the invoices attached to the Exhibit Compendium as **Exhibit F**
2  and investigated whether the correct base-line price as described above, was used and whether the
3  correct algorithm was used to calculate the price reflected on the invoice. Each of the invoices I
4  tested contained all four types of base-line prices as described above: contract, WAC and the two
5  types of special pricing. After checking each of the base-line prices, I determined that none of the
6  invoices I investigated had any errors.
7  I declare under penalty of perjury under the laws of the United States of America that the
8  foregoing is true and correct. Executed this 4th day of June, 2008 at _Norman, OK____

  _/s/ Leslie Morgan_____
  LESLIE MORGAN