```
 1                    IN THE DISTRICT COURT

 2            IN THE NORTHERN DISTRICT OF CALIFORNIA

 3                     OAKLAND, CALIFORNIA

 4        OAKLAND, CALIFORNIA; DEPT 3; WAYNE D. BRAZIL, JUDGE

 5   MCKESSON CORPORATION,          ) 07-5125 WDB

 6                                  ) MARCH 12, 2008

 7             PLAINTIFF,           )

 8   V.                            )

 9   FAMILYMEDS GROUP, INC.         }

10             DEFENDANT.           )

11   _____)

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13   APPEARANCES:

14   FOR THE PLAINTIFF:

15   HENDERSON CAVERLY, LLP
     BY:  MARIA K. PUM,
16        KRISTEN CAVERLY, ATTORNEYS AT LAW
     P.O. BOX 9144 (ALL US MAIL)
17   16236 SAN DIEGUITO ROAD, SUITE 4-13
     RANCHO SANTA FE, CA  92067
18   TEL (848) 756-6342 FAX (858) 756-4732

19   FOR THE DEFENDANT:

20   JEFFER MANGELS BUTLER & MARMARO, LLP
     BY:  ROBERT C. GEBHARDT,
21        MATTHEW S. KENEFICK, ATTORNEYS AT LAW
     TWO EMBARCADERO CENTER, FIFTH FLOOR
22   SAN FRANCISCO, CALIFORNIA  94111-3824
     TEL (415) 398-8080 FAX (415) 398-5584

23

24   REPORTED BY:  STARR A. WILSON, CSR 2462

25
```

```
 1   OAKLAND, CALIFORNIA; WEDNESDAY, MARCH 12, 2008; 3:00 P.M.,
 2   DEPARTMENT 3; WAYNE BRAZIL, JUDGE
 3                            -oOo-
 4        THE CLERK:  All rise.
 5        THE COURT:  Good afternoon, folks.  Please be
 6   seated.
 7        So we have one person appearing by phone; is that
 8   correct?
 9        MS. CAVERLY:  Yes, your Honor.  Kirsten Caverly on
10   behalf of McKesson.
11        THE COURT:  Thank you.
12        So let me ask.  Let me call the case and ask the
13   lawyers who are here in person to announce their appearances
14   for the record.
15        The case short style is McKesson versus Familymeds
16   Group.  Um, it's civil action number 07-5715 WDB.
17        Starting with counsel for McKesson, local for San
18   Diego or whatever, announce their appearance, please.
19        MS. PUM:  Maria Pum of Henderson & Caverly on
20   behalf of McKesson corporation.
21        THE COURT:  Okay.
22        MR. GEBHARDT:  Bob Gebhardt and Matthew Kenefick
23   for the firm of Jeffer, Mangels, Butler & Marmaro for
24   Familymeds Group and Familymeds, Inc.
25        THE COURT:  Okay.  Thank you.
```

1          Let me start actually by making sure I've got this

2    right.   Is it -- is it Ms. Caverly who is on the phone?

3          **MS. PUM:**   That's correct, your Honor.

4          **THE COURT:**   Okay.   Good.

5          Let me start over.   By addressing the protective

6    order that you folks have proposed, um, my clerk noticed

7    that the proposed protective order tracks, at least

8    substantially, the court's model rule but leaves out what is

9    in the model rule, paragraph 5.1, which deals with the

10   exercise of restraint and care and designating material for

11   protection.

12         Is there some reason you folks don't want to do

13   that?

14         **MS. PUM:**   Your Honor, Maria Pum.

15         Um, there, the answer to the question is no, there

16   is not some reason we want to do that, your Honor, except

17   that when I got the initial draft from Mr. Kenefick, it was

18   not in the proposed form that he sent me and I assumed he

19   didn't want it in there and I didn't mind it being out.   So,

20   in my view, it was a compromised that if he wanted it out,

21   that was not something that I was going to insist be in

22   there.

23         **THE COURT:**   Do you folks disagree with that?

24         **MR. GEBHARDT:**   I didn't know anything about that.

25   But in my estimation, it ought to be in there.

1          **THE COURT:**  Okay.  Well, would you do me a favor?

2     I don't want to impose on your clients.  But the -- the

3     concept that's in that paragraph is both necessary under law

4     and necessary for the protection of your client's

5     pocketbooks so I assume it was an inadvertence.

