JEFFER, MANGELS, BUTLER & MARMARO LLP
ROBERT C. GEBHARDT (Bar No. 48965), rcg@jmbm.com
MICHAEL A. GOLD (Bar No. 90667), mag@jmbm.com
MATTHEW S. KENEFICK (Bar No. 227298), msk@jmbm.com
Two Embarcadero Center, Fifth Floor
San Francisco, California  94111-3824
Telephone:    (415) 398-8080
Facsimile:    (415) 398-5584

Attorneys for Defendant and Counterclaimant FAMILYMEDS
GROUP, INC., f/k/a DRUGMAX, INC., a Nevada corporation and
Cross-Complainant FAMILYMEDS, INC., a Connecticut
corporation

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| MCKESSON CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br>v.<br><br>FAMILYMEDS GROUP, INC., f/k/a DRUGMAX, INC., a Nevada corporation,<br><br>Defendant. | CASE NO.    CV07-5715 WDB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION BY MCKESSON CORPORATION** |
| FAMILYMEDS GROUP, INC., f/k/a DRUGMAX, INC., a Nevada corporation,<br><br>Counterclaimant,<br>v.<br><br>MCKESSON CORPORATION, a Delaware corporation,<br><br>Counterdefendant. | **Accompanying papers**: Evidentiary Objections; Separate Statement; Kenefick Declaration; Mercadante Declaration; Tregillis Declaration; and (Proposed) Order<br><br>Time:       August 20, 2008<br>Date:       1:30 p.m.<br>Place:      Ctrm. 4<br>            1301 Clay St., 3d Floor<br>            Oakland, CA<br>Judge:      The Hon. Wayne D. Brazil |
| FAMILYMEDS, INC., a Connecticut corporation,<br><br>Cross-Complainant,<br>v.<br><br>MCKESSON CORPORATION, a Delaware corporation,<br><br>Cross-Defendant. | Complaint filed:        Nov. 9, 2007<br>Counterclaim filed:     Dec. 17, 2007<br>Cross-Complaint Filed:  Dec. 17, 2007<br>Trial date:             none set |

JMBM | Jeffer Mangels Butler & Marmaro LLP

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................1

II.     BACKGROUND .....................................................................................1

        A.    The Parties ...............................................................................1

        B.    The Agreements .......................................................................2

              1.    The First Agreement .......................................................2

              2.    The First Amendment ....................................................2

                    a.    McKesson's Involvement In The First Amendment ...........2

                    b.    Relevant Terms Of The First Amendment .......................3

              3.    The Supply Agreement ...................................................4

                    a.    Relevant Terms Of Supply Amendment...........................4

                    b.    The Documentation Arising From The Agreements .........5

        C.    The Audit .................................................................................6

              1.    Generic Drugs................................................................6

              2.    Specially Priced Merchandise.......................................6

              3.    Cost Plus Pricing...........................................................7

              4.    Contract Products..........................................................7

        D.    The Request .............................................................................7

        E.    The First Action .......................................................................7

        F.    The Second Action ...................................................................9

        G.    The Request For A Stipulation To Dismiss The Cross-Complaint ...........9

        H.    Discovery And Familymeds' Request To Continue The MSJ ..................9

III.    LEGAL ARGUMENT............................................................................10

        A.    This Court Should Continue This Hearing To Enable Familymeds To
              Conduct Discovery On The Bases Of McKesson's MSJ - FRCP 56(f)...................11

              1.    Familymeds Has Demonstrated Good Cause For Continuing The MSJ .....12

              2.    Circumstances Favor The Court Continuing The MSJ................13

753547v2

PRINTED ON
RECYCLED PAPER

JMBM  Jeffer Mangels
      Butler & Marmaro LLP

**TABLE OF CONTENTS**
[Continued]

Page

B.  This Court Should Deny The MSJ Because McKesson Has Failed To Carry Its Burden To Demonstrate That It Has Been Harmed In A Specific Amount .......14

    1.  The Documentation Produced By McKesson In Connection With This MSJ Fails To Demonstrate The Amount McKesson Is Owed ...................14

        a.  Inconsistent Total Outstanding Amount ..........................................14

        b.  Cost Plus Pricing Errors .................................................................15

        c.  Contract Products ............................................................................15

        d.  Specially Priced Products ...............................................................15

        e.  Service/Late Charges ......................................................................16

    2.  Triable Issues Of Material Fact Exists As To McKesson's Prayer For Attorneys' Fees and Costs ...............................................................................16

C.  Section 4(f) of the Supply Agreement Has No Effect On McKesson's MSJ .........17

D.  This Court Should Not Order Familymeds To Perform The Idle Act Of Paying McKesson Any Amount Which McKesson Must Later Return .................17

E.  The Facts Before This Court Properly Establish That FM Group Is Entitled To An Accounting From McKesson In Equity And As An Implied Term To The Supply Agreement ...........................................................................................18

    1.  Because The Underlying Accounts Are Complicated And McKesson Owes FM Group An Amount To Be Ascertained By An Accounting, FM Group Is Entitled To An Accounting In Equity From McKesson ........18

        a.  McKesson's Argument That FM Groups' Claim For An Accounting Cannot Independently Exist Is Un-Supported By Law Or Fact ...................................................................................20

    2.  This Court Should Imply Into The Supply Agreement The Reasonable Term That FM Group Is Entitled To An Accounting And Order Specific Performance Of The Same ...........................................................21

F.  This Court Should Grant FM Inc. Leave To Dismiss Its Counterclaim Without Prejudice, Or Find That An Accounting Is Proper Because Of McKesson's Involvement With The First Amendment ...........................................22

    1.  This Court Should Grant FM Inc. Leave To Dismiss Its Claim For An Accounting From The First Action Without Prejudice ...............................22

    2.  FM Inc. Is Entitled To Accounting In Equity From McKesson Because Of McKesson's Extensive Involvement With The First Amendment ...................................................................................................23

JMBM — Jeffer Mangels Butler & Marmaro LLP

PRINTED ON RECYCLED PAPER

753547v2

CV07-5715 WDB
MPA IN OPP. TO MSJ

**TABLE OF CONTENTS**
[Continued]

Page

G.    This Court Should Exercise Its Inherent Authority And Grant Partial
       Summary Judgment In Favor Of Familymeds And Order McKesson To
       Provide An Accounting ..........................................................................................23

IV.    CONCLUSION...........................................................................................................24

CV07-5715 WDB
MPA IN OPP. TO MSJ

753547v2

PRINTED ON
RECYCLED PAPER

JMBM | Jeffer Mangels Butler & Marmaro LLP

CASES

Anderson v. Liberty Lobby, Inc.,
        477 U.S. 242 (1986)............................................................10, 11

Bowie v. Union Bank,
        11 Cal. App. 3d 807 (1970) .................................................17, 18

Burlington Northern Santa Fe R.R. Co. v.
Assiniboine & Sioux Tribes of Fort Peck Reservation,
        323 F.3d 767 (9th Cir. 2003) ....................................................12

Celotex Corp. v. Catrett,
        477 U.S. 317 (1986)...........................................................11, 23

Citron v. Franklin,
        23 Cal. 2d 47 (1943) ..........................................................21, 22

Civic Western Corp. v. Zila Ind., Inc.,
        66 Cal. App. 3d 1 (1977) ....................................................18, 19

Cornwell v. Electra Central Credit Union,
        439 F.3d 1018 (9th Cir. 2006) .................................................11

County of Santa Clara v. Astra USA, Inc.,
        428 F. Supp. 2d 1029 (N.D. Cal. 2006)................................20, 21

DiMartini v. Ferrin,
        889 F.2d 922 (9th Cir. 1989) ..................................................13

Eastman Kodak Co. v. Image Technical Services, Inc.,
        504 U.S. 451 (1992)................................................................10

Ferrell Gas, Inc. v. American Premier Underwriters, Inc.,
        79 F. Supp. 2d 1160 (C.D. Cal. 1999) ....................................16

Fontenot v. Upjohn Co.,
        780 F.2d 1190 (5th Cir. 1986) ................................................10

