1  JEFFER, MANGELS, BUTLER & MARMARO LLP
   ROBERT C. GEBHARDT (Bar No. 48965), rcg@jmbm.com
2  MICHAEL A. GOLD (Bar No. 90667), mag@jmbm.com
   MATTHEW S. KENEFICK (Bar No. 227298), msk@jmbm.com
3  Two Embarcadero Center, Fifth Floor
   San Francisco, California 94111-3824
4  Telephone:    (415) 398-8080
   Facsimile:    (415) 398-5584
5

6  Attorneys for Defendant and Counterclaimant FAMILYMEDS
   GROUP, INC., f/k/a DRUGMAX, INC., a Nevada corporation and
7  Cross-Complainant FAMILYMEDS, INC., a Connecticut
   corporation
8
                    UNITED STATES DISTRICT COURT
9
                   NORTHERN DISTRICT OF CALIFORNIA
10
                          OAKLAND DIVISION
11

| | |
|---|---|
| MCKESSON CORPORATION, a Delaware corporation, | CASE NO.  CV07-5715 WDB |
| Plaintiff, | **DECLARATION OF EDGARDO MERCADANTE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION BY MCKESSON CORPORATION** |
| v. | |
| FAMILYMEDS GROUP, INC., f/k/a DRUGMAX, INC., a Nevada corporation, | |
| Defendant. | |
| FAMILYMEDS GROUP, INC., f/k/a DRUGMAX, INC., a Nevada corporation, | **Accompanying papers**: Memorandum of Points and Authorities; Kenefick Declaration; Tregillis Declaration; Separate Statement; Evidentiary Objections; and (Proposed Order) |
| Counterclaimant, | Time:   August 20, 2008 |
| v. | Date:   1:30 p.m. |
| MCKESSON CORPORATION, a Delaware corporation, | Place:  Ctrm. 4<br>1301 Clay St., 3d Floor<br>Oakland, CA |
| Counterdefendant. | Judge:  The Hon. Wayne D. Brazil |
| FAMILYMEDS, INC., a Connecticut corporation, | |
| Cross-Complainant, | Complaint filed:        Nov. 9, 2007 |
| v. | Counterclaim filed:     Dec. 17, 2007<br>Cross-Complaint Filed:  Dec. 17, 2007 |
| MCKESSON CORPORATION, a Delaware corporation, | Trial date:             none set |
| Cross-Defendant. | |

PRINTED ON
RECYCLED PAPER

755003v1

CV07-5715 WDB
MERCADANTE DECLARATION

I, Edgardo Mercadante, declare:

1. Since 1997 I have been, and I currently remain, the President, Chief Executive Officer, and Chairman of the Board of Familymeds Group, Inc. ("**FM Group**") at its offices located in Farmington, Connecticut. I am also the current President and Chief Executive Officer of Familymeds, Inc. ("**FM Inc.**") at its offices located in Farmington, Connecticut. FM Group and FM Inc. are collectively referred to herein as "**Familymeds**." If called upon to testify as to the facts set forth in this declaration, I could and would competently testify thereto since the facts set forth herein are personally known to me to be true, except as to those matters which I state on information and belief and as to those matters, I believe them to be true.

2. Attached hereto as **Exhibit 1** is a true and correct copy of my curriculum vitae.

3. I am one of the custodians of the books, records, and files of Familymeds as those books, records, and files pertain to Familymeds' dealings with McKesson Corporation ("**McKesson**"), D&K Healthcare Resources, Inc. ("**D&K**"), the purchase and acquisition of pharmaceutical and related products for resale, and the events and occurrences related to this lawsuit (collectively, the "**Records**"). I have personally worked on the said Records and, as to the following facts, I know them to be true of my own knowledge or have gained knowledge of them from the Records of Familymeds, which Records are maintained in the ordinary course of Familymeds' business.

