MARIA K. PUM (State Bar No. 120987)
KRISTEN E. CAVERLY (State Bar No. 175070)
HENDERSON & CAVERLY LLP
P.O. Box 9144 (all U.S. Mail)
16236 San Dieguito Road, Suite 4-13
Rancho Santa Fe, CA 92067-9144
Telephone: (858) 756-6342
Facsimile: (858) 756-4732
Email: mpum@hcesq.com

Attorneys for Plaintiff
McKESSON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

McKESSON CORPORATION, a Delaware corporation,

Plaintiff,

v.

FAMILYMEDS GROUP, INC., f/k/a Drugmax, Inc., a Connecticut corporation,

Defendant.

---

FAMILYMEDS GROUP, INC., f/k/a Drugmax, Inc., a Connecticut corporation,

Counter-Claimant,

v.

McKESSON CORPORATION, a Delaware corporation,

Counter-defendant.

---

FAMILYMEDS, INC., a Connecticut corporation,

Cross-Complainant,

v.

McKESSON CORPORATION, a Delaware corporation,

Cross-Defendant.

---

Case No. 4:07-cv-05715 WDB

**REPLY OF McKESSON CORPORATION TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUCATION**

Complaint filed: November 9, 2007
Cross-Complaint Filed: December 17, 2007

Date: August 20, 2008
Time: 1:30 p.m.
Place: Ctrm 4
1301 Clay St., 3d Floor
Oakland, CA

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. THE BREACH OF CONTRACT CLAIM. ..... 1

A. There is No Genuine Issue of Material Fact That Prevents Summary Judgment Enforcing the Express Terms of the Supply Agreement Against FM Group. ..... 1

B. FM Group has Waived Any Opportunity it Might Have Had to Pay Anything Less than the Amounts it was Billed. ..... 3

C. Nonpayment Pursuant to Contract Terms for Goods Delivered to FM Group Satisfies the Showing of Damages. ..... 4

D. Payment to McKesson Would Not be an "Idle Act." ..... 5

E. The Forensic Accounting Analyses Offered by FM Group Do Not Substantiate FM Group's Theories of Billing Discrepancies and Do Not Give Rise to Genuine Issues of Material Fact. ..... 6

1. Misstatements by FM Group Regarding the Amounts Stated as Owed. ..... 6

2. FM Group's Allegations of Cost Plus Pricing Errors. ..... 7

3. Alleged Contract Price Overcharges. ..... 8

4. Specially Priced Products. ..... 8

5. Service/Late Charges. ..... 9

6. Limitation of Service Charges to "Retail" Pharmacies. ..... 10

F. The Demand for Attorneys' Fees Does Not Deprive McKesson of Summary Judgment or Summary Adjudication. ..... 11

III. FM GROUP'S DEMAND FOR AN ACCOUNTING ..... 11

A. FM Group Cannot Maintain an Equitable Claim for an Accounting. ..... 11

B. FM Group Cannot Modify the Supply Agreement With an Implied Right to an Accounting. ..... 12

IV. THERE IS NO REASON TO POSTPONE THE HEARING THE MOTION. ..... 13

V. FM GROUP'S STATEMENT OF UNDISPUTED FACTS. ..... 14

VI. THERE IS NO BASIS TO GRANT FM GROUP SUMMARY JUDGMENT ..... 15

VII. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. (1986) .......... 1, 2, 5, 10

*Bellevue v. Prudential Ins. Co. of America*, 23 Fed. Appx. (9th Cir. 2001) .......... 12

*Citron v. Franklin*, 23 Cal. 2d (1943) .......... 12, 13

*Civic Western Corp. v. Zila*, 66 Cal.App.3d (1977) .......... 11

*Colby v. J.C. Penney Co.*, 127 F.R.D. (N.D. Ill. 1989) .......... 14

*County of Santa Clara v. Astra USA*, 2006 U.S. Dist. (N.D. Cal. 2006) .......... 12

*Duggal v. G.E. Capital Communication Services*, 81 Cal. App. 4th (2000) .......... 12

*ERA Franchise Systems v. Brager & Assoc.*, 2007 U.S. Dist. .......... 11

*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. (1968) .......... 5

*Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th (2000) .......... 12

*Hinckley v. Bechtel Corp.*, 41 Cal.App.3d (1974) .......... 3

*In re Mission Ins. Co.*, 41 Cal. App. 4th (1995) .......... 2

*Inc. v. Oroville-Wyandotte Irr. Dist.*, 49 Cal. App.3d (1975) .......... 3

*Janis v. California State Lottery Comm'n*, 68 Cal. App. 4th (1998) .......... 11

