1  MARIA K. PUM (State Bar No. 120987)
   KRISTEN E. CAVERLY (State Bar No. 175070)
2  HENDERSON & CAVERLY LLP
   P.O. Box 9144 (all U.S. Mail)
3  16236 San Dieguito Road, Suite 4-13
   Rancho Santa Fe, CA 92067-9144
4  Telephone:    (858) 756-6342
   Facsimile:    (858) 756-4732
5  Email: mpum@hcesq.com

6  Attorneys for Plaintiff
   McKESSON CORPORATION
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11  McKESSON CORPORATION, a Delaware        Case No.4:07-cv-05715 WDB
    corporation,
12                                          **SUPPLEMENTAL DECLARATION OF**
                      Plaintiff,            **LESLIE MORGAN IN REPLY TO**
13                                          **OPPOSITION TO MOTION FOR**
            v.                              **SUMMARY JUDGMENT OR, IN THE**
14                                          **ALTERNATIVE, SUMMARY**
    FAMILYMEDS GROUP, INC.,                 **ADJUDICATION BY McKESSON**
15    f/k/a Drugmax, Inc., a Connecticut corporation,  **CORPORATION**

16                    Defendant.

17  FAMILYMEDS GROUP, INC.,
      f/k/a Drugmax, Inc., a Connecticut corporation,
18                                          Complaint Filed:  November 9, 2007
                      Counterclaimant,      Cross-Complaint Filed: December 17, 2007
19
            v.                              Motion Date:  August 20, 2008
20                                          Time:  1:30 p.m.
    McKESSON CORPORATION, a Delaware        Place:  Ctrm 4
21  corporation,                                   1301 Clay St., 3d Floor
                                                   Oakland, CA
22                    Counterdefendant.

23

24  FAMILYMEDS, INC.,
    a Connecticut corporation,
25
                      Cross-Complainant,
26          v.

27  McKESSON CORPORATION, a Delaware
    corporation,
28
                      Cross-Defendant.

1    I, LESLIE MORGAN, declare that I have personal knowledge of the following facts and, if

2    called upon to do so, I could and would testify competently thereto:

3        1.    I am employed by McKESSON CORPORATION ("McKesson"). At all times

4    relevant to the events described below, my title was Senior Manager, Contract Compliance.

5        2.    I am providing this Declaration to supplement the declaration that I signed on June

6    4, 2008 (the "Original Morgan Declaration") in support of the motion for summary judgment or in

7    the alternative summary adjudication filed and served by McKesson on that day (the "MSJ").    The

8    two declarations should be read together, such that, for example, any references to information

9    based on the Familymeds Books and Records, are prefaced by the paragraphs laying the foundation

10   for the exception to the hearsay rules that allows me to rely on the books and records of McKesson

11   that are kept in the ordinary course of McKesson's business. Capitalized terms not otherwise

12   defined in this declaration are defined in the Original Morgan Declaration.

13       3.    I have read the Declaration of Christian Tregillis filed in opposition to the MSJ by

14   Familymeds on July 30, 2008 (the "Tregillis Declaration"). The Tregillis Declaration

15   mischaracterizes and/or misinterprets the data that has been provided to FM Group and that FM

16   Group had available to it.

17       4.    The Tregillis Declaration makes a fundamental mistake in that fails to account for

18   the fact that when a customer such as FM Group purchases product from McKesson and an invoice

19   is generated, the invoice alone is not the sole document that reflects what the customer owes at any

20   point in time. The relationship between McKesson and any given customer is dynamic.  Orders are

21   placed by customers on a daily basis and payments are due, in the case of FM Group, within seven

22   days of the billing date.  But the amounts on the invoices that issue due to the placement of an

23   order are not the sole amounts that affect the payment obligations of a customer to McKesson.  In

24   addition, events occur after the invoice issues that results in adjustments to the payment obligations

25   owed by the customer, including (i) credits on account of returned products, (ii) "add-bills" on

26   account of chargebacks denied by vendors that are passed through to the customer, (iii) pricing

27   corrections, (iv) fees and service charges attributable to late payments, and (v) a variety of other

28   "post-invoice" adjustments. These items show up on the billing statements that are issued to the

