1 | MARIA K. PUM (State Bar No. 120987)
  | KRISTEN E. CAVERLY (State Bar No. 175070)
2 | HENDERSON & CAVERLY LLP
  | P.O. Box 9144 (all U.S. Mail)
3 | 16236 San Dieguito Road, Suite 4-13
  | Rancho Santa Fe, CA 92067-9144
4 | Telephone:   (858) 756-6342
  | Facsimile:   (858) 756-4732
5 | Email: mpum@hcesq.com

6 | Attorneys for Plaintiff and Counter-defendant
  | McKESSON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| McKESSON CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br>v.<br><br>FAMILYMEDS GROUP, INC., f/k/a Drugmax, Inc., a Connecticut corporation,<br><br>Defendant. | Case No.4:07-cv-05715 WDB<br><br>**EVIDENTIARY OBJECTION BY MCKESSON CORPORATION TO DECLARATION OF EDGARDO MERCADANTE DATED JULY 30, 2008**<br><br>Complaint Filed: November 9, 2007<br>Cross-Complaint Filed: December 17, 2007 |
| FAMILYMEDS GROUP, INC., f/k/a Drugmax, Inc., a Connecticut corporation,<br><br>Counterclaimant,<br>v.<br><br>McKESSON CORPORATION, a Delaware corporation,<br><br>Counterdefendant. | Date:  August 20, 2008<br>Time:  1:30 p.m.<br>Place: Ctrm 4<br>       1301 Clay St., 3d Floor<br>       Oakland, CA<br><br>Judge: Honorable Wayne D. Brazil<br><br>Trial Date: None Set |
| FAMILYMEDS, INC., a Connecticut corporation,<br><br>Cross-Complainant,<br>v.<br><br>McKESSON CORPORATION, a Delaware corporation,<br><br>Cross-Defendant. | |

McKESSON CORPORATION ("McKesson") hereby objects to the Declaration of Edgardo Mercadante, dated July 30, 2008, in opposition to McKesson's motion for summary judgment or in the alternative summary adjudication of issues.

1. Paragraph 7, lines 7-15

> I have reviewed the records from the Delaware Secretary of State, true and correct copies of which are attached hereto as **Exhibit 2**, which indicate that on August 30, 2005, McKesson's wholly owned subsidiary, Spirit Acquisition Corporation, a Delaware corporation, merged with and into D&K Healthcare Resources, Inc. leaving D&K Healthcare Resources, Inc., a Delaware corporation, as the surviving corporation and thereby rendering D&K Healthcare Resources, Inc. a wholly-owned subsidiary of McKesson. These records indicate that on January 1, 2006, D&K converted from being a Delaware corporation into a Delaware limited liability company, and has thereafter remained as a Delaware limited liability company with McKesson as its sole member.

McKesson objects to the above as (i) irrelevant (FRE 402); (ii) hearsay (FRE 802); and (iii) impermissible lay opinion (FRE 701).

2. Paragraph 11, lines 1-4

> Following McKesson publically announcing its acquisition of D&K, in August 2005, Ned McKenna and Ana Schrank of McKesson contacted Jim Searson of Familymeds and myself. They explained that McKesson would require the First Agreement to be amended to reflect McKesson pricing and payment structures.

McKesson objects to the above as (i) parol evidence; (ii) irrelevant (FRE 402); and hearsay (FRE 802).

3. Paragraph 17, at page 3 lines 23-28 and page 4 lines 1-3

> There are different categories of pharmacies. There is a distinction between a retail pharmacy, a clinic pharmacy, a worksite pharmacy, and a pharmacy which is operated as a long term care pharmacy. During the time periods relevant to this lawsuit, Familymeds owned and operated a collective number of 91 pharmacies. Of these, 41 were retail pharmacies, 44 were clinic pharmacies, three (3) were long term care pharmacies, and three (3) were worksite pharmacies (Familymeds' clinic, long term care, and worksite pharmacies are collectively referred to as "**non-retail pharmacies**"). Attached hereto as **Exhibit 3** is a true and correct copy of a spreadsheet identifying these pharmacies. The term apothecary, as used herein, is term to describe retail community pharmacies.

McKesson object to the above as (i) parol evidence, (ii) improper lay opinion (FRE 701);

1

and (iii) irrelevant in that declarant does not explain what "distinction" allegedly exists other than the self-serving names chosen by declarant to create a dispute of fact (FRE 402).