6          **MR. GEBHARDT:**  I think it was inadvertent, your

7     Honor.

8          **THE COURT:**  So if you folks would just resubmit

9     the thing.  Just, it is presumably in your computers and you

10    can take five minutes to add the paragraph.  Then I'll be

11    happy to sign it in the hope that it lubricates the process

12    and it keeps your budgets a little less fat.

13         Um, now, let's -- let's -- I want to talk about

14    the substance of the motion obviously before we get to the

15    formalities of case management.

16         But I -- I say the formalities because I'm very

17    nervous generally, by the way, not specific to anything in

18    your case, or even my job.  Um, but I'm nervous that there

19    might well be a whole lot of money spent on you folks that I

20    realize you have to make a living, but might be a lot of

21    money spent on you folks that ends up being not

22    overwhelmingly productive.

23         And I should say that I had a case dissimilar in

24    many significant ways to this, sometime over the horizon,

25    but not actually that one though, but in the last couple of

1  years, which was vaguely similar.

2       There was a major national corporation that had

3  been supplying, um, supplies to a physician's group.  This

4  was on a cancerous practice situation.  And they fought back

5  and forth, in the court's disinterested view, meaning it

6  wasn't going to cost me any money no matter what happened.

7  But they fought in a way that wasn't a very handsome

8  reflection on the profession.  But, more importantly, ended

9  up wasting their client's money.  It was basically an

10  accounting case.  Everybody agreed that certain -- that some

11  medical stuff had been supplied and that some money was

12  likely owing, but they had all these sort of peripheral

13  fights that just really -- it just felt bad.  It felt like,

14  gee, this is why our profession isn't very handsomely

15  regarded.

16       Um, and so when I read what this case seems to be

17  about, I got nervous again saying, oh, my goodness.  Here,

18  we have these two big law firms, both presumptively

19  competent, with people.  Oh, you know, three-quarters of a

20  million dollars isn't peanuts.  But you guys can spend that

21  in about half a year.  I'm being a little bit facetious but

22  not entirely.  Um, so what -- what occurs to me is that why

23  don't you get some experts or some people in whom there's

24  some confidence about their neutrality, go through the

25  papers, and settle the case.  Is there some reason not to do

1    that?

2              **MR. GEBHARDT:**  You're looking at me.

3              **THE COURT:**  Well, I don't care.  I'm looking at

4    anybody.  I'm looking at you as a community.

5              **MR. GEBHARDT:**  It makes imminent sense.  I mean

6    we've -- we've retained an expert who has dealt with drug

7    companies and these millions of -- of papers that -- that

8    are generated.  And, um -- and we're willing to -- I have no

9    authority for this, but I'm willing to recommend that we

10   share him.  They ought to know about him, to go in and look

11   and see if, indeed, we've been charged the right amount.

12   Because what -- what you got is a situation where the drug

13   McKesson, that's big.  They -- they supply three to five to

14   ten million dollars a week of -- of material to us and

15   people like us.

16             For people like us to say, "Hold on a second.  The

17   lipstick that you sent us, I think we ought to get a

18   discount on that", I mean it's going to mess up the whole

19   works.  But now we're at an end.  And we have information

20   that there may have been some discounts to which we're

21   entitled that we didn't get.

22             So you're right.  This is an accounting.  We're in

23   favor of that.  I'm willing to recommend -- I'm going to

24   tell my client what you said and recommend to them that we

25   share with them this expert who's, like I said, been through

1    it.  And maybe if we get access to their documents, maybe

2    our fears are unfounded and which case we'll go away.

3            But maybe if our fears aren't found -- are

4    genuine, then possibly --

5            **THE COURT:**  There could be, you know, apparently

6    McKesson feels, not only that they're owed the seven

7    and-a-quarter or whatever it is, but also, and I don't know

8    frankly -- you can sit down.  Thank you.

9            Yeah, I don't know what the play between these

10   things is.  But McKesson also is thinking, gee, they're not

11   entitled to the discounts they got.  Or there's some --

12   there's some play in these accounting joints that might even

13   move the number up.  I don't know about that.

14           I don't -- I don't feel a need to know about that

15   right now.  But I feel a need to feel is common sense, good

16   business judgment, and good faith.  And I see these motions

17   and I see all this horsing around, frankly, and -- and I

18   don't like it.