Garret v. San Francisco,
        818 F.2d 1515 (9th Cir. 1987) ................................................13

Gasperini v. Center for Humanities, Inc.,
        518 U.S. 415 (1996)................................................................21

Gibson v. Mayor & Council of City of Wilmington,
        355 F.3d 215 (3rd Cir. 2004) ..................................................11

753547v2        CV07-5715 WDB
MPA IN OPP. TO MSJ

International Raw Materials, Ltd. v. Stauffer Chem. Co.,
    898 F.2d 946, 949 (3rd Cir. 1990) ...................................................12

Irvin v. Griffin Corp.,
    808 F.2d 802 (11th Cir. 1987) ........................................................11

Janis v. Cal. State Lottery Commission,
    68 Cal. App. 4th 824 (1998) ...........................................................20

Kassbaum v. Steppenwolf Productions, Inc.,
    236 F.3d 487 (9th Cir. 2000) ..........................................................11

Keri v. Board of Trustees of Purdue University,
    458 F.3d 620 (7th Cir. 2006) ..........................................................11

Kritzer v. Lancaster,
    96 Cal. App. 2d 1 (1950) ................................................................18

Nationwide Life Insurance Co. v. Bankers Leasing Association, Inc.,
    182 F.3d 157 (2nd Cir. 1999) .........................................................10

Reid v. Valley Restaurants, Inc.,
    48 Cal. 2d 606 (1957) .....................................................................16

Rivera-Torres v. Rey-Hernandez,
    502 F.3d 7 (1st Cir. 2007).................................................................12

Robinson Helicopter Company, Inc. v. Dana Corp.,
    34 Cal. 4th 979 (2004) ....................................................................14

Salve Regina College v. Russell,
    499 U.S. 225 (1991)..........................................................................21

Stearns Airport Equipment Co., Inc. v. FMC Corp.,
    170 F.3d 518 (5th Cir. 1999) ..........................................................11

T.W. Electric Service, Inc. v. Pacific Electric Contractors Association,
    809 F.2d 626 (9th Cir. 1987) ..........................................................10

Tatum v. City & County of San Francisco,
    441 F.3d 1090 (9th Cir. 2006) ........................................................12

Texas Partners v. Conrock Co.,
    685 F.2d 1116 (9th Cir. 1982) ........................................................11

Torres Vargas v. Santiago Cummings,
    149 F.3d 29 (1st Cir. 1998)..............................................................10

JMBM    Jeffer Mangels
        Butler & Marmaro LLP

<u>Trask v. Franko</u>,
    446 F.3d 1036 (10th Cir. 2006) .................................................................. 12

<u>Union Bank v. Sup. Ct.</u>,
    31 Cal. App. 4th 573 (1995) ................................................................ 20, 21

<u>Waldridge v. American Hoechst Corp.</u>,
    24 F.3d 918 (7th Cir. 1994) .................................................................... 11

<u>Whann v. Doell</u>,
    192 Cal. 680 (1923) ................................................................................ 18

**CODES AND STATUTES**

California Civil Code
    § 1655 ...................................................................................................... 21
    § 3300 ...................................................................................................... 14
    § 3532 ...................................................................................................... 17

California Code of Civil Procedure
    § 1021 ...................................................................................................... 16

**RULES AND REGULATIONS**

Federal Rules of Civil Procedure

    Rule 56(c) ................................................................................................ 10

    Rule 56(f) ............................................................................................ 11, 12

    Rule 26(d)(1) ............................................................................................. 9

    Rule 26(f)(1) ............................................................................................. 9

JMBM Jeffer Mangels Butler & Marmaro LLP

PRINTED ON
RECYCLED PAPER

753547v2

I.    **INTRODUCTION**

McKesson Corporation ("**McKesson**") seeks summary adjudication of its breach of contract claim against Familymeds Group, Inc. ("**FM Group**").  Its motion is premature and should be continued to allow FM Group to conduct discovery.  In order to prevail, McKesson must demonstrate that it has been harmed in a specific ascertainable amount, which necessarily must be reduced for all credits and offsets due to FM Group.  McKesson has failed to carry this burden.

The documentation submitted by McKesson in support of its Motion for Summary Judgment or, in the Alternative, Summary Adjudication (the "**MSJ**"), as well as that produced in discovery, reveals significant accounting discrepancies, overcharges, and inconsistencies.  This tracks the results of Familymeds' internal audit.  McKesson has exclusive possession and control of much of the documentation necessary to verify the full extent of these overcharges.  It refuses to produce this data.  The discrepancies in the documentation McKesson has produced are fatal to McKesson's MSJ, which the Court must therefore deny.

The aforementioned discrepancies also establish that the underlying accounts are complicated and that McKesson owes FM Group for overcharges in an amount yet to be determined, thereby satisfying the elements for FM Group's claim for an accounting in equity.

This Court need not decide Familymeds, Inc.'s ("**FM Inc.**", together with FM Group, "**Familymeds**") claims for an accounting.  FM Inc. has requested, and this Court should grant, FM Inc. leave to dismiss its Counterclaim without prejudice.  Triable issues of material fact exist as to whether McKesson has been harmed, and if so, by how much.  This Court should therefore deny McKesson's MSJ.  This Court should also exercise its inherent authority and *sua sponte* enter partial summary judgment in favor of Familymeds on its accounting claims.

II.    **BACKGROUND**

A.    **The Parties**

**Familymeds.**  FM Group is a reseller of pharmaceutical products.  UMF[1] 24.  FM Inc. is a

---

[1] Set forth in the accompanying Separate Statement of Disputed, Undisputed and Additional Facts in Opposition to Motion for Summary Judgment or, in the Alternative, Summary Adjudication by McKesson Corporation.

753547v2

PRINTED ON
RECYCLED PAPER

JMBM | Jeffer Mangels
Butler & Marmaro LLP

1  wholly owned subsidiary of FM Group and is the operating company for Familymeds.  UMF 25.

2      Familymeds owned and operated a total of 91 pharmacies.  UMF 26.  Of these, 41 were

3  retail pharmacies, 44 were clinic pharmacies, three were long term care pharmacies, and three were

4  worksite pharmacies.  UMF 26.

5      **D&K.**  D&K Healthcare Resources, Inc. (**"D&K"**) was a wholesale supplier of

6  pharmaceutical products.  UMF 27.  D&K is a wholly-owned subsidiary of McKesson.  UMF 28.

7  D&K no longer exists as a corporation; on January 1, 2006, D&K converted into a Delaware limited

8  liability company, with McKesson as its sole member.  UMF 29.

9      **McKesson.**  McKesson is a wholesale supplier of pharmaceuticals.  UMF 30.

10      **B.**    **The Agreements**

11      **1.**    **The First Agreement**

12      On December 28, 2004, FM Inc., Valley Drug Company South, and D&K entered into the

13  Prime Warehouse Supplier Agreement (the **"First Agreement"**).  UMF 17.  The First Agreement

14  had a term of two years, commencing on December 28, 2004.  UMF 17.  There were approximately

15  $142,038,393.32 in invoices to Familymeds under the First Agreement - $1,071,723.72 of which

16  were originated from McKesson.  UMF 31.

17      **2.**    **The First Amendment**

18      On December 27, 2005, DrugMax (which changed its name to Familymeds Group, Inc., a

19  Nevada corporation and is referred to herein as "FM Group"), FM, Inc., and D&K entered into the

20  First Amendment to Prime Warehouse Supplier Agreement, which amended the First Agreement

21  (the First Agreement, as amended, is referred to as the **"First Amendment"**).  UMF 18.

22      **a.**    **McKesson's Involvement In The First Amendment**

23      Following McKesson publically announcing its acquisition of D&K, in August 2005,

24  McKesson informed Familymeds that the First Agreement would have to be amended to reflect

25  McKesson pricing and payment terms.  UMF 32.

26      The First Amendment, as with the Supply Agreement, was negotiated and drafted by

27  McKesson's San Francisco corporate office and legal department.  UMF 33.  The First Amendment

28  was executed by Paul C. Julian - the McKesson executive who executed the Supply Agreement.