4. The Records are kept in the regular course of Familymeds' business. The Records are carefully prepared to reflect all acts, conditions and events at or near the time the said acts, conditions or events occurred and the entries made therein are made by persons who have knowledge of the facts or have a business duty to maintain those records. Based on my personal knowledge and experience, I know that these Records are accurate and trustworthy. The Records are comprised of voluminous writings, recordings, other documentation which cannot conveniently be examined in court.

## The Parties

5. **FM Group**. FM Group is a reseller of pharmaceutical products. On November 12, 2004, Familymeds Group, Inc., a Connecticut corporation merged with and into DrugMax, Inc., a

1  Nevada corporation ("**DrugMax**"), leaving DrugMax as the surviving corporation, and thereafter,
2  on July 10, 2006, DrugMax amended its articles of incorporation to change its name to Familymeds
3  Group, Inc., a Nevada corporation.
4      6.    FM Inc. is a wholly owned subsidiary of FM Group and was at all times relevant to
5  this lawsuit the operating company for Familymeds.
6      7.    **D&K**.  D&K Healthcare Resources, Inc. ("**D&K**") was a wholesale supplier of
7  pharmaceutical products to re-sellers.  I have reviewed the records from the Delaware Secretary of
8  State, true and correct copies of which are attached hereto as **Exhibit 2**, which indicate that on
9  August 30, 2005, McKesson's wholly owned subsidiary, Spirit Acquisition Corporation, a Delaware
10 corporation, merged with and into D&K Healthcare Resources, Inc., leaving D&K Healthcare
11 Resources, Inc., a Delaware corporation, as the surviving corporation and thereby rendering D&K
12 Healthcare Resources, Inc. a wholly-owned subsidiary of McKesson.  These records indicate that on
13 January 1, 2006, D&K converted from being a Delaware corporation into a Delaware limited
14 liability company, and has thereafter remained as a Delaware limited liability company with
15 McKesson as its sole member.

### The Agreements

17     8.    As part of my duties as Chief Executive Officer of FM Inc. and FM Group, I was
18 personally involved with the negotiation, drafting, and execution of the contractual agreements
19 between Familymeds and pharmaceutical wholesalers, including those agreements in-issue in this
20 lawsuit.
21     9.    **The First Agreement.**  On December 28, 2004, FM Inc., Valley Drug Company
22 South, and D&K entered into that certain Prime Warehouse Supplier Agreement (the "**First
23 Agreement**"), which provided for D&K to sell and FM Inc. and Valley Drug to buy pharmaceutical
24 products.
25     10.    **The First Amendment.**  On December 27, 2005, DrugMax, FM, Inc., and D&K
26 entered in that certain written First Amendment to Prime Warehouse Supplier Agreement, which
27 provided, *inter alia*, to amend certain terms of the First Agreement (the First Agreement, as
28 amended, shall be referred to herein as the "**First Amendment**").

11. Following McKesson publically announcing its acquisition of D&K, in August 2005, Ned McKenna and Ana Schrank of McKesson contacted Jim Searson of Familymeds and myself. They explained that McKesson would require the First Agreement to be amended to reflect McKesson pricing and payment structures.

12. The First Agreement was negotiated and prepared by the following D&K representatives - none of which were involved in the First Amendment or Supply Agreement: J. Hord Armstrong, Marty Wilson, and Ed Petrella.

13. The following McKesson representatives were involved in the negotiation of the First Amendment and Supply Agreement: Jack W. Fragie, Ana Schrank, Albert Franco, Ned McKenna, Peter Pasquale, and John Figueroa. The First Amendment and Supply Agreement were both drafted by, or at the behest of, McKesson's San Francisco legal department.

14. Paul C. Julian of McKesson executed both the First Amendment and the Supply Agreement.

15. Beginning in or around February 2006, and until the end of the term of the First Amendment in December 2006, McKesson sent to Familymeds, Inc. and FM Group all invoices for payment which arose under the First Amendment, and payment of those invoices was sent to McKesson. Under the First Amendment, Familymeds was invoiced a collective amount of $155,337,001.69. Of these, $11,515,205.00 in invoices were originated from D&K - $143,821,796.69 were originated from McKesson.