*Keeble v. Brown*, 123 Cal. App. 2d (1954) .......... 11

*Kritzer v. Lancaster*, 96 Cal. App.2d (1950) .......... 11

*Nidds v. Schindler Elevator Corp.*, 113 F.3d (9th Cir. 1996) .......... 14

*Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp.*, 992 F.2d (5th Cir. 1993) .......... 14

*Stoll v. Runyon*, 165 F3d 1238, 1243, n1 (9th Cir. 1999) .......... 15

*Union Bank v. Superior Court*, 31 Cal. App. 4th (1995) .......... 11

*Van de Kamp v. Bank of America*, 204 Cal. App.3d (1988) .......... 11

Statutes

Cal. Com. Code ("UCC") §2607 .......... 4

Civil Code §1655 .......... 14, 15

Civil Code §3300 .......... 4

Civil Code §3302 .......... 5

Civil Code §3532 .......... 6

Rules

Fed. Rule of Civ. Procedure 56(c) .......... 1

Fed. Rule of Civ. Procedure 56(f) .......... 15, 16

Other Authorities

¶ 11 of Judge Brazil's November 11, 2003, Standing Order .......... 17

Civil Local Rule 56-2 .......... 17

## I. INTRODUCTION

The standard for summary judgment set forth in Federal Rule of Civil Procedure ("FRCP") 56(c) "[b]y its very terms . . .provides that the mere existence of ***some*** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no ***genuine*** issue of ***material*** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)(emphasis in original). In the instant case, McKESSON CORPORATION ("McKesson") has established in its motion for summary judgment or, in the alternative, summary adjudication (the "Motion") the existence of a valid and binding contract, performance by McKesson, breach by Defendant FAMILYMEDS GROUP, INC., ("FM Group"), and resulting damages suffered by McKesson. In its opposition brief (the "Opposition") and other papers filed in opposition to the Motion (the "Opposition Papers"), FM Group has sought to defeat the Motion by begging for time to pursue unnecessary discovery, by chronicling 117 new, purportedly material and disputed facts listed in a new statement of disputed and undisputed facts,[1] by fabricating disputes and making misleading statements about the evidence, and by misapplying the applicable law. None of these stratagems demonstrates the existence of a "***genuine*** issue of ***material*** fact" that would forestall summary judgment in favor of McKesson.

## II. THE BREACH OF CONTRACT CLAIM.

### A. There is No Genuine Issue of Material Fact That Prevents Summary Judgment Enforcing the Express Terms of the Supply Agreement Against FM Group.

FM Group does not dispute that the Supply Agreement is a valid contract between FM Group and McKesson. FM Group Facts at ¶¶ 1-4. FM Group does not dispute that FM Group agreed under the Supply Agreement to pay McKesson for amounts billed "without (i) making any deductions, short payments, or other accounts payable adjustments to such obligation; or (ii) seeking to condition such remittance on any demand for or receipt of proofs of delivery." FM Group Facts at ¶8. Nor does FM Group dispute that McKesson delivered to FM Group all

[1] *See* the "Separate Statement of Disputed, Undisputed and Additional Facts in Opposition to Motion for Summary Judgment or, n the Alternative, Summary Adjudication by McKesson Corporation" filed on July 30, 2008 by FM Group and Familymeds, Inc. (the "FM Group Facts").

Merchandise for which it was invoiced. FM Group Facts at ¶14.[2] Based on these admissions by FM Group, summary judgment should be granted in favor of McKesson.

It is irrelevant that FM Group may think it has unearthed or might unearth a host of errors in McKesson's billing statements given enough time. FM Group entered into a contract that required FM Group to pay what it was billed and nothing less. Paragraph 4.F of the Supply Agreement provides:

> Customer agrees to render payment in full to McKesson on the applicable due date as specified in this Agreement without (i) making any deductions, short payments, or other accounts payable adjustments to such payment obligation; or (ii) seeking to condition such remittance on any demand for or receipt of proofs of delivery. Any accounts payable adjustments claimed by Customer shall require prior written authorization of McKesson and must be supported by accompanying detail documenting the basis for any such requested adjustments.

McKesson is entitled to have Paragraph 4.F specifically enforced. It does not matter if FM Group questions a particular charge; FM Group must pay the amount billed. Because there is no excuse for nonpayment, none of the alleged discrepancies catalogued by FM Group (assuming they exist, which they do not) give rise to a genuine issue of material fact that would defeat summary judgment. As was stated by the Supreme Court in *Anderson, supra*: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." 477 U.S. at 248.