1

1 customer and are available for review by customers when they access the SMO System. Thus, for

2 example the May 30, 2008 Statement (the "May 30 Statement") that was attached as <u>Exhibit E</u> to

3 the Compendium of Exhibits filed in support of the MSJ (the "Compendium") contains the

4 following items that add up to the amount owed by FM Group and for which McKesson seeks

5 judgment in the MSJ:

| | |
|---|---|
| Invoices: | $768,107.18 |
| Adjustments on Statement | |
|    Drop Ship | $        - |
|    Credits | $ (60,227.55) |
|    Net Pricing Corrections | $   126.22 |
|    Fee Invoices | $   500.00 |
|    Addbills | $   911.62 |
|    Service charges | $123,816.34 |
|    <u>Residuals</u> | <u>$ (18,814.37)</u> |
|    Statement Totals | **$814,419.44** |

      5.      Because of the pricing adjustments that continuously occur as described above (and

in the Original Morgan Declaration), it is completely misleading for FM Group to cite Paragraph

13 of the Declaration of Ana Schrank filed in support of the MSJ (the "Original Schrank

Declaration") to represent to the Court that McKesson's complaint sought to recover $747,470 as

of October 31, 2007 from FM Group. Said Paragraph 13 had the following chart[1]:

| Invoice Date | Due Date | Gross Payment Owed | Amount initially billed because invoices presume FM Group will qualify for "timely payment" discount |
|---|---|---|---|
| 2/26/07 | 3/5/07 | 110,873.35 | 108,655.87 |
| 3/1/07 | 3/8/07 | 531,138.64 | 520,338.35 |
| 9/11/07 | 9/18/07 | 34,745.61 | 34,037.15 |
| 9/12/07 | 9/19/07 | 23,208.17 | 22,740.64 |
| 9/13/07 | 9/20/07 | 21,666.97 | 21,233.63 |
| 9/14/07 | 9/21/07 | 26,575.03 | 26,044.56 |
| 9/17/07 | 9/24/07 | 14,610.90 | 14,423.89 |

The foregoing chart was provided in the Original Schrank Declaration to illustrate that the breach

---

[1] The Original Schrank Declaration had a typographical error in the second line and
contained the date 3/31/07 where it should have read 3/1/07, and the date 4/7/07 where it should
have read 3/8/07. The chart has been corrected.

2

1  of contract action brought by McKesson involved only seven days' worth of outstanding invoices

2  (the "Unpaid Invoices"): two days of invoices in the first quarter of 2007 and five days of invoices

3  that fell due after September 17, 2007 when McKesson put FM Group on shipping hold due to

4  nonpayment of the February 26, 2007 and the March 1, 2007 invoices.

5        6.     The chart in the Original Schrank Declaration and produced above contained no

6  totals for the columns listed, because McKesson made no claim that the aggregate of the sums

7  listed on the chart was the sum total of what FM Group owed to McKesson. However, if one were

8  to total the figures that appear in the last column of the chart, the total is $747,474.09 which

9  Tregillis Declaration then concludes is an amount that McKesson demanded from FM Group. But

10  McKesson was not asserting that $747,474.09 was the amount owed by FM Group on October 31,

11  2007 or any other date, and $747,474.09 is not the amount that was sought in the complaint

12  commencing this action (the "Complaint"). The Complaint alleged that as of October 31, 2007 the

13  amount due was $724,574, excluding certain unearned discounts.

14        7.     The reasons for the difference between the aggregate of the face amounts of the

15  Unpaid Invoices (as listed on the chart in Paragraph 5 above) and the amounts demanded in the

16  MSJ are the post-invoice pricing adjustments for credits and add-bills and the like described above.

17  Those pricing adjustments are accounted for on the electronic SMO System that was described in

18  the Original Morgan Declaration. Customers such as FM Group had 24/7 access to the SMO

19  System and could identify what the pricing adjustments were, when they were issued, and cross

20  refer those adjustments to particular invoices or purchases. In addition to electronic, 24/7

21  electronic access to the SMO System, FM Group received by email monthly "Statements"

22  generated by the SMO System. The May 30 Statement that was attached as Exhibit "E" to the

23  Compendium is such a statement. Such monthly statements continue to be emailed to FM Group

24  to an email address for a Ms. Pam Prindle.