4. Paragraph 18, lines 4-14

> The Supply Agreement distinguishes between payment terms for products delivered to Familymeds' retail pharmacies as opposed to those delivered all categories of Familymeds' pharmacies, as indicated on the First Amendment (which McKesson drafted and negotiated). This was a bargained for distinction. The pertinent provisions of the First Amendment, as compared against the correlating provisions of the Supply Agreement are as follows:

First Amendment at Paragraph 10 (amending Section 9.A):

> Payment for Products delivered to Customer's store locations shall be due and payable by wire payment fourteen (14) days from the date of invoice.

Supply Agreement at Paragraph 4.A:

> Payment of Merchandise delivered to Customer's **retail Pharmacies** shall be paid by Customer as follows: Invoices are due and payable within seven days from invoice date via EFT or ACH. (Emphasis added.)

McKesson objects to the above as (i) parol evidence; (ii) hearsay (FRE 802); and (ii) improper lay opinion (FRE 701).

5. Paragraph 19, lines 16-22

> Based on my involvement with the negotiation and drafting of the First Amendment and the Supply Agreement, it is my understanding that the seven (7) day payment terms of the Supply Agreement only applied to invoices for merchandise delivers to Familymeds' retail pharmacies, and therefore, expressly do not apply to invoices for merchandise delivered to Familymeds' non-retail pharmacies. Accordingly, any service fees charged by McKesson to Familymeds for Familymeds' alleged failure to pay within seven (7) days for goods delivered to Familymeds' non-retail pharmacies were erroneous and improper.

McKesson objects to the above as (i) parol evidence; (ii) hearsay (FRE 802); and improper lay opinion (FRE 701).

6. Paragraph 24, lines 21-25

> Following McKesson's acquisition of D&K and during the course of the First Amendment and Supply Agreement, Familymeds made repeated inquiries to McKesson about pricing discrepancies, at multiple levels, as part of its regular and ordinary business routine, practice, habit, process and procedure; however, none of the key data discussed in Paragraph 23 above was provided to Familymeds.

McKesson objects to the above as (i) hearsay (FRE 802); irrelevant (FRE 402).

7. Paragraph 25, page 5 lines 27-28

> On September 17, 2007, Ana Schrank of McKesson informed Familymeds that McKesson was terminating the Supply Agreement.

McKesson objects to the above as (i) hearsay (FRE 802); and (ii) irrelevant (FRE 402).

8. Paragraph 25, page 5 line 28 and page 6 lines 1-2

> As this stood to be the conclusion of Familymeds' business relationship with McKesson, I wanted to conduct an audit of Familymeds' dealings with McKesson. This is standard practice.

McKesson objects to the above as (i) irrelevant (FRE 402); (ii) lack of foundation (FRE 602); and (iii) improper lay opinion (FRE 701).

9. Paragraph 26, lines 3-11

> I thereafter conducted an investigation of Familymeds' dealings with McKesson under the Supply Agreement and the transactions which occurred under the First Amendment following McKesson's acquisition of D&K (the "Audit"). Familymeds, however, had very limited information from McKesson. McKesson maintained exclusive possession and control of most of the information pertaining to the transactions under the Supply Agreement. I performed the Audit using the information I had available, my extensive experience in the pharmaceutical industry, as well as my education, training, and background. In addition to examining transactions which occurred under the First Amendment following McKesson's acquisition of D&K, the Audit included examination of the following areas pertaining to the Supply Agreement:
>
> a) **Generic Drugs**. Under Paragraph 9 of the Supply Agreement, Familymeds was required to participate in the McKesson OneStop Generics Program. This accounted for approximately 12% of all of Familymeds' purchases under the Supply Agreement (12% of $60,286,260.38 = $7,234,351.25). In examining the prices McKesson charged Familymeds for generics drugs, I examined the average generic deflation in prices extended to wholesalers, chain pharmacies, independent pharmacies and other groups at product cost level according to the National Association of Chain Drug Stores ("NACDS") prescription statistics for prescription programs (the "Deflation Amount"). The Deflation Amount aggregate cost price decreases are weighted towards new product generic introductions that rapidly go down in pricing after their single source manufacturer availability is exhausted and many other manufacturers produce the individual generic product. This is very important in the pharmaceutical industry, which is based on very small profit margins, because insurers and