19           Now, you don't, you know, you don't have to do

20   what I like or don't like.  You only have to do what I order

21   consistent with the law.  And I can't order that.  Well, I

22   don't think I can order it.  But it seems to me that given

23   what I saw somewhere, $170 million in total or something as

24   an environment in which we're working and we're talking

25   about three-quarters of a million, so we're talking about

1    less than a half of a percent or something like that.

2            Um, it seems to me that -- that it's really

3    important for your clients, especially if they have an

4    ongoing relationship which --

5            **MR. GEBHARDT:**  Not any more.

6            **THE COURT:**  Okay.  Well, that takes that card off

7    the table.

8            But just how about being -- trying to be good

9    citizens and being responsible to their shareholders.  Um,

10   just get a plus or minus 20 percent and move on.

11           Um, now, I know you, I'm not assuming anything.

12   I'm going to let you talk here in a second.

13           What I do want you to hear from me before you talk

14   is that -- is that I recognize that there is a considerable

15   amount of instinctive paranoia about using someone that

16   someone else suggests.  And if there isn't any, great.

17   Wonderful.

18           But if there is that kind of paranoia, it is

19   not -- the only option is not to use somebody that defense

20   suggests, but instead we could find some completely

21   uncontaminated by ever being connected with anybody.  And we

22   need -- we need someone who can read the computer stuff that

23   you guys have and say, okay, this makes sense.  And to whom

24   both of you can make civilized sitting-down-at-a-table

25   pitches about well, here's -- here are the circumstances

 1    under which these discounts obtain.  Here are the

 2    circumstances under which they don't.  Listen to that and

 3    say, okay, he's not the judge or she's not the judge saying

 4    well, here's what I think the numbers ought to be.  And then

 5    you settle the case.  And if you don't settle the case, then

 6    we fight about who's on first base.

 7            **MS. PUM:**  Thank you, your Honor.

 8            Um, the reason we're not settling this case, your

 9    Honor, is because their clients won't pay.  We have a

10    contract that indicates that if we send them an invoice,

11    they are supposed to pay the invoice amount.  And if they

12    dispute any amounts that are on that invoice after the fact,

13    they can come back and make a claim.  They can even try to

14    make some suggestion that there is a mistake beforehand.

15            And we offered to talk to them about whatever

16    mistakes they think there were, but they couldn't come up

17    with a single example of a mistake.

18            They have come up -- this is pure fantasy on their

19    part, your Honor.  When we got to the end of the

20    relationship, there was $725,000 left owing.  They just

21    simply refused to pay.

22            The contract says they must pay it.  And if they

23    have some issue or offset right, they have to come back

24    after the fact and make that claim.  But they have to pay up

25    front.

1          **THE COURT:**  When you said pay up front, you said

2     that they could talk to you beforehand.

3          **MS. PUM:**  Oh, we're always willing to talk to them

4     but they still have to pay their invoice.  And we did talk

5     to them beforehand.  We asked them, give us an example.

6     They could not come up with an example.

7          Your Honor, I've come to learn a lot more about

8     how this -- this ordering process works.

9          Every single time a pharmacist anywhere around the

10    country that is, you know, in the Familymeds Family makes an

11    order, say, for a box of aspirin or something, they get an

12    invoice for that, you know, that one order so there's

13    hundreds of thousands of orders.

14         But every time they have that invoice, they have

15    access to a computer terminal that they can go on what's

16    called the supply management online system, the SMO system.

17    They can go on there and they can look up, see what invoices

18    are open, what they've paid.  They can go through and click,

19    pay this invoice.  Pay this invoice.

20         **THE COURT:**  Who are they that you're talking

21    about?

22         **MS. PUM:**  Familymeds.

23         **THE COURT:**  The pharmacists?

24         **MS. PUM:**  Family -- Familymeds or the pharmacists

25    or whoever has the purse strings.  I don't really know the

1    Familymed side of the equation.  But in principle, um,

2    anyone on the Familymeds side can go through and pick

3    invoices to pay.

4            So they know all along, through this entire

5    $170 million relationship, how much they're being picked --

6    they're being charged for every piece of -- every aspirin,

7    everything they're getting.

8            Only at the very end of this relationship, when

9    finally McKesson said, "Hey, you stopped paying us on

10   September 14.  What's up?"

11           And they said, "We've decided we're not going to

12   pay you any more".

13           And McKesson said, "Well, why aren't you going to

14   pay us any more?