JMBM | Jeffer Mangels Butler & Marmaro LLP

1  UMF 34. The First Amendment required all notices to be served on McKesson and that Familymeds

2  was obligated to participate in the McKesson OneStop Generics Program.  UMF 35, 43.

3          Beginning in February 2006, and until December 2006, McKesson sent to Familymeds all

4  invoices under the First Amendment, and payment of those invoices was sent to McKesson.  UMF

5  36.  Under the First Amendment, Familymeds was invoiced a collective amount of $155,337,001.69

6  - of which $11,515,205.00 in invoices were originated from D&K and $143,821,796.69 were

7  originated from McKesson.  UMF 37.  Thus, McKesson originated and processed approximately

8  93% of the invoices under the First Amendment.

9                       **b.    Relevant Terms Of The First Amendment**

10         In negotiating the First Amendment, McKesson inserted product pricing terms which, for

11  the most part, mirror those in the Supply Agreement between McKesson and FM Group (discussed

12  below).

13         **Terms of Payment**.  The First Amendment required payment within fourteen (14) days from

14  the date of invoice for products delivered to Familymeds' pharmacies:

15             Payment for Products delivered to Customer's store locations shall be due and
              payable by wire payment fourteen (14) days from the date of invoice.  UMF 38.
16

17  **Cost of Goods**.  ███████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████



19  ██████ (the "**Cost Plus**" pricing structure):

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  The First Amendment provided for a discount under ██████████████████████████

26  ████████████████████████████████████████████████

27  ████████  UMF 40.

28  **Contract Products**.  The First Amendment provided for Familymeds to receive ████████

1    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ("Contract Price").  UMF 41.

2    **Specially Priced Products**.  The First Amendment carved out from the Cost Plus pricing

3    structure certain types of products designated as ▓▓▓▓▓▓▓▓▓▓▓▓▓



10    **OneStop Generics**.  The First Amendment required participation in McKesson's ▓▓▓▓▓

11    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ UMF 43.

12    **3.    The Supply Agreement**

13    On February 2, 2007, FM Group and McKesson entered into the Supply Agreement (the

14    "**Supply Agreement**") which provided for McKesson to sell and FM Group to buy pharmaceutical

15    products.  UMF 1, 2.  The Supply Agreement was effective as of December 28, 2006, and provided

16    for a term of three years.  UMF 3.  McKesson invoiced Familymeds a total of  $60,286,260.08

17    under the Supply Agreement.  UMF 44.

18    As with the First Amendment, the Supply Agreement was negotiated and drafted by

19    McKesson's San Francisco corporate office and legal department, executed by Paul C. Julian, and

20    McKesson sent invoices and received payments arising thereunder.  UMF 45-47.

21    **a.    Relevant Terms Of Supply Amendment**

22    **Terms of Payment**.  Unlike the First Amendment, the Supply Agreement (at Paragraph

23    4.A) limited the expedited payment terms to FM Group's *retail* pharmacies:

24        Payment for Merchandise delivered to Customer's **retail Pharmacies** shall be
         paid by Customer as follows:  Invoices are due and payable within seven days
25        from invoice date via EFT or ACH.  (Emphasis added)  UMF 48.

26    **Cost of Goods**.  The Supply Agreement at Paragraph 5.B, as with the First Amendment,

27    utilized the Cost Plus pricing structure, which includes Contract Price:

28    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Jeffer Mangels Butler & Marmaro LLP



As with the First Amendment, the [REDACTED]

[REDACTED]

[REDACTED] UMF 50.

**Specially Priced Products**. The Supply Agreement (at Paragraph 5.C) also carved out from the Cost Plus pricing structure certain types of products as [REDACTED] UMF 51.

**OneStop Generics**. As with the First Amendment, the Supply Agreement (at Paragraph 9) required participation in [REDACTED]. UMF 52.

        **b.**     **The Documentation Arising From The Agreements**

McKesson provided information pertaining to the Supply Agreement through its Supply Management Online system (the "**SMO**"). UMF 53. The SMO is a web-based application which is accessed through the Internet. UMF 54. The SMO only provided Familymeds with the products it had ordered and the products' prices; it did not provide Familymeds with any of the underlying information pertaining to how those prices were calculated and whether such calculations conformed to the formulae in the Supply Agreement. UMF 55.

On or about September 30, 2007, McKesson terminated Familymeds' access to the SMO. UMF 56. Familymeds had previously downloaded EDI (electronic data interchange) files from the SMO; however, these files involve hyper-linked core files which would no longer work as a result of McKesson's cessation of Familymeds' access to the SMO. UMF 57.

McKesson has exclusive possession and control of the information necessary to verify whether the prices extended to Familymeds were accurately calculated in accordance with the terms of the Supply Agreement. UMF 58. This information generally includes McKesson's actual base-line price on invoice dates, what concessions McKesson received for each of the products, and

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    whether those concessions were reflected in the prices charged to Familymeds pursuant to the terms

2    of the Supply Agreement. The data also generally includes the bases for McKesson classifying

3    certain products as Specially Priced, which thereby prevented Familymeds from benefitting from

4    the Cost Plus pricing scheme.

### C.    The Audit

In September 2007, McKesson informed Familymeds that it was ending the Supply

Agreement. UMF 59. Familymeds then reviewed its records -- a standard practice when

concluding such a business relationship. UMF 60. Using the limited information in its possession,

Familymeds investigated transactions under the Supply Agreement, as well as those which occurred

under the First Amendment following McKesson's acquisition of D&K (the "**Audit**"). UMF 61.

The Audit included examination of the following areas.

#### 1.    Generic Drugs

Familymeds examined the average generic deflation in prices during time periods relevant to

the Supply Agreement. It determined McKesson had most likely improperly delayed extending the

resulting deflation amounts to Familymeds on an average of approximately 14 days. UMF 62.

Generics accounted for approximately 12% (or $7,234,351.25) of all of Familymeds' purchases

under the Supply Agreement. UMF 63. This improper 14 day delay equated to an estimated

$47,746.72 in overcharges under the Supply Agreement. UMF 64.

#### 2.    Specially Priced Merchandise

Familymeds examined products which McKesson categorized as Specially Priced. UMF 65.

Familymeds discovered McKesson had categorized approximately 6.5% (or $3,918,606.92) of all

non-generic drug purchases under the Supply Agreement as Specially Priced. UMF 66.

Familymeds also discovered McKesson had previously invoiced Familymeds for many of the **exact**

**same** products under the Cost Plus pricing structure. UMF 67. On the average, McKesson invoiced

Familymeds, 2.3% more per line extension under Specially Priced than it previously had for that

same merchandise under Cost Plus. UMF 68. McKesson had not provided any explanation, notice,

or reasoning for its change in billing categories for these items. UMF 69. This equated to an

estimated $90,127.96 in overcharges under the Supply Agreement. UMF 70.

PRINTED ON
RECYCLED PAPER

JMBM | Jeffer Mangels
Butler & Marmaro LLP

### 3. Cost Plus Pricing

In examining invoices for products billed under the Cost Plus pricing structure under the Supply Agreement, Familymeds discovered that the manufacturer pricing rebates and pricing incentives which were to be extended to Familymeds pursuant to the Supply Agreement were not indicated in the invoices to Familymeds. UMF 71.

### 4. Contract Products

Familymeds determined that McKesson had probably not honored the ▮▮▮▮rranged by contracts that Familymeds entered through Group Purchasing Organizations ("GPO's"), which affected an estimated $53.5 million in product. UMF 72, 73. Familymeds also determined McKesson probably overcharged Familymeds approximately 0.5% on these purchases by failing to honor bid-price ($267,500.00). UMF 74.

This Audit was conducted using the limited information McKesson had provided to Familymeds. UMF 75. Familymeds requires the underlying documentation from McKesson to fully ascertain the existence and extent of the overcharges under the Supply Agreement. UMF 76.