16. **The Supply Agreement**. On February 2, 2007, FM Group and McKesson entered into that certain written Supply Agreement (the "**Supply Agreement**") which provided for McKesson to sell and FM Group to buy pharmaceutical products.

17. There are different categories of pharmacies. There is a distinction between a retail pharmacy, a clinic pharmacy, a worksite pharmacy, and a pharmacy which is operated as a long term care pharmacy. During the time periods relevant to this lawsuit, Familymeds owned and operated a collective number of 91 pharmacies. Of these, 41 were retail pharmacies, 44 were clinic pharmacies, three (3) were long term care pharmacies, and three (3) were worksite pharmacies (Familymeds' clinic, long term care, and worksite pharmacies are collectively referred to as "**non-**

**retail pharmacies**"). Attached hereto as **Exhibit 3** is a true and correct copy of a spreadsheet identifying these pharmacies. The term apothecary, as used therein, is term to describe retail community pharmacies.

18. The Supply Agreement distinguishes between payment terms for products delivered to Familymeds' retail pharmacies as opposed to those delivered all categories of Familymeds' pharmacies, as indicated in the First Amendment (which McKesson drafted and negotiated). This was a bargained for distinction. The pertinent provisions of the First Agreement, as compared against the correlating provisions of the Supply Agreement, are as follows:

First Amendment at Paragraph 10 (amending Section 9.A):

> Payment for Products delivered to Customer's store locations shall be due and payable by wire payment fourteen (14) days from the date of invoice.

Supply Agreement at Paragraph 4.A:

> Payment for Merchandise delivered to Customer's **retail Pharmacies** shall be paid by Customer as follows: Invoices are due and payable within seven days from invoice date via EFT or ACH. (Emphasis added.)

19. Based on my involvement with the negotiation and drafting of the First Amendment and the Supply Agreement, it is my understanding that the seven (7) day payment terms of the Supply Agreement only applied to invoices for merchandise delivered to Familymeds' retail pharmacies, and therefore, expressly do not apply to invoices for merchandise delivered to Familymeds' non-retail pharmacies. Accordingly, any service fees charged by McKesson to Familymeds for Familymeds' alleged failure to pay within seven (7) days for goods delivered to Familymeds' non-retail pharmacies were erroneous and improper.

20. According to the Records of Familymeds, Familymeds' was invoiced under the First Agreement for a collective amount of $142,038,393.32, of which, $1,071,723.72 in invoices were originated from McKesson for Florida based Familymeds stores (pursuant to Florida regulatory laws following McKesson's acquisition of D&K). Familymeds' Records also indicate that Familymeds was invoiced for a collective amount of $155,337,001.69 under the First Amendment, of which, $143,821,796.69 of those invoices were originated from McKesson and $11,515,205.00

were originated from D&K, and Familymeds was invoiced for a collective amount of $60,286,260.08 under the Supply Agreement.

### The Documentation Arising From The Agreements

21.     McKesson provided Familymeds with information pertaining to invoices through the McKesson Supply Management Online system (the "**SMO**"). The SMO was a web-based application; thus, Familymeds accessed it through the Internet. The SMO only provided Familymeds with the identity and quantity of the products it ordered and the prices extended - it did not provide Familymeds with any of the underlying information pertaining to how those prices were calculated and whether such calculations conformed to the terms agreed upon in the Supply Agreement. The SMO was Familymeds' only source of such information (other than the packing slips sent in hard copy to the branch pharmacies).

22.     On or around September 30, 2007, McKesson terminated Familymeds' access to the SMO. Familymeds had previously downloaded EDI (electronic data interchange) files from the SMO; however, these files involve hyper-linked core files which would no longer work after McKesson terminated Familymeds' access to the SMO.