FM Group's sole argument against enforcement of Paragraph 4.F is that "Section 4(f) is merely a term of the Supply Agreement, which McKesson claims FM Group breached." Opposition at p.17; lls. 9-10. Dismissing Paragraph 4.F as "merely a term of the Supply Agreement" is akin to asking the Court to rewrite the Supply Agreement to eliminate Paragraph 4.F. That argument fails. "[W]hen the language of a contract is plain and unambiguous it is not within the province of a court to rewrite or alter by construction what has been agreed upon." *In re Mission Ins. Co.*, 41 Cal. App. 4th 828, 836 (1995). Nor can FM Group take refuge in an argument that to enforce Paragraph 4.F would cause a harsh result to FM Group. "[T]he courts cannot

---

[2] FM Group states that they dispute Fact No. 14 , but the explanation underneath the word "Disputed" shows that FM Group is not disputing whether the Merchandise ordered was delivered. Rather, FM Group alleges that there are discrepancies in the amounts billed.

rewrite a contract to avoid difficulty or hardship." *Wyandotte Orch., Inc. v. Oroville-Wyandotte Irr. Dist.*, 49 Cal. App.3d 981, 988 (1975) (citation omitted); *Hinckley v. Bechtel Corp.*, 41 Cal.App.3d 206, 212 (1974) ("Courts cannot make for the parties better agreements than they themselves made or rewrite contracts because they operate harshly or inequitably as to one of the parties.")

FM Group is a sophisticated purchaser of vast quantities of pharmaceutical products from large wholesalers such as McKesson. Indeed the curriculum vitae of Mr. Edgardo Mercadante attached as Exhibit "1" to the Declaration of Edgardo Mercadante filed among the Opposition Papers, indicates that Mr. Mercadante had 25 years in the prescription health care, chain pharmacy and retail nutrition industries. He understood what he was doing when he entered into a contract with a provision that required FM Group to pay amounts billed without adjustment or offset. This is not a harsh result. This is what FM Group bargained for.

**B. <u>FM Group has Waived Any Opportunity it Might Have Had to Pay Anything Less than the Amounts it was Billed.</u>**

Each of the Unpaid Invoices contains a legend that required FM Group to call any claims to McKesson's attention within five days of the date of the invoices. Supp. Morgan Decl. at ¶10. No claims or disputes were ever called to McKesson's attention before McKesson notified FM Group that it would cease shipping Merchandise to FM Group. Only then did it state that it wished to investigate whether any claims might exist with regard to billing practices. *Id. See also*, the Original Schrank Declaration at ¶11 and the Supplemental Declaration of Ana Schrank filed and served herewith (the "Supp. Schrank Declaration") at ¶9. Because no claims were raised by FM Group, it has waived any claims it might have made concerning alleged billing error.

FM Group has also waived its claims regarding perceived billing errors by virtue of California Commercial Code ("UCC") §2607. Section 2607 provides in pertinent part:

> (1) The buyer must pay at the contract rate for any goods accepted.
>
> . . . .
>
> (3) Where a tender has been accepted:
>
> (A) The buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy;

It is not reasonable for FM Group to have waited until after September 17, 2007 before it asserted

any claims about pricing discrepancies affecting invoices issued in January 2007 and perhaps sooner. Nor is it reasonable to challenge billings relating to the Unpaid Invoices that were first issued on February 26, 2007 or March 1, 2007. FM Group, even if it had not contracted away its right to challenge invoices without paying them, waived its ability to do so by failing to notify McKesson of the alleged breach within a reasonable amount of time. Because it has no right to challenge the billing at this late date, summary judgment should be granted in favor of McKesson.

**C. Nonpayment Pursuant to Contract Terms for Goods Delivered to FM Group Satisfies the Showing of Damages.**

FM Group appears to contend that McKesson cannot establish that it has suffered damages for either of two reasons. First, FM Group contends based on Civil Code §3300[3] that McKesson is not damaged by FM Group's nonpayment because if McKesson establishes that FM Group breached its obligations under the Supply Agreement, McKesson will be compensated "for all the detriment proximately caused by the breach." Opposition at p.14; lls.10-13. Under this theory, no party to a breached contract could show that it has been damaged by the breaching party's non-payment because the non-breaching party can point to a statue that promises that the non-breaching party will be fully compensated (some day) for any loss proximately caused by the non-payment. Such is not the law. In fact, Civil Code §3302 provides:

> The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon.

In other words, McKesson has established it was damaged merely by virtue of FM Group's having failed to pay McKesson as provided in Paragraph 4.F of the Supply Agreement.