25        8.     Because of the dynamic nature of the calculations of what was owing by FM Group

26  on any given day, FM Group managed its payment obligations by referring to the SMO System

27  from computer terminal and then paying all items that were shown as billed seven days earlier and

28  therefore due on that particular day. While accessing the SMO System, FM Group was able to

1   check invoiced amounts and review all the post-invoice adjustments.  At no time until the date that

2   McKesson advised FM Group it would cease shipping unless its accounts were brought current did

3   FM Group dispute any charge on its SMO Statements or on the SMO System, nor did FM Group

4   dispute the integrity of the system overall

5           9.      I am aware that FM Group has stated in its proposed statement of undisputed facts

6   that FM Group's access to the SMO System was terminated on or about September 30, 2007.  This

7   is incorrect.  Access was not terminated, although if there is no activity on an account for six

8   months, a user's "ID" can become inactive.  However, Pam Prindle's "ID" is still active.

9           10.     All invoices issued to FM Group contain the following legend: "THE INVOICE

10  PAYABLE TO MCKESSON DRUG CO. AT ABOVE ADDRESS. CLAIMS MUST BE MADE

11  WITH IN FIVE DAYS AND SHOW DATE OF INVOICE." *See, e.g.*, Exhibit "F" to the

12  Compendium.  FM Group never raised any claim or issue with regard to any Unpaid Invoice.  The

13  Unpaid Invoices that were already delinquent on September 15, 2008 had been outstanding for

14  over six months—well past the five-day dispute period set forth in the Unpaid Invoices.

15          11.     Paragraph 6 of the Tregillis Declaration represents that:

16      The "Total Net Invoice Amount" as reflected in the Unpaid Invoices is $634,726, which is
        significantly lower than the $747,470 identified in McKesson's Motion for Summary
17      Judgment.

18  This statement is incorrect.  The "Total Net Amount" of the Unpaid Invoices was in fact $747,470.

19  However, as was noted above, that figure is not what McKesson claimed was owing to McKesson

20  as of October 31, 2007.  Furthermore, the "Net" amount stated on each invoice is not the relevant

21  data because once FM Group failed to pay on a timely basis, the "Gross" amount is what became

22  payable by FM Group.  The "Net" amount listed on an invoice applied if payment was made timely

23  because the amount then owed is "net" of the 2% timely payment discount.

24          12.     Mr. Tregillis provides a chart in Paragraph 6 to attempt to substantiate that

25  McKesson's data is inconsistent.  The analysis mixes apples and oranges.  The amounts claimed as

26  due by McKesson in the Complaint and in the MSJ came from contemporaneous SMO Statements

27  not solely from the face amounts of the Unpaid Invoices.  Furthermore, Mr. Tregillis misrepresents

28  the source of his data when he labels the second aggregate column with the heading "Per Unpaid

                                                    4

1   Invoices (Bates # MCK 483-566)." The documents referenced by those Bates numbers are not the

2   Unpaid Invoices. Instead, Bates # MCK 483-566 refers to a compilation of pricing data prepared

3   in response to FM Group's discovery. The third column of data on Mr. Tregillis' chart was

4   apparently was pulled from the June 30, 2008 SMO Statement that was produced in discovery.

5         13.     In Paragraph 9 of the Tregillis Declaration, Mr. Tregillis states that he identified

6   "945 line items from the Unpaid Invoices with a listed pricing method of COG, but for which the

7   discount of or WAC was zero. . . ." He contends this is an error and refers the Court to Exhibit "2"

8   of his declaration to detail this observation. The explanation here is the express language of the

9   Supply Agreement. The items listed on Exhibit "2" to the Tregillis Declaration are "over the

10  counter" or "OTC" items. Under the Supply Agreement, OTC items have a 0% adjustment. See

11  Paragraph 5.C of the unredacted Supply Agreement which was filed and served on July 22, 2008.

12        14.     The Tregillis Declaration states in Paragraph 9 that Mr. Tregillis identified "48 line

13  items in which the price charged to Familymeds was higher than WAC." Investigation of this

14  statement indicates all of these items fell within the categories of "Specially Priced Merchandise"

15  which is defined in Paragraph 5.C of the Supply Agreement. (Due to confidentiality concerns I

16  have not quoted the language here but it is located in the unredacted version of the Supply

17  Agreement on page 5.) In fact, 85% of these Specially Priced Merchandise items that were priced

18  higher than WAC relate to products that are manufactured by Wyeth which is a vendor that does

19  not provide customary cash discounts. With regard to this type of pricing adjustment, Paragraph

20  5.E of the Supply Agreement is also relevant.