3

third-party adjusters reduce the price they pay the pharmacies such as Familymeds to reflect the Deflation Amount. Based on my research, I determined that the Deflation Amount was approximately 16.5% in 2005 and approximately 17% in 2006. This equates to an average price decrease of 0.32% (32 basis points) per week during 2005 and 0.33% (33 basis points) per week during 2006. Based on my expertise, I concluded that the 2006 amount was properly extrapolated through the year of 2007. I reviewed a statistically significant sample of invoices and discovered that McKesson and decreased its generic prices to Familymeds on an average of fourteen (14) days after the various manufacturers had issued their respective price decreases into market/industry. These figures applied extend to $47,746.72 in overcharges for generics under the Supply Agreement (2 week average delay @0.33% per week applied the $7,234,351.25 in estimated generic purchases under the Supply Agreement). This does not take into account the $143,821,796.69 invoiced by McKesson under the First Amendment or the $1,071,723.72 invoiced by McKesson under the First Agreement. Based on this, I concluded there was a high likelihood of significant overchargers under the Supply Agreement and the underlying documentation pertaining to generic purchases would enable Familymeds to determine the existence and scope of these overcharges.

  b) **Specially Priced Merchandise**. Review of a statistically significant sample of invoices and data which was available from the SMO )and which Familymeds no longer has access to) revealed that under the Supply Agreement McKesson categorized approximately 6.5% of all non-generic drug purchases under the Specially Priced terms (Paragraph 5.C of the Supply Agreement) (6.5% of $60,286,260.38 = $3,918,606.92). McKesson, however had previously invoiced Familymeds for many of the same exact products under the Cost Plus pricing structure. McKesson had provided to Familymeds absolutely no explanation, notice, or reasoning for its change in billing categories for these items. These invoices also revealed that McKesson invoiced Familymeds, on the average, 2.3% (230 basis points) greater in cost per line extension under Specially Priced program than it previously had for that same merchandise under the Cost Plus structure. These figures applied extend to $90,127.96 in overcharges for non-generic drugs being improperly mis-categorized as Specially Priced under the Supply Agreement (2.3% overcharge extended to $3,918,606.92 in non-generic drug purchases). This does not take into account the $143,821,796.69 invoiced by McKesson under the First Amendment or the $1,071,723.72 invoiced by McKesson under the First Agreement. Based on this, I concluded there was a high likelihood of significant overcharges under the Supply Agreement and the underlying documentation pertaining to Specially Priced categorization of products would enable Familymeds to determine the existence and scope of these overcharges.

  c)  **Cost Plus Pricing**. In evaluating the McKesson invoices under the Supply Agreement for products invoiced pursuant to the Cost Plus structure (Paragraph 5.B of the Supply Agreement), I first determined that the drug price inflation according to the General Accounting Office and the NACDS was 4.5% for 2005 and 4.75% for 2006. I then examined a statistically significant sample of invoices for the products invoiced under the Cost Plus pricing structure under the Supply Agreement, and determined that the invoices originated by McKesson during the same time periods under the Cost-Plus structure increased by 8.3% in 2005 and 7.8% in 2006. Prompted by this discrepancy, I sampled a statistically significant number of brand name high volume pharmaceuticals and commonly re-occurring products which appeared in thousands of invoices. Based on information provided by the manufacturers of these drugs, I discovered that the "best volume" purchasers of these products, such as McKesson, were extended rebates and pricing incentives, which included fixed price buy-in privileges. From the invoices I sampled, I could not discern whether any of these incentives orrebates were passed-on to Familymeds pursuant to the terms of the Supply Agreement. Based on this, I concluded there was a high likelihood of significant overcharges under the Supply Agreement and the underlying documentation pertaining to Cost-Plus pricing would enable Familymeds to determine whether McKesson, in-fact, honored the Cost-Plus terms of the Supply Agreement.

  d)  **Contract Products**. Under Paragraph 5.B of the Supply Agreement, McKesson was obligated to extend to Familymeds "bid price" for Contract Products. Based on my review of a statistically significant sample of invoices, I determined that McKesson had not honored the bid price arranged by contacts Familymeds entered through the Group Purchasing Organizations of Armada HealthCare and Med Assets for an estimated $53.5 million in product. Based on my calculations, I determined that McKesson overcharged Familymeds approximately 0.5% on these purchases by failing to honor bid-price ($267,500.00). Based on this, I concluded there was a high likelihood of significant overcharges under the Supply Agreement and the underlying documentation pertaining to Contract Product pricing would enable Familymeds to determine whether McKesson, in-fact, honored the Contract Pricing terms of the Supply Agreement.

McKesson objects to the above as (i) improper lay opinion (FRE 701), (ii) lacking foundation (FRE 602); and referring to matter outside the record (FRCP 56(e)).

DATED: August 6, 2008.  HENDERSON & CAVERLY LLP

By: _____
  Maria K. Pum
Attorneys for MCKESSON CORPORATION,
Plaintiff and Counter-defendant

5