15           They had basically sold their last two stores.

16   They didn't really need to order anything more from

17   McKesson.  They dug their heels in and said they weren't

18   going to pay any more.

19           Then they come -- concocted with a cock and bull

20   story -- pardon me, your Honor -- about how there were

21   mistakes in the pricing to Familymeds.  And now we need to

22   look at the entire relationship, not just between McKesson

23   Corporation and Familymeds Group, but also going into the

24   years before that between Familymeds, Inc., and an entity

25   that was subsequently purchased by McKesson, which was D&K

1    Health Care.  So they're trying to drag in all these other

2    purchases.

3            **THE COURT:**  Let me just ask you.

4            **MS. PUM:**  I'm sorry.

5            **THE COURT:**  Did D&K Health Care, was it a supplier

6    before McKesson?  Was it -- was it a supplier before

7    McKesson joined the relationship?

8            **MS. PUM:**  Yes, your Honor.

9            **THE COURT:**  So was -- was McKesson functioning at

10   all?  I know it was functioning out there in the world.  Was

11   McKesson also a supplier at that time or was it all D&K?

12           **MS. PUM:**  It was not a supplier to FamilyMeds.

13           **THE COURT:**  That's what I mean.

14           **MS. PUM:**  Yes.  They were completely separate

15   relationships.

16           **THE COURT:**  Well, let me ask -- I hear what you

17   say and I feel the heat on.  I don't have any reason to

18   quarrel or not.  But I -- I'm not sure that it --

19           **MS. PUM:**  Your Honor, I apologize for the heat in

20   my tone.

21           **THE COURT:**  Oh, that's okay.

22           **MS. PUM:**  I --

23           **THE COURT:**  I get it all the time.

24           **MS. PUM:**  Okay.

25           **THE COURT:**  It's part of the program.  I had that

1   heat this morning for a US attorney.  But I'm not sure --

2   what I -- what I hear you saying is by implication --

3   fellows, listen up, please.

4          **MR. KENEFICK:**  Sorry, your Honor.

5          **THE COURT:**  What I hear you saying by implication

6   is there's no chance we're wrong about anything and we don't

7   want any review about anything and that strikes me as

8   possible but --

9          **MS. PUM:**  No -- no --

10         **THE COURT:**  -- not -- not necessarily inevitable.

11  Um, and what I'm suggesting is why don't you guys sit down.

12  Maybe you don't need an expert.  Maybe you sit down as human

13  beings, God forbid, and say, "Okay, here's -- look, bring in

14  Joe Schmo from McKesson who knows, if necessary, G&K.

15  Hopefully not.  Bring in somebody from McKesson who knows

16  all about these billings and forms and -- and when the

17  entitlements for discounts mature and so forth.  And say

18  "Look, Mr. Lawyer for group or Inc. or whoever you're

19  lawyering for, "Here's why you owe us this money".  And

20  then -- and then listen to what they say.  And if at the end

21  of that, they can't, with their little person -- I don't

22  mean little person -- their person who knows all about this

23  little stuff, that item by item, as you say, it's little

24  stuff, their person who knows all about that and says, oh,

25  no, no, no.  If they can -- if it's babbling at that point,

 1    this is just baloney.  It's just -- there's nothing to this.

 2    Then you come back, you guys come back and we fight about

 3    it.  But -- but the point is, it -- it -- it just doesn't

 4    seem, it's possible that the only motive on their side is

 5    escape from a -- from a real economically obligation and pay

 6    the lawyers a couple hundred grand to see if you can escape.

 7    Okay.  That's possible.  But this -- but I'm reluctant just

 8    to assume that.

 9         **MS. PUM:**  Your Honor, I'm not asking the court to

10    assume that.  Your Honor, what I'm -- and my point about the

11    individual item by item and their ability to get on the

12    computer and check is had there been a genuine dispute at

13    any point during the relationship up until the very end of

14    it, they would have raised it.

15         **THE COURT:**  No.  No.  No.  That's a non secateur.

16    Sometimes people don't figure things out until late.

17    Seriously.  I mean you're smiling like everybody in the room

18    is a crook.  Come into my morning calendar and I'll show you

19    some crooks.

20         **MS. PUM:**  The -- the -- the --

21         **THE COURT:**  It's possible that they're crooks.