### D. The Request

In a letter dated September 18, 2007, and addressed to Ana Schrank of McKesson, James E. Searson, a Familymeds officer and director, requested documentation pertaining to prior account statements, Specially Priced Products, charges, credits, pricing adjustments, and payments. UMF 77. This request was refused. UMF 78.

### E. The First Action

**The Complaint**. On November 9, 2007, McKesson filed its Complaint for Breach of Contract to enforce amounts allegedly due under the Supply Agreement. UMF 79.

**The Counterclaim**. On December 17, 2007, Familymeds filed their Counterclaim for Specific Performance of Contract and Accounting; Cross-Complaint for Accounting seeking an accounting under contract and in equity (the "**Counterclaim**"), which includes a Cross-Complaint by FM Inc. against McKesson for an accounting in equity (the "**Cross-Complaint**"). UMF 80.

**The Motion To Dismiss**. On January 14, 2008, McKesson filed its Motion to Dismiss the Counterclaim (the "**Motion to Dismiss**"), wherein McKesson requested the Court to order FM Inc.

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    to file a separate lawsuit or to file a motion for FM Inc. to join the First Action.  UMF 81.

2        **March 12 Order**.  On March 12, 2008, this Court held the initial case management

3    conference for this action and ordered that discovery would be stayed and that the parties were to

4    conduct an informal accounting conference ("**March 12 Order**").  UMF 82.

5        **May 5 Order**.  On May 5, 2008, the Court heard and denied McKesson's Motion to Dismiss

6    without prejudice, directing FM Inc. to either file a motion to join the First Action, or to file a

7    separate action (the "**May 5 Order**").  UMF 83.

8        **Motion For Summary Judgment**.  On June 4, 2008, McKesson filed its MSJ.  McKesson

9    seeks an adjudication that it is entitled to $814,419.44 in damages plus additional services charges

10   and interest accrued thereon under its breach of contract claim.  UMF 84.  This amount is based on

11   invoices and service charges thereon as indicated in a May 30, 2008 account statement submitted by

12   McKesson with the MSJ (the "**Statement**").  UMF 85.  McKesson also seeks its attorneys' fees.

13   UMF 86.

14       McKesson further seeks an adjudication that FM Group is not entitled to an accounting from

15   McKesson under the Supply Agreement in equity or under contract.  UMF 87.  McKesson

16   additionally seeks an adjudication that FM Inc. is not entitled to an accounting in equity.  UMF 99.

17       **The Statement and Unpaid Invoices**.  The Statement submitted by McKesson in

18   connection with the MSJ was later produced in discovery.  UMF 89.  McKesson also produced

19   invoices for the period of February 26, 2007 through September 30, 2008 (the "**Unpaid Invoices**").

20   UMF 90.  These documents contain irreconcilable internal inconsistencies and fail to demonstrate

21   that Familymeds' is indebted to McKesson.  As discussed below in further detail, this reveals

22   serious errors and discrepancies in the total amount McKesson seeks, problems in the prices derived

23   under the Cost Plus structure and Contract Pricing, improper categorization of items as "Specially

24   Priced," treatment of credits and debits contrary to the terms of the Supply Agreement, and

25   improper and erroneous late/service charges.  As a result of these inconsistencies, the entirety of the

26   Unpaid Invoices and Statement is compromised and McKesson has failed to demonstrate the

27   absence of a triable issue on the amount it is allegedly owed.

28   ///

JMBM | Jeffer Mangels Butler & Marmaro LLP

**F.    The Second Action**

On June 6, 2008, Familymeds filed its Complaint for Specific Performance of Contract and Accounting, which includes a cause of action by FM Inc. against McKesson for an accounting in equity (the "**Second Action**"). UMF 91. On June 18, 2008, the Court entered its order which held that the Second Action is related to the First Action. UMF 92.

**G.    The Request For A Stipulation To Dismiss The Cross-Complaint**

FM Inc. re-filed its claims in the Second Action, as this Court had suggested. On July 14, 2008, Familymeds requested that McKesson stipulate to FM Inc. dismissing its claims in the Cross-Complaint without prejudice. UMF 93. McKesson refused this request. UMF 93. Because portions of the MSJ address the Cross-Complaint, Familymeds requested McKesson continue hearing on the MSJ to allow sufficient time for the Court to address Familymeds' request for leave to dismiss the Cross-Complaint without prejudice. McKesson denied this request as well. UMF 94.

Accordingly, on July 16, 2008, Familymeds filed its Motion for Order Granting Familymeds, Inc. Leave to Dismiss Cross-Complaint without Prejudice ("**Dismissal Motion**"). UMF 95. By granting Familymeds' Dismissal Motion this Court will render moot those portions of the MSJ directed at FM Inc.'s claims.

**H.    Discovery And Familymeds' Request To Continue The MSJ**

**Discovery Was Stayed Until May 5, 2008.** Pursuant to Federal Rule of Civil Procedure 26(d)(1), discovery was stayed until the parties conducted their Federal Rule of Civil Procedure 26(f)(1) conference, which occurred on January 23, 2008. UMF 96. Thereafter, at the March 12, 2008 Case Management Conference, this Court ordered that discovery was stayed until further order. UMF 82. It was not until this Court's May 5 Order that discovery was re-opened. UMF 83.

**Familymeds' Written Discovery.** On June 11, 2008, approximately one month after the Court lifted its stay on discovery, and one week after McKesson filed its MSJ, Familymeds served on McKesson its first set of interrogatories and requests for production (collectively, the "**Written Discovery**"). UMF 97.

**Familymeds' Request.** On June 30, 2008, Familymeds requested McKesson to continue the hearing on the MSJ for sixty days to allow Familymeds sufficient time to review and analyze

1   McKesson's responses to the Written Discovery, as well as to conduct follow-up discovery,

2   including depositions. UMF 98. McKesson rejected this request. UMF 98. Ultimately, McKesson

3   agreed to continue the hearing on the MSJ for two weeks until August 20, 2008. UMF 99.

4        **McKesson's Responses**. On July 17, 2008, Familymeds received McKesson's responses to

5   the Written Discovery (the "**Responses**"). UMF 100. The Responses contain mostly rote and

6   boilerplate objections and evasive responses. UMF 100. In connection with the Responses,

7   McKesson supplied a cd-rom with containing certain spreadsheets. UMF 101. These spreadsheets,

8   while containing tens of thousands of line entries, lack key data fields which would enable

9   Familymeds to discern the accuracy of either the Unpaid Invoices or the Statement. UMF 102.

10   More troubling is the fact that someone -- either McKesson's personnel or McKesson's lawyers --

11   took the **additional step of converting these spreadsheets to .pdf format before production**,

12   thereby rendering the spreadsheets virtually unusable. UMF 103. In light of the fact that

13   McKesson's counsel knew that Familymeds intended to utilize this information to oppose the MSJ,

14   McKesson's conversion of these spreadsheets was an inappropriate tactic which should not be

15   condoned. McKesson failed to produce any correspondence or e-mail documentation. Familymeds

16   therefore initiated the meet and confer process, which is currently ongoing.

17   **III.   LEGAL ARGUMENT**

18        Because summary judgment is a drastic device, cutting off a party's right to present its case

19   to a jury, the moving party bears the "heavy burden" of demonstrating the absence of any triable

20   issue of material fact and that it is entitled to judgment as a matter of law. Nationwide Life Ins. Co.

21   v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2nd Cir. 1999); Fed. R. Civ. P. 56(c). This

22   requires the moving party to establish beyond controversy every essential element of its claim. See

23   Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986); Torres Vargas v. Santiago

24   Cummings, 149 F3d 29, 35 (1st Cir. 1998). All reasonable inferences must be drawn in the

25   opposing party's favor both where the underlying facts are undisputed and where they are in

26   controversy. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 112 (1992);

27   T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-631 (9th Cir. 1987).

28   At the summary judgment stage, the opposing party's version of any disputed issue of fact is

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    presumed correct. Id. Summary judgment is to be granted with caution and only where the

2    evidence is "so one-sided that one party must prevail as a matter of law." Anderson v. Liberty

3    Lobby, Inc., 477 U.S. 242, 250, 55 (1986).

4        The opposing party "need not match the movant witness for witness, nor persuade the court

5    that her case is convincing, she need only come forward with appropriate evidence demonstrating

6    that there is a pending dispute of material fact." Waldridge v. American Hoechst Corp., 24 F.3d

7    918, 921 (7th Cir. 1994); Keri v. Board of Trustees of Purdue Univ., 458 F3d 620, 651 (7th Cir.