23.     McKesson has never provided to Familymeds documentation which indicates McKesson's actual base-line price on invoice dates, what concessions McKesson received for each of the products, and whether those concessions were reflected in the prices extended to Familymeds pursuant to the terms of the Supply Agreement. McKesson has also never provided to Familymeds the bases for McKesson classifying certain products as Specially Priced.

24.     Following McKesson's acquisition of D&K and during the course of the First Amendment and Supply Agreement, Familymeds made repeated inquiries to McKesson about pricing discrepancies, at multiple levels, as part of its regular and ordinary business routine, practice, habit, process and procedure; however, none of the key data discussed in Paragraph 23 above was provided to Familymeds.

### The Audit

25.     On September 17, 2007, Ana Schrank of McKesson informed Familymeds that McKesson was terminating the Supply Agreement. As this stood to be the conclusion of

Familymeds' business relationship with McKesson, I wanted to conduct an audit of Familymeds' dealings with McKesson. This is standard practice.

26. I thereafter conducted an investigation of Familymeds' dealings with McKesson under the Supply Agreement and the transactions which occurred under the First Amendment following McKesson's acquisition of D&K (the "**Audit**"). Familymeds, however, had very limited information from McKesson. McKesson maintained exclusive possession and control of most of the information pertaining to the transactions under the Supply Agreement. I performed the Audit using the information I had available, my extensive experience in the pharmaceutical industry, as well as my education, training, and background. In addition to examining transactions which occurred under the First Amendment following McKesson's acquisition of D&K, the Audit included examination of the following areas pertaining to the Supply Agreement:

    a) **Generic Drugs**. Under Paragraph 9 of the Supply Agreement, Familymeds was required to participate in the McKesson OneStop Generics Program. This accounted for approximately 12% of all of Familymeds' purchases under the Supply Agreement (12% of $60,286,260.38 = $7,234,351.25). In examining the prices McKesson charged Familymeds for generics drugs, I examined the average generic deflation in prices extended to wholesalers, chain pharmacies, independent pharmacies and other groups at product cost level according to the National Association of Chain Drug Stores ("NACDS") prescription statistics for prescription programs (the "**Deflation Amount**"). The Deflation Amount aggregate cost price decreases are weighted towards new product generic introductions that rapidly go down in pricing after their single source manufacturer availability is exhausted and many other manufacturers produce the individual generic product. This is very important in the pharmaceutical industry, which is based on very small profit margins, because insurers and third-party adjusters reduce the price they pay to pharmacies such as Familymeds to reflect the Deflation Amount. Based on my research, I determined that the Deflation Amount was

approximately 16.5% in 2005 and approximately 17% in 2006. This equates to an average price decrease of 0.32% (32 basis points) per week during 2005 and 0.33% (33 basis points) per week during 2006. Based on my expertise, I concluded that the 2006 amount was properly extrapolated through the year of 2007. I reviewed a statistically significant sample of invoices and discovered that McKesson had decreased its generic prices to Familymeds on an average of fourteen (14) days after the various manufacturers had issued their respective price decreases into market/industry. These figures applied extend to $47,746.72 in overcharges for generics under the Supply Agreement (2 week average delay @ 0.33% per week applied to $7,234,351.25 in estimated generic purchases under the Supply Agreement). This does not take into account the $143,821,796.69 invoiced by McKesson under the First Amendment or the $1,071,723.72 invoiced by McKesson under the First Agreement. Based on this, I concluded there was a high likelihood of significant overcharges under the Supply Agreement and the underlying documentation pertaining to generic purchases would enable Familymeds to determine the existence and scope of these overcharges.