Second, FM Group contends that McKesson allegedly cannot show that it has been harmed by FM Group's non-payment because once FM Group is given the opportunity to scour all the line items of every invoice and each billing statement issued to FM Group over the course of the $60,000,000 relationship between FM Group and McKesson, FM Group is confident that it will

---

[3] Civil Code section 3300 reads: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

unearth such a level of pricing errors that any monies paid to McKesson will have to be returned to FM Group. Thus, McKesson is not harmed by FM Group's nonpayment. Opposition at p14, lls. 13-15. The prospect of some treasure trove of pricing errors is unsubstantiated wishful thinking on the part of FM Group. It is not even plausible that FM Group genuinely believes that it can find $800,000 in pricing errors when (i) FM Group raised not a single complaint about billing practices for 10 months involving $60,000,0000 in sales before September 17, 2007, notwithstanding that money was in short supply for FM Group and it was managing every penny closely, (ii) FM Group has yet to come forward with a single concrete example of an error by McKesson that was not corrected by the processes that are built in to McKesson's billing system and are reflected on FM Group's billing statements, (iii) FM Group had access on a 24/7 basis to the SMO System operated by McKesson that would have allowed FM Group to inquire about any perceived discrepancies, and (iv) for all his investigation to date, the forensic accountant hired by FM Group has not identified any true discrepancies as is discussed below and even those he mistakenly believes exist are immaterial. FM Group's hopes of finding a "smoking" gun are not sufficient to withstand a motion for summary judgment. To paraphrase the Supreme Court in *Anderson, supra*, FM Group may not "rest on [its] allegations of [pricing errors] to get to a jury without 'any significant probative evidence tending to support [its defense].'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (*citing First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290 (1968)). Nonpayment of the outstanding billing statements establishes damages.

**D. <u>Payment to McKesson Would Not be an "Idle Act."</u>**

FM Group also seeks to defeat the Motion by resorting to one of the maxims of jurisprudence codified in Civil Code §3532 which provides: "The law neither does nor requires idle acts." According to FM Group, even if McKesson "demonstrated that it is entitled to the Statement amounts, this Court should not order Familymeds to perform the idle act of paying that amount which McKesson must later return following an accounting." Opposition at p. 17; lls. 20-22. According to FM Group, there is a "real prospect that the amount [owed] will be adjusted." Opposition at p.18; lls.14-19. Payment of $800,000 in arrearages by a company that is no longer operating and may be dissipating its assets is not an "idle act." Moreover, to withstand summary

judgment on this point, FM Group must come forward with more that its hopes and dreams.

**E. The Forensic Accounting Analyses Offered by FM Group Do Not Substantiate FM Group's Theories of Billing Discrepancies and Do Not Give Rise to Genuine Issues of Material Fact.**

McKesson has established that it is entitled as a matter of law to have Paragraph 4.F of the Supply Agreement enforced against FM Group and that FM Group should be ordered to pay the May 30 Statement balance without offset or adjustment of any kind. Nevertheless, because the allegations made by FM Group in the Opposition Papers may give the false impression that the billing statements issued to FM Group are either inherently unreliable or riddled with errors, McKesson will respond to some of the allegations made in the Opposition Papers although none of the alleged discrepancies—even if they existed, which they do not—can give rise to a dispute of a *material* issue of fact because (a) McKesson is entitled to receive payment without adjustment or set off, and/or (b) FM Group has waived any opportunity it had to question charges made on the invoices or billing statements. In any event, McKesson has set forth in a summary format below its responses to the criticism leveled against the integrity of McKesson's systems and the amounts claimed by McKesson to be due in the Opposition Papers. Greater detail and "back up" is set forth in the Supplemental Morgan Declaration and the Supplemental Schrank Declaration filed herewith. In the final analysis, none of the billing criticisms made by FM Group are justified or substantiated.

**1. Misstatements by FM Group Regarding the Amounts Stated as Owed.**

The Opposition lists an array of figures that it claims represent inconsistent amounts demanded by McKesson as being what FM Group must pay McKesson. For example, the Opposition alleges that the Unpaid Invoices reflect "Total Net Invoice Amounts" due of $634,726. Opposition at p. 14; lls. 26. Not so. FM Group pulled this figure not from the Unpaid Invoices as is represented was done, but from a compilation spreadsheet that was prepared to provide FM Group with pricing data they asked for in their discovery requests. Supp. Morgan Decl. at ¶¶11-12.

Next, the Opposition represents that McKesson stated in the Motion that the "Total Net Invoice Amount" listed on the Unpaid Invoices aggregated $747,470. Opposition at p. 14; lls. 27. Also not true. The number $747,470 appears nowhere in the Motion. The source of this figure is a chart on page 11 of the Motion that was used to illustrate that the Unpaid Invoices were each billed

on one of seven days. Apparently, FM Group added up the numbers in the final column and arrived at the figure $747,470. Supp. Morgan Decl. at ¶¶5-6. But McKesson never stated that adding up that column would include all credits and debits for which FM group was liable. Supp. Morgan Decl. at ¶6. To calculate what FM group owes, it is necessary to account for post invoice events such as "add-bills", credits, pricing corrections and various other "post-invoice" adjustments. Supp. Morgan Decl. at ¶¶4,6. Those line items appear in the billing statements but they were not germane to the purposes of the chart set forth on page 11 of the Motion.