21

22

23

24

25

26

27

28

15.     In Paragraphs 10 and 11 and the accompanying Exhibits "3" and "4" to the Tregillis

Declaration, the question of "contract pricing" is raised.  A contract-priced item is an item where

FM Group has negotiated directly with a vendor or manufacturer of a particular product for a set

price.  If FM Group enters into such an agreement with a vendor, then the contract price that FM

Group has negotiated with that vendor is the price that FM Group is charged when FM Group

purchases that product through McKesson as the distributor of the vendor's product.  This means

that FM Group had (and presumably has) the data available to it to verify whether the price that

was charged to FM Group is the price that FM Group negotiated with the vendor.  Therefore, Mr.

Tregillis' disquiet in Paragraph 11 of the Tregillis Declaration about 155 line items in which the

contract price was higher than the Cost of Goods price (after the applicable mark down) based on

the assertion that this pricing "appears to be contrary to the purpose of contract pricing" is

misplaced.  The Supply Agreement does not give FM Group the *lower* of the contract price it

negotiated with a vendor or the price that McKesson would offer under the Cost of Goods model,

nor is FM Group guaranteed that it will never pay more than WAC.  If FM Group negotiates a

contract price with a vendor, that's the price that FM Group gets.  This is not a "gotcha" vis a vis

FM Group.  McKesson has no information concerning what other incentives may have been given

to FM Group to agree to a particular contract price for a particular product.  In sum, FM Group gets

the price it negotiated for each contract-priced item and it had (and presumably has) the ability to

verify that it paid the correct price since it was the one that entered into the agreement with the

vendor.

16.     The Tregillis Declaration states in Paragraph 12 that McKesson did not provide any

documentation that demonstrates why certain items are categorized as either "NSP" or "Net

Billed."  This is incorrect.  I explained that "NSP" or "National Specialty Pricing" pertained to caps

and vials sold to FM Group—that is, the containers into which pharmaceutical products are

dispensed—in Paragraph 17 of the Original Morgan Declaration.  (I also explained this in the

informal settlement meeting held on April 22, 2008.)  The NSP price for caps and vials was

WAC—as I also stated in Paragraph 17 of the Original Morgan Declaration.

17.     With regard to "Net Billed" items, McKesson explained in the responses to the interrogatories propounded by Familymeds (a copy of which response is attached as Exhibit "6" to the Declaration of Matthew Kenefick filed in opposition to the MSJ) that Net-Billed Items are the same as Specially Priced Merchandise. The methodology for determining whether a product falls within Specially Priced Merchandise is set forth in Paragraph 5.C of the Supply Agreement, the relevant provisions of which are quoted in Paragraph 14 of this supplemental declaration.

18.     Mr. Tregillis testifies in Paragraph 13 of his declaration that he identified 12 items that were billed under Net Billed and either the Contract or COG method on the same day and he states that Exhibit "5" to the Tregillis Declaration illustrates his findings. In fact, Exhibit "5" shows that the items that were purchased were not identical. In each case where a COG price was indicated and a Net Billed price was indicated for ostensibly the same type of product, the difference is explained by the RXPak program offered by McKesson. Under the RXPak Program, McKesson purchases brand name drugs in large quantities and repackages the drugs into standard count sizes, resulting in a savings to a customer. Closer inspection of Exhibit "5" reveals that there is a distinction between the ostensibly identical products which is revealed in the Description column which refers to "RXPAK" for one item but does not have that notation for the other. Exhibit "5" also reflects that the Item number is different as between the RXPak product and the non-RX Pak product. For example, Vicodin ES Tab 750mg RXPAK 100 is identified as Item no. 3658788 (and is priced under the COG model) and Vicodin ES Tab 750 mg 100 (without any reference to RX Pak) is identified as Item No. 667903 (and is priced under the Net Billed model).