22    Totally possible.  It's also possible that they're harshly

23    inept.  They didn't comply with some of the contract.  They

24    didn't do it in a timely way.  But they see now, holy cow,

25    we -- we -- we -- we got overcharged for this or they see it

1    now.  If that's the way it is, they violated the contract.

2    And say, "Okay, you violated the contract."

3          Now, speaking in McKesson's voice, I see, with the

4    benefit of my sight, and you're doing this wholeheartedly

5    that you really only owe us $500 instead of seven and a

6    quarter.  Because you're late, you pay us 400 and we go

7    home.  What's wrong with something like that?  If it's

8    totally impossible, then -- then I think you're not

9    connected with the real world.

10          I work for the federal government, which is a

11    very, um, imperfect institution.  There is no such thing

12    though, no matter how much money your CEO makes, there is no

13    such thing as a perfect institution.  And it staggers my

14    imagination that -- not their tardiness, and perhaps

15    breaching the contract, but that you're perfect and they got

16    it all right.

17          **MS. PUM:**  Your Honor, I don't know that McKesson

18    is perfect and I'm not --

19          **THE COURT:**  No, you do know.  It's not.

20          **MS. PUM:**  And I'm not -- and I'm not arguing that

21    they are perfect.  What I am saying is we have a contract

22    that says that -- no, no, your Honor.  Please hear me out.

23    That says they must pay the invoice amount.  If, after they,

24    you know, pay the invoice amount and comply with the

25    contract, they think they have a dispute or an issue, then

1  they can bring it up with us.  But it is not a condition to

2  their obligation to pay that they pay that amount.  And that

3  there isn't -- that there is no question --

4          **THE COURT:**  So the actually structured recourse is

5  to pay first and then we'll give you the money back if we're

6  wrong.

7          **MS. PUM:**  Yes, your Honor.

8          **THE COURT:**  Okay.

9          **MS. PUM:**  Unlike FamilyMeds, your Honor, McKesson

10  isn't going anywhere.  And that's the second point I want to

11  make, your Honor.  FamilyMeds doesn't -- isn't operating any

12  more.  As of December 31 they closed their doors.

13          **THE COURT:**  No.  No.

14          **MS. PUM:**  So if we don't do this now, your Honor.

15          **THE COURT:**  There is no successor in interest?

16          **MS. PUM:**  There is nobody, your Honor.

17          **THE COURT:**  All right.

18          **MS. PUM:**  I would love to hear otherwise, your

19  Honor.  But if we don't do this now, your Honor, and if we

20  don't cut to the chase right away, which is why we had to

21  bring the lawsuit, we will see no money.  And we have some

22  concerns about that now, your Honor.  But be that as it may,

23  this is not a situation where there will be somebody there

24  to pay from the FamilyMeds side if we let this linger.

25          **THE COURT:**  But why -- I'm not sure that that

```
 1   sense of economic urgency cuts against what I'm suggesting.
 2   Why can't you do, in the next three weeks, what I'm
 3   suggesting?  And see if you can guys can figure it out?
 4   Let's say that they're on the verge of floating off into the
 5   bankruptcy sunset.  Um, it seems to me that -- that -- that
 6   there's a duty by the people who, um, represent McKesson to
 7   get as much money for the shareholders as they can.  And it
 8   seems to me that one way to do that would be to say, okay,
 9   let's get our 400 or 500 or even our seven and a quarter now
10   by going through this little process, spending less on us,
11   being the lawyers, get as much as we can, and move on,
12   especially if these guys are, um, these guys being group or
13   Inc. or whoever they are, are, um, if there's a danger that
14   they're going to disappear as -- as a pocket.
15           MS. PUM:  Well, your Honor, we were perfectly
16   willing to go to early mutual evaluation.
17           THE COURT:  Right.
18           MS. PUM:  And to do some of these other
19   procedures.  We were told by the Familymed side that, no, we
20   need to do six months --
21           THE COURT:  I know --
22           MS. PUM:  Six months -- six months of discovery.
23           THE COURT:  Yes.  That's too long.  That's too
24   long.
25           MS. PUM:  And then we can start talking about
```

1   settling.

2            **THE COURT:**  That's not going to happen.

3            **MS. PUM:**  When I served this complaint, the first

4   thing I was expecting to receive was, okay, you sued us now.

5   How about we pay x and you go away.  That offer never came.

6   This -- this -- this litigation, your Honor, is entirely

7   because they want to stall.  And if I hear anything

8   contrary, I would be more than pleased, your Honor.