8    2006). The opposing party may rely upon circumstantial evidence to create a genuine issue of

9    material fact sufficient to defeat a motion for summary judgment. Cornwell v. Electra Central

10   Credit Union, 439 F3d 1018, 1029-1030 (9th Cir. 2006).

11       The court has absolute discretion to deny summary judgment wherever it determines that

12   justice and fairness require a trial on the merits. Anderson v. Liberty Lobby, Inc., (1986) 477 U.S.

13   242; Irvin v. Griffin Corp., 808 F.2d 802, 807 (11th Cir. 1987). Such a denial is appropriate when

14   the procedural posture of the case indicates the ruling might be premature. See Texas Partners v.

15   Conrock Co., 685 F.2d 1116 (9th Cir. 1982).

16       This Court also has the inherent authority to enter summary judgment *sua sponte*. See

17   Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Thus, this Court may grant summary judgment

18   in favor of Familymeds on its accounting claims for relief even though it has not filed a cross-

19   motion. See Kassbaum v. Steppenwolf Productions, Inc., 236 F.3d 487, 494–495 (9th Cir. 2000);

20   Gibson v. Mayor & Council of City of Wilmington, 355 F.3d 215, 222 (3rd Cir. 2004).

21   A.    **This Court Should Continue This Hearing To Enable Familymeds To Conduct Discovery On The Bases Of McKesson's MSJ - FRCP 56(f)**

22

23       This Court has the discretion to continue the hearing on McKesson's MSJ to enable

24   Familymeds to conduct discovery regarding the bases of McKesson's MSJ. See Fed. R. Civ. P.

25   56(f); See Stearns Airport Equip. Co., Inc. v. FMC Corp., 170 F.3d 518, 534 (5th Cir. 1999).

26   Following the lift of the stay on discovery, Familymeds promptly commenced discovery on

27   McKesson's claims. Familymeds seeks this information to enable it to oppose the MSJ, and

28   therefore, this Court should exercise its discretion to continue the MSJ pursuant to Rule 56(f).

PRINTED ON
RECYCLED PAPER

753547v2

JMBM

Jeffer Mangels
Butler & Marmaro ᴸᴸᴾ

1.    **Familymeds Has Demonstrated Good Cause For Continuing The MSJ**

A party demonstrates good cause for postponement of a motion for summary judgment pending discovery by showing:

a)  A likelihood that controverting evidence exists as to a material fact;

b)  Specific reasons why such evidence was not discovered or obtained earlier in the proceedings;

c)  The steps or procedures by which the opposing party proposes to obtain such within a reasonable time; and

d)  An explanation of how those facts will defeat the pending summary judgment motion. See Tatum v. City & County of San Francisco, 441 F.3d 1090,1100-1101 (9th Cir. 2006); Trask v. Franko, 446 F.3d 1036, 1042 (10th Cir. 2006); Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st Cir. 2007).

In circumstances such as these, in which little or no discovery has been completed, the party requesting the continuance is held to a lower standard because "a party making a Rule 56(f) motion cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not been laid." See Burlington Northern Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation, 323 F.3d 767, 774 (9th Cir. 2003). Moreover, where essential facts are in the moving party's possession, such as here, a Rule 56(f) continuance "should be granted almost as a matter of course." International Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3rd Cir. 1990). Familymeds has demonstrated good cause for this Court to continue the hearing on McKesson's MSJ.

**A Likelihood That Controverting Evidence Exists As To A Material Fact.** The Unpaid Invoices and Statement are the foundation for McKesson's MSJ. Familymeds' Written Discovery is devoted to examining the validity of that material and the data upon which it is allegedly based. Upon receipt of *responsive* information to Familymeds' Written Discovery, Familymeds' experts and attorneys will analyze it and conduct any necessary follow-up discovery. The information Familymeds seeks is in the exclusive possession and control of McKesson. Familymeds intends to utilize this material to oppose McKesson's MSJ by challenging the validity or accuracy of the Unpaid Invoices.

**Specific Reasons Why Such Evidence Was Not Discovered Or Obtained Earlier In The Proceedings.** Discovery was stayed until May 5, 2008 - approximately two months before

PRINTED ON
RECYCLED PAPER

753547v2

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    Familymeds' opposition to the MSJ was due. On June 11, 2008, one week after receiving the MSJ,

2    Familymeds propounded its Written Discovery. The evidence Familymeds seeks in its Written

3    Discovery to oppose the MSJ is in McKesson's exclusive control.

4    On July 17, 2008, Familymeds received McKesson's discovery responses. These responses

5    are wholly evasive and comprised of little more than objections. McKesson produced a disc full of

6    spreadsheets; however, McKesson converted these spreadsheets into a form which was not

7    reasonably useable by Familymeds. These spreadsheets omitted key fields which Familymeds

8    requires to verify the validity of McKesson's invoices. Familymeds is presently in the process of

9    enforcing the Written Discovery through the meet and confer process.

10   **The Steps Or Procedures By Which The Opposing Party Proposes To Obtain Such**

11   **Evidence Within A Reasonable Time.** Familymeds is currently meeting and conferring with

12   McKesson regarding its discovery responses, will propound follow up discovery requests, and will

13   depose both Ana Schrank and Leslie Morgan on their declarations submitted in connection with this

14   MSJ, including the documents upon which they rely but fail to provide. Familymeds intends to

15   depose Ms. Morgan on the scope of the "audit" she performed, what techniques and procedures she

16   utilized, and the reliability of her conclusions. This will be accomplished within 90 days - assuming

17   McKesson cooperates.

18   **How Those Facts Will Suffice To Defeat The Pending Summary Judgment Motion.**

19   The Unpaid Invoices and Statement are the foundation of the MSJ. Familymeds intends to examine

20   the backup information for these documents to determine if McKesson charged Familymeds the

21   correct product pricing, accurately invoiced Familymeds, and if the Unpaid Invoices and Statement

22   reflect credits and rebates due to Familymeds. This information can be used by Familymeds to

23   controvert the accuracy and validity of the amounts McKesson seeks in its MSJ.

24   **2.    Circumstances Favor The Court Continuing The MSJ**

25   **Discovery Was Stayed.** Discovery was stayed until May 5, 2008, which prevented

26   Familymeds from examining the bases for McKesson's claims. This favors this Court granting

27   Familymeds' Request. See DiMartini v. Ferrin, 889 F.2d 922, 926-927 (9th Cir. 1989).

28   **This Action Involves Complex Facts.** The complicated nature of the underlying facts,

*JMBM* Jeffer Mangels Butler & Marmaro LLP

1    including the complex financial relationship between the parties, favors this Court continuing the

2    hearing on the MSJ. See Garret v. San Francisco, 818 F.2d 1515, 1518-1519 (9th Cir. 1987).

3        **No Prejudice To McKesson**. McKesson seeks a liquidated amount. If this amount is

4    established, then McKesson stands to potentially accrue interest thereon pending resolution of this

5    Action. McKesson, therefore, will not be prejudiced by delay of this Court hearing its MSJ.

6        Accordingly, this Court should continue the hearing on McKesson's MSJ for 90 days to

7    enable Familymeds' to conduct discovery.

8    **B.    This Court Should Deny The MSJ Because McKesson Has Failed To Carry Its**
     **Burden To Demonstrate That It Has Been Harmed In A Specific Amount**
9

10       McKesson's sole cause of action is for breach of contract. If McKesson establishes that FM

11   Group breached it contractual obligations, then McKesson is entitled to recover an amount that will

12   compensate McKesson for all the detriment proximately caused by the breach. See Civil Code §

13   3300; Robinson Helicopter Company, Inc. v. Dana Corp., 34 Cal.4th 979, 992-993 (2004). This

14   amount necessarily includes credits and offsets due to Familymeds; McKesson cannot be harmed by

15   the loss of funds to which it is not entitled in the first place.