    b)  **Specially Priced Merchandise**. Review of a statistically significant sample of invoices and data which was available from the SMO (and which Familymeds no longer has access to) revealed that under the Supply Agreement McKesson categorized approximately 6.5% of all non-generic drug purchases under the Specially Priced terms (Paragraph 5.C of the Supply Agreement) (6.5% of $60,286,260.38 = $3,918,606.92). McKesson, however, had previously invoiced Familymeds for many of the same exact products under the Cost Plus pricing structure. McKesson had provided to Familymeds absolutely no explanation, notice, or reasoning for its change in billing categories for these items. These invoices also revealed that McKesson invoiced Familymeds, on the average, 2.3% (230 basis points)

greater in cost per line extension under Specially Priced program than it previously had for that same merchandise under the Cost Plus structure. These figures applied extend to $90,127.96 in overcharges for non-generic drugs being improperly mis-categorized as Specially Priced under the Supply Agreement (2.3% overcharge extended to $3,918,606.92 in non-generic drug purchases). This does not take into account the $143,821,796.69 invoiced by McKesson under the First Amendment or the $1,071,723.72 invoiced by McKesson under the First Agreement. Based on this, I concluded there was a high likelihood of significant overcharges under the Supply Agreement and the underlying documentation pertaining to Specially Priced categorization of products would enable Familymeds to determine the existence and scope of these overcharges.

    c)  **Cost Plus Pricing**. In evaluating the McKesson invoices under the Supply Agreement for products invoiced pursuant to the Cost Plus structure (Paragraph 5.B of the Supply Agreement), I first determined that the drug price inflation according to the General Accounting Office and the NACDS was 4.5% for 2005 and 4.75% for 2006. I then examined a statistically significant sample of invoices for the products invoiced under the Cost Plus pricing structure under the Supply Agreement, and determined that the invoices originated by McKesson during the same time periods under the Cost-Plus structure increased by 8.3% in 2005 and 7.8% in 2006. Prompted by this discrepancy, I sampled a statistically significant number of brand name high volume pharmaceuticals and commonly re-occurring products which appeared in thousands of invoices. Based on information provided by the manufacturers of these drugs, I discovered that the "best volume" purchasers of these products, such as McKesson, were extended rebates and pricing incentives, which included fixed price buy-in privileges. From the invoices I sampled, I could not discern whether ▬▬▬▬

- 8 -    CV07-5715 WDB
MERCADANTE DECLARATION

755003v1

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2  ▮▮▮▮▮▮▮ Based on this, I concluded there was a high likelihood of significant overcharges under the Supply Agreement and the underlying documentation pertaining to Cost-Plus pricing would enable Familymeds to determine whether McKesson, in-fact, honored the Cost-Plus terms of the Supply Agreement.

      d) **Contract Products**. Under Paragraph 5.B of the Supply Agreement, McKesson was obligated to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Based on my review of a statistically significant sample of invoices, I determined that McKesson had not honored the bid price arranged by contracts Familymeds entered through the Group Purchasing Organizations of Armada HealthCare and Med Assets for an estimated $53.5 million in product. Based on my calculations, I determined that McKesson overcharged Familymeds approximately 0.5% on these purchases by failing to honor bid-price ($267,500.00). Based on this, I concluded there was a high likelihood of significant overcharges under the Supply Agreement and the underlying documentation pertaining to Contract Product pricing would enable Familymeds to determine whether McKesson, in-fact, honored the Contract Pricing terms of the Supply Agreement.

## The Request

27.    In a letter dated September 18, 2007, and addressed to Ana Schrank of McKesson, James E. Searson, an officer and director of both Familymeds, Inc. and FM Group, requested documentation pertaining to prior account statements, Specially Priced Products, charges, credits, pricing adjustments, and payments. I was copied on this letter, a true and correct copy of which is attached hereto as **Exhibit 4**. McKesson refused this request.

///

///

///

1  I declare under penalty of perjury that the foregoing is true and correct.
2  Executed on July 30, 2008                    _____
                                                 EDGARDO MERCADANTE, Declarant