Next, the Opposition contends that McKesson elsewhere in the Motion stated that the "Total Net Invoice" amount was $724,574. Opposition at p. 14; lls. 28. Not so. McKesson never stated that $724,574 was the "Total Net Invoice" amount. The $724,574 was what McKesson alleged in the Complaint was owing as of October 31, 2007, excluding certain unearned discounts. Supp. Morgan Decl. at ¶4,6. Finally, the Opposition expresses disquiet that even after McKesson ceased to ship product to FM Group, there were 41 line items entered after September 19, 2007. However, post-invoice adjustments are customary events in the industry and can occur months after the product at issue was purchased and invoiced to FM Group. These adjustments were all appropriate and are discussed in greater detail in the Supp, Morgan Decl. at ¶¶4 & 21.

**2. FM Group's Allegations of Cost Plus Pricing Errors.**

FM Group asserts that the Unpaid Invoices include significant pricing errors which "compromise the validity of the Unpaid Invoices as a whole." Opposition at p.15; lls. 10-11. Each of the cited pricing errors is debunked by the Supplemental Declaration of Leslie Morgan. For example, in Paragraph 9 of the Tregillis Declaration, Mr. Tregillis states that he identified "945 line items from the Unpaid Invoices with a listed pricing method of COG, but for which the discount of or WAC was zero. . . ." (See also Opposition at p. 15; lls. 13-15.) Mr. Tregillis contends this is an error and refers the Court to Exhibit "2" of his declaration to detail this observations. Mr. Tregillis's error here is that he did not recognize that the items listed on Exhibit "2" were "over the counter" or "OTC" items and under the Supply Agreement, OTC items have a 0% adjustment. Supp. Morgan Decl. ¶13.

The Tregillis Declaration also identifies in Paragraph 9 "48 line items in which the price

charged to Familymeds was higher than WAC." Investigation of this criticism indicated that all of these were "Specially Priced Merchandise," a term defined in Paragraph 5.C of the Supply Agreement. Supp. Morgan Decl. ¶14. In fact, 85% of these Specially Priced Merchandise items that were priced higher than WAC relate to products that are manufactured by Wyeth which is a vendor that does not provide customary cash discounts. *Id.*

As purported further evidence of alleged "Cost Plus Pricing Errors," the Opposition references a finding made by Mr. Tregillis that 34 items on the Unpaid Invoices involved line items where "WAC appears to be different" for the same product on the same day. Exhibit "6" to the Tregillis Declaration is said to illustrate this point. Supp. Morgan Decl. ¶20. As is explained in the Supplemental Morgan Declaration, there is no discrepancy here because the products thought by Mr. Tregillis to be the same items, were not the same. One product was a repackage product sold under McKesson's RxPak program—as is indicated on Exhibit 6 to the Tregillis Declaration and the other was not. Supp. Morgan Decl. ¶20.

**3. Alleged Contract Price Overcharges.**

The crux FM Group's claim that there were errors in contract pricing is that of the 300 line items designated as contract priced items, 155 reflected contract prices where the contract price was higher than the Cost Plus pricing, and in 20 instances the contract price exceeded WAC. Opposition at p.15;lls.19-22. The Opposition asserts these are improper overcharges. *Id.* at lls. 24. Not so. A contract-priced item is an item where FM Group has negotiated directly with a vendor or manufacturer of a particular product for a set price. If FM Group enters into such an agreement with a vendor, then the contract price that FM Group has negotiated with that vendor is the price that FM Group is charged when FM Group purchases that product through McKesson as the distributor of the vendor's product. Supp. Morgan Decl. ¶15. The Supply Agreement does not give FM Group the *lower* of the contract price it negotiated with a vendor or the price that McKesson would offer under the Cost of Goods model, nor is FM Group guaranteed that it will never pay more than WAC. If FM Group negotiates a contract price with a vendor, that's the price that FM Group gets. Supp. Morgan Decl. ¶15. There were no "improper overcharges" here.

**4. Specially Priced Products.**

With regard to Specially Priced items, the Opposition cites the finding made in Paragraph 13 of the Tregillis Declaration and in Exhibit 5 thereto that 12 items were billed under Net Billed and either the Contract or COG method on the same day. Review of Exhibit 5 shows that the items listed were not identical as is claimed by FM Group. In each case where a COG price was indicated and a Net Billed price was also indicated for ostensibly the same type of product, the difference is explained by the "RXPak" notation on the "Description" line for the products listed on Exhibit 5. Under the RXPak Program McKesson purchases brand name drugs in large quantities and repackages the drugs into standard count sizes, resulting in a savings to a customer. The distinction is evident "RXPAK" notation in the description and also because the Item number is different as between the two products. For example, Vicodin ES Tab 750mg ***RXPAK*** 100 is identified as Item no. 3658788 (and is priced COG ) and Vicodin ES Tab 750 mg 100 (without any reference to RX Pak) is identified as Item No. 667903 (and priced Net Billed). Supp. Morgan Decl. ¶18. There is no evidence of a discrepancy here.