19.     In each of the three instances referred to on Exhibit "5" to the Tregillis Declaration where a the same product appears to have been billed under the Contract model for one order but under the Net Billed category for a different order, the two Pharmacies ordering the product were different and Contract pricing had been negotiated to apply to one Pharmacy, but did not apply to the other. So, Familymeds LTC PHCY 81.5 got a contract price for Keppra Oral Sol 00mg/ml 16 oz. and Familymeds Pharmacy 801 got Net Billed pricing. The difference was a penny.

20.     The Tregillis Declaration states in Paragraph 14 that for 34 items on the Unpaid Invoices "WAC appears to be different" for the same product on the same day. Exhibit "6" to the Tregillis Declaration is said to illustrate this point. This analysis suffers from the same error as did the analysis in Exhibit "5" as described in Paragraph 18 above. The pricing is different as between repackaged products and products that were not repackaged and WAC is different as between the two products. And it is possible to identify the distinction from the data provided by McKesson that is reproduced on Exhibit "6" to the Tregillis Declaration, because the "Description" column contains a reference to "RXPAK" and the item numbers are different. The reasons that one Pharmacy may purchase the "RXPAK" product and another the non-"RXPAK" product are many: one Pharmacy may have designated the item number for the non-RXPAK product, it may prefer the non-RXPAK, or the non-RXPAK may have been the only form of the particular drug available when the order was filled. The bottom line is that WAC did not vary as between the same product on the same day; the products were different.

21.     In Paragraph 17, the Tregillis Declaration takes issue with "41 items in the form of Addbills, Pricing Corrections, Fee Billing, Invoices, and Credits issued after 9/19/07, when Familymeds stopped making purchases from McKesson." The 41 items are listed on a spreadsheet attached as Exhibit "7" to the Tregillis Declaration. I believe I explained in the Original Morgan Declaration and elaborated further in Paragraph 4 above that adjustments often continue to be made to amounts owing by customers for months after the product that generated the later adjustment was purchased by the applicable customer. I will elaborate on some of the information I previously provided to clarify what is a normal phenomenon in the wholesale pharmaceutical business:

(a) Add-Bills: Add-Bills arise in the contract pricing context. If a customer such as FM Group enters into a contract with a vendor whereby FM Group is permitted to purchase Product "A" for $4.00 from that vendor, but the normal price (typically WAC) for that item is $10.00, then when McKesson acting as a distributor sells Product A to FM Group but is only able to charge FM Group $4.00 for Product A, McKesson has the ability to "charge-back" the $6.00 difference to the vendor due to the discount that the vendor agreed to give FM Group. Sometimes, however, the vendor will not honor the chargeback either because the customer

8

1    was not eligible for the discount or for other reasons. In that event, McKesson can pass along

2    its loss from the cancelled chargeback to FM Group in the form of an Add-Bill. Chargebacks

3    and add-bills can take months to work through the system.

4        (b) <u>Invoices</u>. Although McKesson had intended to stop shipping Merchandise to FM

5    group due to nonpayment of the Unpaid Invoices, a few Pharmacies owned or operated by FM

6    Group were able to place orders and have them filled after September 17, 2008.

7        (c) <u>Credits</u>. Credits for returns can occasionally take quite some time to be processed

8    through the system. If a FM Group Pharmacy returned a particular product not to McKesson

9    directly but to a third party processor at a time when the remaining shelf life of the returned

10   product is too short to resell the product, the third party processor holds the product for

11   remaining shelf life—which might be 90 days or more—before returning the product to

12   McKesson. The minimum remaining shelf life of a particular product after which a product

13   cannot be sold to a reseller is a period of time dictated by the underlying vendor. But

14   McKesson has to wait for the actual return which can involve waiting until the expiration of the

15   product at issue. So credits for returns can sometimes trail for quite some time after the invoice

16   for the particular product was issued. In the case of FM Group, ten credits occurred after

17   McKesson ceased shipping product in September, 2007. Given the $60,000,000 relationship

18   between McKesson and FM Group, neither the number of credits nor the timing of those credits

19   is surprising to me.