9            **THE COURT:**  Okay.  All right.  How about this?  I

10  hear what you're saying.  Let's stop there.

11           **MS. PUM:**  Go ahead.

12           **THE COURT:**  You guys are going to have a month.

13  I'm ordering right now.  You guys have a month.  You figure

14  out between yourselves, you are all smart people.  You

15  figure out, okay, what's the quickest cleanest way to -- for

16  each of us to learn from the other what the basis is for

17  these differences of view?  And -- and I think what it means

18  is you get somebody who is a lot smarter than I am and knows

19  these computer systems and sits down with you guys and

20  you -- not, I don't want some outside expert.  What I don't

21  want is so important.

22           What you need to do is get somebody say, okay, you

23  tell me in English, Mr. Computer genius, what does all this

24  mean and how does this work?  And you guys sit down at a

25  table for a few hours and figure that out.  You got one

1    month to do that.  And -- and I'm going to set a follow up

2    date right now for us to do what we were supposed to do

3    today if you fail to do this.  And the motion, but what I

4    was going to do, I had this lengthy agenda, well, who the

5    hell is this and who's that?  Excuse me.  And what are these

6    relationships?  And what happened to rule 20?  And what

7    happened to rule 24?  What are you doing with somebody who

8    is not named?  And why D&K?  We're not going to do any of

9    that right now.  But I am going to do it vigorously if you

10   guys don't get off your collective keisters and get this

11   thing done.  And I wouldn't be so -- if this were a

12   different kind of a case and -- and the environment were

13   different, I wouldn't be so animated, but it's not.  And I'm

14   going to actually send an order that you must send to your

15   clients, not that you need to, but I want your clients to

16   know why I'm doing this.  And I'm going to order you to pass

17   the order along to your clients.  Um, so here, let's see.

18   Um, Michelle, how about sometime sixteenth, seventeenth,

19   eighteenth, or the next week of April for the follow-up

20   session where we, um, set, clean up these pleadings, figure

21   out who really should be in this case and by what vehicle.

22   And we're not going to play Jardice versus Jardice.  We're

23   not going to play 19th century pleading.  We're going to do

24   this by common sense.  We're going to get the people in here

25   who need to be in here and we are going to move the case.

```
 1   And we're not going to do any six months of discovery about

 2   anything.  So, any way, sometime during the week of -- not

 3   before April 16 -- the week that -- those three days of the

 4   next week.

 5            Let me ask you folks.  I want this to be realistic

 6   so I'm going to change my mind.  Twenty-third.  April 23.

 7   Can you guys --

 8            MS. CAVERLY:  Yes, your Honor.

 9            MS. PUM:  Yes, your Honor.

10            THE COURT:  April 23, 1:30 in the afternoon for

11   the purposes we were supposed to be here today.

12            THE CLERK:  There's something at 1:30.

13            THE COURT:  Sorry.  My clerk's telling me that's

14   not going to work.

15            THE CLERK:  If we can do three o'clock.

16            THE COURT:  Three o'clock that day.  And Ms.

17   Caverly, you can continue to appear by phone because I would

18   like to save your client that money.

19            MS. CAVERLY:  Thank you, your Honor.

20            THE COURT:  Don't even do what I told you to do

21   about the protective order.  Don't even spend that money.

22   Do this.  And then after, if you fail in this business, then

23   we'll do the protective order and sometime in the latter

24   part of April.

25            MR. GEBHARDT:  Your Honor --
```

1          **THE COURT:**  Oh, wait.  Wait.  Sorry.  What I just

2     say screw up your ability to move things back and forth

3     between yourselves?

4          **MS. PUM:**  No.  But I have --

5          **THE COURT:**  Okay.  I'm entering a blanket

6     protective order right now that protects all the stuff that

7     you exchange right now, all of it, through the end of April.

8          **MR. GEBHARDT:**  Well, that's what I was going to

9     ask you about.  Instead of the twenty-third, can you do it

10    on the thirtieth?  And the reason is I'm starting trial

11    Monday.  It shouldn't interfere with my ability --

12         **THE COURT:**  Okay.  The thirtieth is okay, but

13    no -- nothing after that.

14         **MR. GEBHARDT:**  If it's okay with the court.

15         **THE COURT:**  Nothing after that.  I don't have any

16    sense of hey, we're stumbling.  We got some of this and

17    that.