16       McKesson must demonstrate the harm it suffered from FM Group's alleged breach of

17   contract. On summary judgment, McKesson has the additional burden of demonstrating that no

18   triable issue exists as to this amount. McKesson simply has not done so. The documentation

19   submitted by McKesson is incomplete and laden with errors. Accordingly, because triable issues

20   exist as to the amount of McKesson's damages, if any, this Court must deny the MSJ.

21   **1.    The Documentation Produced By McKesson In Connection With This**
     **MSJ Fails To Demonstrate The Amount McKesson Is Owed**
22

23       The documentation submitted by McKesson in support of this MSJ, as well as that produced

24   in discovery, contain serious and fatal internal inconsistencies and errors, which include:

25   **a.    Inconsistent Total Outstanding Amount**

26       The "Total Net Invoice" amount indicated in the Unpaid Invoices is $634,726. UMF 104.

27   McKesson, however, claims this amount is $747,470 in its MSJ. UMF 105. McKesson, at another

28   point in the MSJ, states this amount is $724,574. UMF 106. The Statement indicates this amount

as $707,879. UMF 107. None of these amounts reconcile. McKesson has not explained these troubling and significant inconsistencies. The Supply Agreement was terminated on September 17, 2007, yet the Statement contains 41 line items entered after September 19, 2007 (some as late as May 30, 2008). UMF 108. The Statement contains unexplained and irreconcilable positive adjustments totaling $32,045 and negative adjustments in the amount of $35,363. UMF 109. In fact, McKesson concedes that the amount it seeks is not accurate. UMF 110. Additionally, the sampling methodology used by McKesson to verify the validity of the Unpaid Invoices and Statement fails all standards of accounting practice. UMF 111.

### b.    Cost Plus Pricing Errors

The Unpaid Invoices include significant overcharges and pricing errors under the Cost Plus pricing structure which compromise the validity of the Unpaid Invoices as a whole. UMF 112. As indicated above, ███████████████████████████████████████████ ████████████████████████████████████████ UMF 113. For 945 of the line items in the Unpaid Invoices, Familymeds was charged the WAC, with absolutely no discount extended. UMF 114. For 48 line items in the Unpaid Invoices, the price charged to Familymeds actually *exceeded* the WAC. UMF 115. For 34 line items, the WAC is different for the **same** product on the **same** date. UMF 116.

### c.    Contract Products

300 line items in the Unpaid Invoices, representing an aggregate net invoice amount of $59,145, were designated as Contract Price. UMF 117. These line items list 16 various contracts. UMF 117. This includes 155 line items where the Contract Price was higher than the Cost Plus pricing, and 20 line items where the Contract Price exceeded the WAC. UMF 118. ████████ ███████████████████████████████████ UMF 119. These are improper overcharges.

### d.    Specially Priced Products

In the Unpaid Invoices, McKesson seeks $43,440 for NSP and Net Billed products, which equates to $1,055 more than under the Cost Plus pricing structure for the very same products. UMF 120. 12 line items, however, are invoiced as Net Billed in certain invoices, yet are also invoiced **on**

PRINTED ON

RECYCLED PAPER

753547v2

- 15 -

CV07-5715 WDB
MPA IN OPP. TO MSJ

JMBM | Jeffer Mangels
Butler & Marmaro LLP

1    **the same day** under the Cost Plus pricing structure in other invoices.  UMF 121.

2                     e.      **Service/Late Charges**

3        The Statement fails to offset credit and debit balances on a chainwide level; rather,

4    McKesson treated each branch pharmacy as a different customer.  UMF 122.  This procedure does

5    not meet general accounting principals and resulted in $36,677 in negative balances at branch level,

6    which would have otherwise been resolved at chainwide level, causing $6,200 in improper

7    service/late charges.  UMF 123.  The majority of service/late fees were first assessed on September

8    17, 2007 - when McKesson terminated the Supply Agreement, and continued to accrue at 1% every

9    15 days thereafter.  UMF 124.  Many of those service/late service fees are neither 1% nor 2%,

10   which are the rates specified in the Supply Agreement; thus, the service charges are arbitrary and

11   unexplained.  UMF 125.  A sample of service/late fees reveals that McKesson improperly assessed

12   service/late fees when there were no outstanding invoices due.  UMF 126.  McKesson also

13   improperly assessed Familymeds $64,923 in service/late fees for non-retail locations, in direct

14   contradiction of the terms of the Supply Agreement.  UMF 127.

15       These errors are substantial and under the general principals of accounting, compromise the

16   integrity of the Unpaid Invoices and Statement as a whole.  They are consistent with the conclusions

17   of Familymeds' Audit.

18       McKesson has failed to reconcile any these inconsistencies, overcharges, or errors.  As a

19   result, McKesson has failed to carry its burden to establish that it has been damaged in a specific

20   amount.  At the very least, the foregoing creates triable issues of material fact as to this, thereby

21   requiring the Court to deny McKesson's MSJ.

22               2.      **Triable Issues Of Material Fact Exists As To McKesson's Prayer For**
                         **Attorneys' Fees and Costs**

23

24       In its complaint and MSJ McKesson seeks recovery of its attorneys' fees.  UMF 128.  Under

25   California law, however, attorneys' fees are not recoverable from an opposing party in the absence

26   of an express statutory provision or contractual agreement providing for such.  Reid v. Valley

27   Restaurants, Inc., 48 Cal.2d 606 (1957); Code of Civil Procedure § 1021.  Attorneys' fees are not

28   ordinarily recoverable as an element of damages.  Ferrell Gas, Inc. v. American Premier

PRINTED ON
RECYCLED PAPER

JMBM  Jeffer Mangels
      Butler & Marmaro LLP

1   Underwriters, Inc., 79 F.Supp.2d 1160 (C.D. Cal. 1999).

2        The Supply Agreement does not contain a prevailing party attorneys' fees provision.  UMF

3   129.  McKesson fails to provide in its complaint or its MSJ the basis for its attorneys' fees prayer.

4   UMF 130.  As a result, a triable issue exists as to whether McKesson is entitled to a portion of the

5   recovery it seeks - its attorneys' fees.  As such, this Court should deny McKesson's MSJ.

6        **C.    Section 4(f) of the Supply Agreement Has No Effect On McKesson's MSJ**

7        McKesson appears to argue that Section 4(f) of the Supply Agreement, which required FM

8   Group to remit payment on certain invoice amounts without offset, somehow now requires FM

9   Group to pay such amounts, irrespective whether an offset is appropriate.  Section 4(f) is merely a

10  term of the Supply Agreement, which McKesson claims FM Group breached.  In any event,

11  McKesson still must demonstrate the absence of any triable issue of material fact as to the exact

12  amount of damages that flow from FM Group's alleged breach of this term.  Obviously, McKesson

13  is only entitled to that which it is owed under the Supply Agreement; this damage calculation

14  necessarily must take into account offsets and adjustments which under the Supply Agreement

15  McKesson is obligated to apply.  Section 4(f) does not in any way expand McKesson's damage

16  claims.  Thus, the amount McKesson is entitled to recover from FM Group is the same, whether or

17  not Section 4(f) exists.

18       **D.    This Court Should Not Order Familymeds To Perform The Idle Act Of Paying**
         **McKesson Any Amount Which McKesson Must Later Return**
19

20       Even assuming McKesson had demonstrated that it is entitled to the Statement amounts, this

21  Court should not order Familymeds to perform the idle act of paying that amount which McKesson

22  must later return following an accounting.

23       The law does not require a party to perform an idle act.  See Civil Code § 3532; Bowie v.

24  Union Bank, 11 Cal.App.3d 807, 816 (1970).  In Bowie, a construction company had deposited

25  certain funds in a commercial account.  The construction company was indebted to the bank under a

26  promissory note.  A third-party obtained a right to attach order and levied upon the construction

27  company's commercial account.  Following re-financing of the construction company's obligations

28  to the bank, additional funds were transferred to a separate, segregated account in favor of the third-

PRINTED ON
RECYCLED PAPER

753547v2                                    - 17 -    CV07-5715 WDB
                                                     MPA IN OPP. TO MSJ

1    party attachor.