**5. Service/Late Charges.**

The Opposition makes three objections to the imposition of service charges: (i) the billing statement fails to offset credit and debit balances on a chain-wide level which allegedly runs afoul general accounting principals, (ii) the service fees or late charges as calculated by Mr. Tregillis seem arbitrary because they are neither 1% nor 2%, (iii) that late charges were assessed when there were no outstanding invoices, and (iv) McKesson imposed service charges on 100% of the pharmacies owned or operated by FM Group when only "retail" pharmacies were allegedly subject to such charges. The first three criticisms are addressed in the Supplemental Morgan Declaration. In a nutshell:

- There is no showing that McKesson was under any obligation under the Supply Agreement to offset credit and debit balances on a chain-wide level. The Supply Agreement states in Paragraph 4.E that late charges are imposed when any payment is past due; no netting as between Pharmacies is contemplated or required. Supp. Morgan Decl. ¶25;
- Mr. Tregillis calculated the late fess based on what is shown to be outstanding on the current billing statement. But that is not when the relevant service charge was imposed. The service charge was imposed any time a payment became delinquent. The amount of the invoice may later have been paid or reduced due to a credit, but the service charge remains outstanding until it is paid or reduced by a credit. Supp. Morgan Decl. ¶¶22-25.

- Late charges can still appear on a billing statement for a particular Pharmacy even after the underlying invoice that resulted in the service charge is paid. Supp. Morgan Decl. ¶22.

The fourth objection with regard to the imposition of late charges is dealt with below.

**6. Limitation of Service Charges to "Retail" Pharmacies.**

According to the Opposition Papers, the Supply Agreement drew a distinction between "retail" pharmacies and "non-retail" pharmacies and only "retail" pharmacies were subject to the seven-day payment terms. If this new theory were to be believed, then 41 out of the 91 Pharmacies owned and operated by FM Group would have been subject to seven-day payment terms and the remaining 50, which Mr. Mercadante now classifies as a type of Pharmacy other than a "retail" Pharmacy would have had no payment deadline whatsoever because nothing in the Supply Agreement contains any provisions that would govern these "non-retail" Pharmacies. This is clearly not what was intended by the Supply Agreement. Supp. Schrank Decl. at ¶¶4-7. The pattern and practice and course of dealing off FM Group is also completely inconsistent with any genuine belief that the seven-day payment terms only applied to 41 out of the 91 Pharmacies. On the one hand FM Group was trying to stretch its payment terms as long as possible to meet its cash flow restrictions, and on the other it was purportedly allowing more than half of its Pharmacies to pay on seven-day terms when they allegedly did not have to because they were not "retail" pharmacies. In fact, FM group attempted every day to pay 100% of the invoices dated seven days earlier. No professed distinction between retail and non-retail was ever made because none existed. Supp. Schrank Decl. at ¶¶9-10. Indeed, no objection was ever made by any representative of FM Group that only half of its Pharmacies were subject to seven day terms. Supp. Schrank Decl. at ¶9. It is not plausible that this retail/non-retail distinction exists and therefore FM Group cannot now use it to manufacture a dispute to forestall summary judgment because the dispute is not genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248 (in order to be a genuine dispute of a material fact, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party.")

**F. The Demand for Attorneys' Fees Does Not Deprive McKesson of Summary Judgment or Summary Adjudication.**

According to FM Group, because McKesson included a claim for attorneys' fees in the Motion and did not provide a basis for that claim, the demand for attorneys fees defeats the Motion. This is incorrect. A determination of what attorneys' fees may be awarded occurs on a hearing of a separate motion which takes place within 14 days after entry of judgment by the District Court. N.D. Cal. Civil L.R. 54-6 (2008). The language regarding attorneys' fees in the summary judgment motion is intended to preserve McKesson's right to seek attorneys' fees on a noticed motion after the summary judgment has been granted.