20       (d) <u>Pricing Corrections</u>. Pricing corrections typically occur when there is a contract price

21   negotiated by a customer that later changes or if a contract price is based on conditions that the

22   customer fails to meet as determined between the customer and the vendor. Here, it appears

23   that one Pharmacy in particular, FAMILYMEDS SPEC PHCY 314, received 16 of the 18

24   pricing corrections listed on Exhibit 7, all of them in November, 2007. The reason that pricing

25   corrections trail the timing of the order is that it can take time for a vendor to notify McKesson

26   of a pricing change or of the fact that FAMILYMEDS SPEC PHCY 314 was not eligible for

27   the contract price charged or that a different contract price should have been charged.

28

9

22.     In Paragraphs 18 and 19, the Tregillis Declaration contends that because the June 30 Statement indicates that six of the Pharmacies underline currently have negative balances, improper service charges were imposed on them.  The explanation here is that it is not significant that a Pharmacy might currently have a negative balance if it previously had a positive balance and became delinquent at the time of the positive balance.  The service charges were calculated automatically by McKesson's billing systems at the time the positive balance existed and the customer became delinquent; those service charges then carry forward on the invoices until they are paid or a credit eliminates them.  Thus, one cannot look at a negative balance on May 30, 2008 and conclude that a service charge that was issued on September 30, 2007 was erroneous.

23.     The $266 late fee that Mr. Tregillis objects to in Paragraph 20 with regard to Pharmacy # 411 that was charged on March 1, 2007 when Pharmacy #411 had no past due invoices on that date, was based all invoices dated and due payable February 12th and before (that is, 15 days earlier).  At that time there was a delinquent balance of $26,628.86 composed of 10 unpaid invoices.  Per the Supply Agreement, McKesson was allowed to charge 1% of the delinquent balance.  The $266 is equal to 1%.

24.     Attached to the Tregillis Declaration as Exhibit "9" is a spreadsheet that is said to list  late charges assessed on September 17, 2007 that appear to be arbitrary to Mr. Tregillis as being neither 1% nor 2%.  Mr. Tregillis does not calculate the late fees correctly, in part because the late fees that are reflected on the Statement were generated off balances that may have been adjusted since the late fee was imposed as was explained in Paragraph 23 above.  In addition, the 1% late penalties are calculated by McKesson's systems invoice by invoice so rounding errors can occur.  The following example based on the $47.81 late charge issued for Arrow Pharmacy 018 which is the fourth line item listed on Exhibit "9" is illustrative.  That entity is reported to have a negative $3,788.66 balance on Exhibit "9."  However, the late charge is not attributable to that particular balance.  The late charge was calculated on earlier positive and past due balances as follows:

10

| Doc # | Net Due Date | Billing Date | GROSS Amt | 1% of GROSS Amt |
|---|---|---|---|---|
| 7297210984 | 3082007 | 3012007 | 3,379.08 | 33.79 |
| 7297210986 | 3082007 | 3012007 | 14.82 | 0.15 |
| 7296781174 | 3052007 | 2262007 | 4,151.61 | 41.52 |
| 7296781177 | 3052007 | 2262007 | 4,417.43 | 44.17 |
| 7296781183 | 3052007 | 2262007 | 1,142.80 | 11.43 |
| 7297243319 | 3012007 | 3012007 | -8,325.36 | -83.25 |
| | | | **4,780.38** | **47.81** |

This example also illustrates how a rounding error can occur because late charges are calculated invoice by invoice.

25.    Mr. Tregillis objects in Paragraph 18 of his Declaration that McKesson should have offset credit and debit balances across Pharmacies. But that is not what the Supply Agreement provides. The Supply Agreement clearly states in Paragraph 4.E that late charges are imposed when any payment is past due; no netting as between Pharmacies is contemplated or required. Paragraph 4.E reads:

> Any payments made after the due date indicated shall result in a two percent (2%) (or the maximum amount permissible under applicable law, if lower) increase in the purchase price of the Merchandise. A one percent (1%) service charge (or the maximum amount permissible under applicable law, if lower) will be imposed semi-monthly on all balances delinquent more than fifteen (15) days.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 6th day of August, 2008 at Montvale, New Jersey.

LESLIE MORGAN

11