18         **MS. PUM:**  Your Honor, may I make one additional

19    request of that order?

20         **THE COURT:**  Sure.

21         **MS. PUM:**  Could we direct FamilyMeds Group and

22    FamilyMeds, Inc. not to dissipate their assets in the

23    next -- over the next thirty days?

24         **THE COURT:**  Is there some risk that Family --

25         **MR. GEBHARDT:**  I -- I didn't hear about it until

1    just now.  FamilyMeds Group is the entity that's a holding

2    company and they sold off all their retail assets.  I don't

3    think there's any danger of that kind of thing.  But I don't

4    believe that this -- this kind of a request is appropriate

5    at this time without some kind of a showing letter.

6            **THE COURT:**  That's probably right.  But as a favor

7    to the court, communicate to your clients that there's

8    concern by McKesson that there won't be any money left to

9    pay.  And that -- and that if, after the case, all the dust

10   settles in the case, there isn't any money left to pay, then

11   the court might have to make inquiry about why.  So just

12   tell them that.

13           **MR. GEBHARDT:**  That would be fine.  And -- and I

14   believe they're protected if there was any, which there

15   won't be.  But let me ask the court, just you want us to get

16   together, Ms. Pum and me, and possibly Ms. Caverly, with

17   our, as I -- I told the court, I've hired a man who is an

18   expert from the Crowell Company.  And he's -- they deal in

19   these massive deals.  And I'm going to recommend that he be

20   made available to talk about what -- what we need because,

21   just for the court's edification, yes, we had this computer

22   program called SOM that's set forth what the prices were but

23   what we're -- what we want to know is what -- what was the

24   basis for setting those prices and that requires

25   computerese.  And we're going to, I can guarantee, in

1   listening to the court, we're going to meet and we're going

2   to meet in good faith and more than one time, if necessary,

3   to find out what we need.  But we may be coming back here to

4   tell the court this is what we need in order to -- to find

5   out whether the prices have been set appropriately.  That's

6   what I'm thinking then.

7         **THE COURT:**  Well, okay.  Two sort of thoughts

8   about that.  They -- they, what I would envision happening

9   in this informal process.  And, by the way, I'm going to

10  protect all of your motion and discovery rights independent

11  of this process.

12        **MR. GEBHARDT:**  Okay.

13        **THE COURT:**  So, but what I would envision

14  happening is McKesson saying, hey, we think, and we claimed

15  you owe us seven and a quarter.  Here is our computer guy or

16  whoever the person is, and here's why.  Boom, boom, boom,

17  boom, boom.  And we got all of these little transactions and

18  all of this piece of paper.  Here's why.  And -- and -- and

19  here's why the, not overwhelmingly, certainly not

20  transaction by transaction, specific level, but here's why

21  the prices are appropriate.  Here's the setting in which we

22  set prices.  Here's -- here's our little protocol and this

23  is what we set.  Boom.  That's it.

24        So, and then you guys say, well, we don't

25  understand.  Or -- or what about this and what about that?

1    You can't just say, we don't owe it.  You got to have -- you

2    got to have something in there.  But the first thing is they

3    explain so you have a basis for understanding and you may

4    well have this already, but they bring a very computer

5    information specific knowledgable person in there about

6    this -- this specific kind of billing.

7            **MR. GEBHARDT:**  Okay.

8            **THE COURT:**  And you bring in whoever you want and

9    they explain to you.  If you understand, you pay.  If you,

10   that is assuming you understand and it looks right, you pay.

11   If you understand, and what they're saying and no, that's

12   wrong.  You explain why it's wrong.  You can't just say, oh,

13   this doesn't feel good.  Why is it wrong?  So their person

14   can listen and say oh, oh, I hear that argument but it's not

15   correct for this reason, or oh, gee, you got some point

16   there.  That's the way it is.  That you just talk like

17   you're real people with the informational expertise that you

18   need.

19           **MR. GEBHARDT:**  That's all right.  I understand it.

20   And so they understand it is we should -- I mean if the

21   lawyers get together, I don't think anything's going to

22   happen.  We got to have people.

23           **THE COURT:**  Real people.

24           **MR. GEBHARDT:**  We are real people.  It's just the

25   computer experts.  We need computer experts to get together

1    and talk on a different level than us about what was used to

2    set the prices, what we claim should have been used and

3    maybe have the computer people get together to agree on what

4    was either -- what the proper price was or what we might

5    need in order to establish what the proper price is.