2        The construction company thereafter filed for bankruptcy. The writ of attachment lapsed.

3    The bank setoff against the funds in the attachment account, never transferring any funds back to

4    the commercial account and leaving no funds remaining. The bank refused to turn over the funds to

5    the bankruptcy trustee because it had set off against the funds in the attachment account -- in effect,

6    zeroing out the construction company's obligations.

7        The Court of Appeal found that the construction company was indebted to the bank, and

8    upon lapsing of the writ of attachment, the bank was entitled to set off against the previously

9    attached funds. In rejecting the bankruptcy trustee's arguments, the Court of Appeal held that the

10   bank was not obligated to transfer those funds to the original account before applying the set off, as

11   that would have been an idle act.

12           It was not necessary for the bank to make accounting entries to return the funds
             to the company's commercial account before exercising its setoff right; the law
13           does not require idle acts. . . . Id.

14       Similarly here, this Court should reject McKesson's request that FM Group perform the idle

15   act of paying to McKesson the amounts allegedly owing under the Unpaid Invoices, with the real

16   prospect that that amount will be adjusted and those funds returned back to FM Group following an

17   accounting. Such an unnecessary procedure would be a waste of the Court's, as well as the parties',

18   resources and time, and would constitute an idle act. Accordingly, this Court should not order

19   Familymeds pay McKesson anything until the true status of this account is determined.

20   **E.    The Facts Before This Court Properly Establish That FM Group Is Entitled To
             An Accounting From McKesson In Equity And As An Implied Term To The**
21   **      Supply Agreement**

22       **1.    Because The Underlying Accounts Are Complicated And McKesson
                 Owes FM Group An Amount To Be Ascertained By An Accounting, FM**
23   **          Group Is Entitled To An Accounting In Equity From McKesson**

24       An accounting in equity is proper when an unknown balance is due that cannot be

25   ascertained without an accounting, the means of which are within the knowledge of the defendant.

26   See Whann v. Doell, 192 Cal. 680, 684 (1923); Kritzer v. Lancaster, 96 Cal.App.2d 1, 7 (1950).

27   Even in the absence of a fiduciary relationship, an accounting is appropriate where accounts are so

28   complicated that an ordinary legal action demanding a fixed sum is impracticable. See Civic

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    <u>Western Corp. v. Zila Ind., Inc.</u>, 66 Cal.App.3d 1, 14 (1977).

2         In <u>Civic</u>, the plaintiff sought to enforce amounts allegedly due and owing under promissory

3    notes. Following the execution of a stipulation to allow the plaintiff to enforce its claims against its

4    collateral, the defendant filed a cross-complaint seeking, among other things, an accounting in

5    equity. The defendant alleged that the plaintiff had not properly accounted to the defendant during

6    the course of their business relations and that "the transactions were so involved and complicated as

7    to require an accounting to determine the financial status of the parties with respect to each other;

8    the total volume of the transactions was asserted to be in the area of $2 million." <u>Id</u>. at 7.

9         The plaintiff filed a motion for summary judgment on the cross-complaint. In opposition,

10    the defendant submitted declarations stating that there were discrepancies in the records it had

11    received from the plaintiff and that those records lacked sufficient information to enable the

12    defendant to ascertain the validity of the records it had received from the plaintiff. <u>Id</u>. At 9.

13         The trial court granted the summary judgment motion. The plaintiff had submitted

14    declarations stating that the defendant was sent, as part of the plaintiff's regular business practice,

15    monthly statements indicating the balance due. The plaintiff also submitted declarations stating that

16    the underlying financial information had been made available for the defendant's review. <u>Id</u>. at 10.

17         The Court of Appeal reversed, explaining that an accounting is proper "where the accounts

18    are so complicated that an ordinary legal action demanding a fixed sum is impracticable." It

19    explained that the defendant's officers declared that the information provided by the plaintiff was

20    insufficient to enable the defendant to "calculate a sum certain which constituted a final

21    determination of accounts." Additionally, the plaintiff had failed to demonstrate that the statements

22    the plaintiff had provided to the defendant were "sufficiently detailed to allow (the defendant) to

23    trace particular accounts, thereby enabling the (the defendant) to confirm whether the total balances

24    were correct." <u>Id</u>. at 14-15.

25         Similarly here, FM Group's relationship with McKesson under the Supply Agreement is so

26    complicated that an ordinary legal action demanding a fixed sum is impracticable. The Supply

27    Agreement involves complicated pricing mechanisms which graduate and adjust. Under the Supply

28    Agreement there were approximately $60 million in transactions involving hundreds of thousands

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    of invoices. Additionally, as in <u>Civic</u>, the information McKesson has provided to FM Group is

2    insufficiently detailed to enable FM Group to ascertain the accuracy of the balances set forth

3    therein. Further, the inconsistent records submitted by McKesson in conjunction with this MSJ are

4    laden with inconsistencies and require an accounting to verify. This tracks FM Group's internal

5    Audit, which indicates McKesson owes to FM Group hundreds of thousands of dollars for

6    overcharges. All of this is properly before this Court. Accordingly, FM Group has properly

7    demonstrated that it is entitled to an accounting in equity from McKesson under the Supply

8    Agreement, which the Court should order. At the very least, FM Group has demonstrated that a

9    triable issue of material fact exists as to this thereby mandating denial of the MSJ.

10        **a.    <u>McKesson's Argument That FM Group's Claim For An</u>**
          **<u>Accounting Cannot Independently Exist Is Un-Supported By Law</u>**
11        **<u>Or Fact</u>**

12        Familymeds has, at the very least, established that its accounts with McKesson are so

13    complicated that an ordinary legal action demanding a fixed sum is impracticable and that

14    McKesson owes FM Group for overcharges under the Supply Agreement. This establishes that FM

15    Group is entitled to an accounting. McKesson's argument that FM Groups' claim for an accounting

16    cannot independently exist therefore fails.

17        McKesson stretches an out-of-context quote for this argument. This quote is taken from

18    <u>County of Santa Clara v. Astra USA, Inc.</u>, 428 F.Supp.2d 1029 (N.D. Cal. 2006), which relies upon

19    <u>Janis v. Cal. State Lottery Comm'n</u>, 68 Cal.App.4th 824, 833 (1998). <u>Janis</u> in turn, relies upon

20    <u>Union Bank v. Sup. Ct.</u>, 31 Cal.App.4th 573, 593-594 (1995).

21        <u>Union Bank</u>, 31 Cal.App.4th 573 simply restated the fundamental element for an accounting

22    that the defendant must be indebted to the plaintiff in an amount to be determined by the

23    accounting. In that case, the Court of Appeal found that the plaintiff had no claim for an accounting

24    because it had not shown the requisite element that it was owed an amount to be determined by the

25    accounting:

26            ...Since defendant owes no money to plaintiff and did not deprive
             them of any moneys... the accounting cause of action must be
27            dismissed... No California decision holds that the existences of a
             complicated accounting relations between parties by itself permits the
28            maintenance of the lawsuit when no money is owed or property must

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    be returned... Id. at 594.

2    Familymeds, on the other hand, has alleged in its Counterclaim and indisputably

3    demonstrated that McKesson is indebted (whether for payment or offset) to FM Group in an amount

4    to be determined by an accounting -- at the very least, a triable issue exists as to this.  Familymeds'

5    Audit, the Unpaid Invoices, and the Statement all indicate that McKesson owes FM Group a

6    substantial amount for overcharges under the Supply Agreement; an accounting is necessary to

7    ascertain the full scope of these overcharges.  This is a claim which is entirely proper and can

8    independently exist.

9    Even assuming County of Santa Clara v. Astra USA, Inc., 428 F.Supp.2d 1029 (N.D. Cal.

10   2006) stands for the proposition which McKesson claims, which it does not, Union Bank v. Sup.