## III. FM GROUP'S DEMAND FOR AN ACCOUNTING

**A. FM Group Cannot Maintain an Equitable Claim for an Accounting.**

Under California law, in order to state an equitable claim for an accounting, all three of the following elements must be present: "(1) a relationship or circumstances that require an accounting; (2) a balance is due which cannot be ascertained without an accounting; and (3) the means of an accounting are within the defendant's knowledge." *ERA Franchise Systems v. Brager & Assoc.*, 2007 U.S. Dist. LEXIS 56418, 22, citing *Van de Kamp v. Bank of America*, 204 Cal. App.3d 819, 864 (1988) *and Kritzer v. Lancaster*, 96 Cal. App.2d 1, 7 (1950). Accordingly, California courts have generally held that a fiduciary relationship must exist between the parties for an accounting to be found necessary. *Van de Kamp*, at 864 (citations omitted); see also *Kritzer*, at 6-7, and *Keeble v. Brown*, 123 Cal. App. 2d 126, 133 (1954). Here, there is no contention that a fiduciary relationship exists.

FM Group relies on *Civic Western Corp. v. Zila*, 66 Cal.App.3d 1, 14 (1977) for the proposition that FM Group can maintain an independent cause of action for an accounting where no fiduciary relationship exists on the grounds that the "accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable." Oppostion at p.18; lls 27-28. FM Group's reliance on *Civic Western* misplaced. A right to an accounting is a derivative action that must be based on other claims. *Janis v. California State Lottery Comm'n*, 68 Cal. App. 4th 824, 833-834 (1998), citing *Union Bank v. Superior Court*, 31 Cal. App. 4th 573, 593-594 (1995).

Although FM Group tries to claim that *Janis* misapplies the decision in *Union Bank*, numerous courts have ruled explicitly that an accounting claim can only exist when based on an underlying cause of action. See *Duggal v. G.E. Capital Communication Services*, 81 Cal. App. 4th 81, 95 (2000)("The right to an accounting is derivative and depends on the validity of a plaintiff's underlying claims."); *Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1023 n.3 (2000)(an accounting claim is "dependant upon a substantive basis for liability'); *Bellevue v. Prudential Ins. Co. of America*, 23 Fed. Appx. 809, 811 (9th Cir. 2001)(cannot maintain accounting claim without underlying contract claim because right to accounting must be based on other claims); *County of Santa Clara v. Astra USA*, 2006 U.S. Dist. LEXIS 57176 (N.D. Cal. 2006).

In explaining its decision in *County of Santa Clara*, the court relies on the holding in *Janis* to support its holding that accounting claims are dependent on other claims. The court goes on to review *Civic Western*, noting that in *Civic Western* accounting was never a stand-alone claim; although the *Civic Western* court found an accounting claim could go forward, it was supported by two other independent causes of action. *County of Santa Clara*, at 19-20. Absent an independent basis for liability, FM Group cannot maintain an action for an equitable accounting.

The Opposition also argues that the accounts at issue in this case are so complicated that an accounting in equity is necessary to determine the amounts in dispute. "Allegations of complicated accounts, however, are not enough to state a claim for an accounting." *County of Santa Clara*, 2006 U.S. Dist. LEXIS 57176 at 20, citing *Civic Western*, at 14. However, even if the accounts at issue were sufficiently complicated, as FM Group alleges, that alleged complexity will not give rise to a right to an accounting "where it appears from the complaint that none is necessary or that there is an adequate remedy at law." *Id.* Here now accounting is necessary or appropriate because (i) FM Group bargained away any opportunity it might have had to assert a right to an accounting, (ii) FM Group waived any ability to contest perceived pricing errors in the billing statements and invoices, (iii) and FM Group has an adequate remedy at law.

### G. <u>FM Group Cannot Modify the Supply Agreement With an Implied Right to an Accounting.</u>

FM Group asserts that "[t]he law will imply into a contract any terms that are necessary to make the contract reasonable under the circumstances" and cites Civil Code §1655 for that

proposition, as well as *Citron v. Franklin*, 23 Cal. 2d 47 (1943). Section 1655 reads:

> Stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention.

This statute does not support FM Group's claim to an implied right to accounting inasmuch as an implied right to an accounting *is completely inconsistent with Paragraph 4.F of the Supply Agreement which requires payment of billed amounts within seven days without adjustment.*

Likewise, *Citron*, is distinguishable from the situation here. In *Citron*, the plaintiff had a right to exercise an option that he could not exercise without getting data from the defendant and the defendant was stonewalling the plaintiff. Indeed, the Court found that "defendant, through fraudulent representations, endeavored to gain an unconscionable advantage over plaintiff." 23 Cal. 2d at 57. The *Citron* court ruled based on Civil Code §1655 that in order to make the option agreement reasonable it would supply a term that did not appear in the contract: the requirement that defendant furnish accurate information to plaintiff and so long as he did not comply with that obligation, the option was extended. *Id.* at 56. Here, the Supply Agreement is not silent concerning FM Group's payment obligations: it must pay within seven days of the invoice date without any adjustment. There is no need to read any term into the agreement to make it "reasonable."