6            **THE COURT:**  Okay.  That's fair enough.  The

7    only -- my only concern is it's not -- it's not as obvious

8    to me that it's primarily a computer person.  An IT person.

9    It is someone who understands certainly the computer

10   environment in which this stuff is done, but someone who

11   understands how the billing system works.  What -- what

12   protocols are followed in the billing process, and what

13   rules apply within McKesson and under the contracts that

14   attach here.  What rules apply to the pricing process.

15           So, for example, at what junctures with respect to

16   what kinds of transactions for what kinds of drugs or

17   whatever they are, medicines, the price moves this way or

18   that way.  That's the kind of person I'm talking about.

19           **MR. GEBHARDT:**  Yeah.

20           **THE COURT:**  Okay.

21           **MR. GEBHARDT:**  Okay.  I believe I understand you.

22           **THE COURT:**  Okay.  So I'll see you guys on the

23   thirtieth.  You can appear by phone, too, if you want to.

24   You're from San Diego?

25           **MS. PUM:**  I am, your Honor.

1          **THE COURT:**  Okay.  You can come up, too.  I don't

2     care.  If you get this done before this, send me a piece of

3     paper that says we're done.  And then I'll, you know,

4     eventually you can dismiss the case.  The whole case.  If

5     you're not done, send me some paper by -- by Monday.  Let's

6     see.  Monday, the twenty-eighth at noon I got to receive it

7     that says what's going on.

8          **MS. PUM:**  Your Honor, what I'm concerned about

9     here is you've now given the Defendant another six weeks to

10    not pay up.  And who knows where the money is going to go

11    over that six weeks.  But now they're going on a fishing

12    expedition to see what they might be able to find out.

13    There is absolutely no downside to them dragging their feet

14    for the next six weeks.

15         **THE COURT:**  Yes, there is.  Yes, there is because

16    I'm going to push this so fast they're going to have to put

17    five lawyers on it and you're going to get the same place

18    you would have gotten today but you're going to get it in a

19    more compact way.  That's all.

20         **MS. PUM:**  Your Honor, it was our intention to

21    bring a motion for summary judgment on the issue of the

22    contract and the language in the contract.  I would like to

23    go, be able to go forward and do that, your Honor.

24         **THE COURT:**  You can't.  You can file a motion

25    on -- is there a thirty-first?  No.  On -- on the first.

 1          **MS. PUM:**  But, your Honor, then that means that

 2    we've now given them six weeks and another 35 days in order

 3    to not pay us, your Honor.

 4          **THE COURT:**  Well, what, you know what, the motion

 5    on the contract may be resolved.  And I don't know,

 6    obviously, one direction or another, but it's pretty darn

 7    unlikely that it will result in a final movement of money

 8    from one side of the case to the other.  Because there --

 9    there are probably going to be arguments about offsets and

10    defenses.  Yeah, that's what the contract means and blah,

11    blah, blah.  But don't make us pay that right now because

12    we've been screwed by all these overcharges or whatever.  So

13    I don't think it's going to hurt you.  But I'm promising

14    you, this is going to go very compactly if you guys don't

15    get this done.  That's all.

16          **MR. GEBHARDT:**  Thank you, your Honor.

17          **MR. KENEFICK:**  Your Honor, what time on the

18    thirtieth?

19          **THE COURT:**  Oh, I'm sorry.  The thirtieth.  I'm

20    sorry.  I'm sorry.

21          **MR. GEBHARDT:**  Three o'clock.

22          **THE COURT:**  Three o'clock.

23          **MR. KENEFICK:**  Thank you, your Honor.

24          **MS. PUM:**  Thank you, your Honor.

25          **MS. CAVERLY:**  Thank you, your Honor.

1    (Whereupon, at 3:35 p.m. the proceedings concluded.)

2                    COURT REPORTER'S CERTIFICATE

3        I, STARR A. WILSON, CSR NO. 2462, United States

4    District Court, Northern District of California, do hereby

5    certify that the foregoing is a correct transcript from the

6    record of proceedings in the above-entitled matter.

7        I certify that the transcript fees and format

8    comply with those prescribed by the Court and Judicial

9    Conference of the United States.

10

11                    _____

12                    STARR A. WILSON, CSR NO. 2462

13

14

15

16

17

18

19

20

21

22

23

24

25