11   Ct., 31 Cal.App.4th 573 (1995) is the law of California.  A federal court must apply state law, and

12   such application is reviewed de novo by the Court of Appeals.  See Gasperini v. Center for

13   Humanities, Inc., 518 U.S. 415, 416 (1996); Salve Regina College v. Russell, 499 U.S. 225, 231

14   (1991).  As Familymeds has satisfied the standard of Union Bank v. Sup. Ct., 31 Cal.App.4th 573

15   (1995), it sufficiently states a claim for accounting and this Court must deny McKesson's MSJ.

16         **2.    This Court Should Imply Into The Supply Agreement The Reasonable
                   Term That FM Group Is Entitled To An Accounting And Order Specific**
17         **Performance Of The Same**

18   Even if this Court concludes that the Supply Agreement does not provide an express right to

19   an accounting, this Court should imply such a right into the Supply Agreement as a reasonable term.

20   The law will imply into a contract any terms necessary to make the contract reasonable

21   under the circumstances.  Civil Code § 1655; Citron v. Franklin, 23 Cal.2d 47, 57 (1943).  In Citron

22   the plaintiff and defendant entered into a contract which granted the plaintiff an option to purchase

23   up to 25% percent of the stock of a company held by the defendant.  The price for the stock was to

24   be determined by the amount of money the defendant had invested into the company.  The contract

25   provided that if the defendant sold the company prior to the defendant's exercise of his option, that

26   the defendant would be entitled 10% of the difference between the selling price of the company and

27   the amount that the defendant had invested therein.  Id. a 49.

28   The plaintiff repeatedly requested that the defendant identify the amount of money he had

1   invested in the company. The plaintiff wanted this information to determine whether to exercise the

2   option. This information was in the exclusive control of the defendant. The defendant, however,

3   would not provide this information to the plaintiff in a usable form. Id. at 53-55.

4       The time period set forth in the contract for the plaintiff to exercise the option lapsed and the

5   defendant sold the company. Id. at 50. The California Supreme Court held that the option had been

6   extended by the defendant's breach of the implied contractual term to provide to the plaintiff an

7   accounting. Id. at 56-57. As explained by the California Supreme Court:

8           …The option agreement provided that the option price should be computed upon
            the amount which defendant had paid into the corporation. No method was
9           provided by the express terms of the agreement to enable plaintiff to determine
            the amount defendant had so paid. We therefore believe it necessary, in order to
10          make the agreement reasonable, to read into the agreement the implied terms that
            defendant would furnish plaintiff with accurate information concerning that
11          amount at any time… and that any delay on the part of the defendant in
            furnishing such information would extend the life of the option.… Id. at 56.
12

13      Similarly, Familymeds and McKesson have a written agreement which provides

14  Familymeds with a product purchase price derived on what McKesson paid for those products. As

15  with the Citron defendant, these amounts are in McKesson's exclusive custody and control.

16  McKesson has made inconsistent representations to Familymeds about the discounts and prices

17  extended under the Supply Agreement; however, McKesson has never allowed Familymeds to

18  inspect the underlying documentation to verify these amounts. As with the contract in Citron, the

19  Supply Agreement lacks a procedure for Familymeds to inspect the underlying documentation.

20  Accordingly, this Court should follow Citron and imply into the Supply Agreement the reasonable

21  term that Familymeds is entitled to inspect the underlying documentation pertaining to its

22  transactions with McKesson to determine if it received the benefit of the terms of their agreement.

23  **F.     This Court Should Grant FM Inc. Leave To Dismiss Its Counterclaim Without
        Prejudice, Or Find That An Accounting Is Proper Because Of McKesson's**
24      **Involvement With The First Amendment**

25      **1.     This Court Should Grant FM Inc. Leave To Dismiss Its Claim For An
            Accounting From The First Action Without Prejudice**
26

27      This Court need not address McKesson's request for adjudication of FM Inc.'s claim for an

28  accounting. That claim has been re-filed in the Second Action pursuant to this Court's May 5 Order.

PRINTED ON
RECYCLED PAPER

753547v2

- 22 -     CV07-5715 WDB
           MPA IN OPP. TO MSJ

JMBM | Jeffer Mangels Butler & Marmaro LLP

1   Familymeds has requested leave to dismiss that claim without prejudice from the First Action.  This

2   Court should grant the Dismissal Motion, thereby vitiating the need for it to address the portion of

3   the MSJ directed at FM Inc.'s claim for relief.

4           **2.      FM Inc. Is Entitled To Accounting In Equity From McKesson Because**

5                     **Of McKesson's Extensive Involvement With The First Amendment**

6           If this Court is not willing to dismiss FM Inc.'s claims for an accounting from the First

7   Action, then it should order McKesson to provide FM Inc. with an accounting.

8           FM Inc. states a claim for an accounting in equity against McKesson for the same reasons

9   that FM Group is entitled to the same relief (discussed above).  The underlying accounts are so

10  complicated that an ordinary legal action demanding a fixed sum is impracticable; the pricing terms

11  of the First Amendment and Supply Agreement practically mirror one another.  The Audit also

12  extended to invoices under the First Amendment, which indicate substantial overcharges.

13          Although McKesson was not a party to the First Amendment, its extensive involvement is

14  absolutely indisputable.  McKesson was intimately involved in creating and servicing the First

15  Amendment.  As a result of its involvement, McKesson possesses and controls information

16  necessary to conduct an accounting under the First Amendment.  Accordingly, FM Inc. is entitled to

17  obtain an accounting from McKesson under the First Amendment.

18          McKesson has not, and simply cannot, point to any authority to support its bald statement

19  FM Inc. can only obtain an accounting from a party with which it shares contractual privity.  No

20  such limit exists on this Court's equitable powers.  This Court has the full authority to order such an

21  accounting.  This Court should order McKesson to provide to FM Inc. an accounting under the First

22  Amendment.  At the very least, a triable issue exists as to FM Inc.'s entitlement to this relief thereby

23  requiring this Court to deny McKesson's MSJ.

24          **G.      This Court Should Exercise Its Inherent Authority And Grant Partial**

25                     **Summary Judgment In Favor Of Familymeds And Order McKesson To**
                       **Provide An Accounting**

26          This Court has the inherent authority to enter summary judgment *sua sponte*.  See Celotex

27  Corp. v. Catrett, 477 U.S. 317, 326 (1986).  This Court properly has before it sufficient information

28  to determine that an accounting is appropriate.  This will put an end to what stands to be a

JMBM | Jeffer Mangels Butler & Marmaro LLP

1    protracted and contentious litigation. The parties will, under Court order, conduct an accounting an

2    determine who owes who what. Thus, this Court is fully authorized to, and should, enter partial

3    summary judgment on Familymeds' claim for an accounting and conclude this litigation.

4    **IV.    CONCLUSION**

5            This Court should deny McKesson's MSJ. The MSJ is premature and was filed a month

6    after this Court's stay on discovery was lifted. Further, the Unpaid Invoices and Statement fail to

7    demonstrate that McKesson has been harmed in any specific ascertainable amount as the result of

8    Familymeds' alleged breach of contract. This documentation, however, does establish that

9    Familymeds is entitled to an accounting. It is indisputable that the underlying accounts are

10   complicated and that McKesson has overcharged Familymeds in an amount to be determined by an

11   accounting. Accordingly, this Court should *sua sponte* enter partial summary judgment in favor of

12   Familymeds, ordering an accounting, and resolve this litigation.

13

14   DATED: July 30, 2008                    JEFFER, MANGELS, BUTLER & MARMARO LLP

15                                           ROBERT C. GEBHARDT
                                             MICHAEL A. GOLD
16                                           MATTHEW S. KENEFICK

17                                           By: /s/  Robert C. Gebhardt
                                                    ROBERT C. GEBHARDT
18                                           Attorneys for FAMILYMEDS GROUP, INC., f/k/a
                                             DRUGMAX, INC., a Nevada corporation and
19                                           FAMILYMEDS, INC., a Connecticut corporation

20

21

22

23

24

25

26

27

28