**IV. THERE IS NO REASON TO POSTPONE THE HEARING THE MOTION.**

There is no justification for a continuance of the hearing on the Motion pursuant to FRCP 56(f). There was nothing "prompt" about FM Group's commencement of discovery. FM Group waited 37 days after the discovery stay was lifted to send out any discovery. Declaration of Maria K. Pum filed and served herewith (the "Pum Decl.") at ¶2. And this was while they knew that McKesson had been directed to file a motion for summary judgment by June 4, 2008. *Id.* In addition, the discovery was not served in a manner to expedite matters; it was served on June 11, 2008 by first class mail. Pum Decl. at ¶¶ 2-3. The alleged meet and confer efforts are non-existent on the part of FM Group as they have postponed each of the two conference calls that were set up and have not sought to reschedule a meet and confer conference since they cancelled the last call on July 23, 2008. Pum Decl. at ¶6. Everything FM Group has done to date has been to delay the

time before FM Group's defenses are put to the test. It is proper for the Court to deny a request for a stay pursuant to Rule 56(f) where the requesting party has failed to diligently pursue discovery. *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 921 (9th Cir. 1996).

Apart from the lack of diligence in completing meaningful discovery, the hearing on the Motion should not be continued because FM Group cannot show that there is a likelihood that controverting evidence exists as to a material fact. Opposition at p.12; lls. 4. The Supply Agreement provides that payments must be made without set off or adjustment. FM Group's failure to bring any alleged pricing errors to McKesson's attention within 5 days (or within a reasonable time) results in a waiver of its claims. Additionally, McKesson has shown that the touted errors do not exist. Where it reasonably appears that further discovery would not produce evidence creating a genuine issue of material fact, the district court's preclusion of further discovery prior to entering summary judgment is proper. *Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp.*, 992 F.2d 1398, 1401 (5th Cir. 1993).

Furthermore, FM Group has failed to satisfy the condition to obtaining a continuance set forth in Rule 56(f) that a party, not its counsel, submit an affidavit stating "specified reasons, [why] it cannot present facts essential to justify its opposition." FRCP 56(f); *Colby v. J.C. Penney Co.*, 127 F.R.D. 509, 512 (N.D. Ill. 1989). Here, no such declaration was submitted.

## V. FM GROUP'S STATEMENT OF UNDISPUTED FACTS.

When McKesson filed its Motion on June 4, 2008, it filed and served a statement of undisputed facts containing 23 facts it believed were undisputed (the "Original Statement"). McKesson could not file a *joint* statement of undisputed facts as is contemplated by the Local Rules of this Court because FM Group refused to provide any responses to the draft provided to them a week before the Motion was required to be filed. Instead, FM Group waited until its Opposition Papers were due and to then filed, without calling to discuss it with counsel for McKesson, the FM Group Facts in which FM Group responded to the 23 facts included in the Original Statement and in addition tacked on an additional 117 allegedly undisputed facts. FM Group did not meet and confer concerning neither the Original Statement nor the FM Group Facts. *See* Pum Declaration at ¶9. McKesson was obliged to respond. McKesson prepared a

reconciliation of the Original Statement and the FM Group Facts (the "Reconciliation of Facts") which was filed herewith. The Reconciliation of Facts addresses FM Group's responses to the first 23 facts submitted by McKesson, and then addresses the remaining 117 facts, including by making appropriate objections. The Reconciliation of Facts also includes a request (which request is hereby repeated here) that this Court impose a sanction upon FM Group for its failure to meet and confer with regard to either the Original Statement or the FM Group Facts in the form of striking and refusing to consider the contents of the FM Group Facts. Sanctions are contemplated by Civil Local Rule 56-2 and ¶ 11 of Judge Brazil's November 11, 2003, Standing Order ("Order 11") The sanction requested is appropriate here.

### VI. THERE IS NO BASIS TO GRANT FM GROUP SUMMARY JUDGMENT

In the Opposition, FM Group "reminds" the Court of its inherent power to issue summary judgment sua sponte. Summary judgment for the non-moving party is only appropriate where it is apparent from the record that there is no genuine issue of material fact and that the moving party has had a full opportunity to ventilate the issue and the non-movant is entitled to judgment as a matter of law. *Stoll v. Runyon*, 165 F3d 1238, 1243, n1 (9th Cir. 1999). As indicated above, FM Group's accounting cause of action is insupportable.

### VII. CONCLUSION

For the foregoing reasons, McKesson respectfully requests that the Court grant McKesson the relief requested in its Motion.

DATED: August 6, 2008.

HENDERSON & CAVERLY LLP

By: ______________________
Maria K. Pum
Attorneys for McKesson Corporation